# EXHIBIT 1

US011216802B2

(12) **United States Patent**
Overholser et al.

(10) **Patent No.:**    **US 11,216,802 B2**
(45) **Date of Patent:**    **Jan. 4, 2022**

(54) **SELF-ENFORCING SECURITY TOKEN IMPLEMENTING SMART-CONTRACT-BASED COMPLIANCE RULES CONSULTING SMART-CONTRACT-BASED GLOBAL REGISTRY OF INVESTORS**

(71) Applicant: **tZERO IP, LLC**, New York, NY (US)

(72) Inventors: **Scott Overholser**, Salt Lake City, UT (US); **Robert Christensen**, Sandy, UT (US); **Nicole Sanders**, Cottonwood Heights, UT (US); **Justin Wilson**, Draper, UT (US); **Robert Valmassoi**, New York, NY (US); **Chase Lester**, West Jordan, UT (US); **Michael William Stuart Smith**, Provo, UT (US)

(73) Assignee: **tZERO IP, LLC**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 47 days.

(21) Appl. No.: **16/536,940**

(22) Filed: **Aug. 9, 2019**

(65) **Prior Publication Data**

US 2020/0051067 A1      Feb. 13, 2020

**Related U.S. Application Data**

(60) Provisional application No. 62/881,121, filed on Jul. 31, 2019, provisional application No. 62/715,543, (Continued)

(51) **Int. Cl.**
**G06Q 20/36**          (2012.01)
**H04L 29/06**          (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ....... **G06Q 20/367** (2013.01); **G06F 16/1834** (2019.01); **G06Q 20/0658** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ............. G06Q 20/367; G06Q 20/0658; G06Q 20/389; G06Q 20/3672; G06Q 20/405;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

9,819,670 B2      11/2017   Bhat et al.
2017/0011460 A1*    1/2017   Molinari ............... G06F 21/645
(Continued)

FOREIGN PATENT DOCUMENTS

JP        2018521437  A      8/2018
WO        2017145019  A1      8/2017

OTHER PUBLICATIONS

Regulation A—Conditional Small Issues Exemption, from the electronic code of Federal Regulations, sections 230.251 through 230.263, 22 pages, Apr. 20, 2015 (Year: 2015).*

(Continued)

*Primary Examiner* — James D Nigh
(74) *Attorney, Agent, or Firm* — Fogg & Powers LLC

(57)        **ABSTRACT**

A network node that includes at least one processor, at least one memory, and at least one network interface is disclosed. The network node is part of a peer-to-peer network of network nodes implementing a distributed ledger. The network node is communicatively coupled to at least one remotely located computing device through the at least one network interface. The at least one processor is configured to receive, from a remotely located computing device, a request to transfer a security token. The at least one processor is also configured to execute a plurality of compliance rules associated with the security token. At least one of the compliance rules is implemented using at least one smart contract. The at least one smart contract references a global

(Continued)



## US 11,216,802 B2

Page 2

registry. The at least one processor is also configured to transfer the security token based on the execution of the compliance rules.

**19 Claims, 7 Drawing Sheets**

### Related U.S. Application Data

filed on Jul. 8, 2019, provisional application No. 62/717,575, filed on Aug. 10, 2018.

(51) **Int. Cl.**

| | |
|---|---|
| *H04L 9/32* | (2006.01) |
| *G06Q 20/06* | (2012.01) |
| *G06Q 20/38* | (2012.01) |
| *G06F 16/182* | (2019.01) |
| *G06Q 20/40* | (2012.01) |

(52) **U.S. Cl.**
CPC ....... *G06Q 20/3672* (2013.01); *G06Q 20/389* (2013.01); *G06Q 20/405* (2013.01); *H04L 9/3236* (2013.01); *H04L 63/20* (2013.01); *G06Q 2220/00* (2013.01); *H04L 2209/38* (2013.01); *H04L 2209/56* (2013.01)

(58) **Field of Classification Search**
CPC ............. G06Q 20/065; G06Q 20/3678; G06Q 2220/00; H04L 63/20; H04L 63/12; H04L 9/3236; H04L 9/3239; H04L 2209/56; H04L 2209/38; H04L 2463/102
USPC .......................................................... 705/65
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2017/0223012 | A1 | 8/2017 | Xu et al. | |
| 2018/0240107 | A1* | 8/2018 | Andrade | G06Q 20/36 |
| 2019/0251629 | A1* | 8/2019 | Gordon, III | G06Q 20/3821 |
| 2019/0333051 | A1* | 10/2019 | Brogger | G06Q 20/3678 |
| 2019/0349372 | A1* | 11/2019 | Smith | H04L 9/3265 |
| 2019/0377724 | A1* | 12/2019 | Pennington | G06Q 20/223 |
| 2020/0051072 | A1* | 2/2020 | Black | G06Q 20/3224 |
| 2020/0320222 | A1* | 10/2020 | Zhou | H04L 9/3247 |

#### OTHER PUBLICATIONS

Regulation D—Rules Governing the Limited Offer and Sale of Securities Within Registration under the Securities Acto of 1933, sections 230.500 through 230.508, 22 pages, Oct. 9, 2020 (Year: 2020).*

Regulation S—Rules Governing Offers and Sales made outside the United States without Registrations under the Securities Act of 1933, sections 230.901 through 230.905, 16 pages, Dec. 17, 2007 (Year: 2007).*

DTC Chills and Freezes, SEC.gov, 3 pages, May 1, 2012 (Year: 2012).*

International Searching Authority, "International Search Report and Written Opinion from PCT Application No. PCT/US2019/045910", from Foreign Counterpart to U.S. Appl. No. 16/536,940, filed Dec. 5, 2019, pp. 1-13, Published: WO.

Omar et al., "Identity Management in IoT Networks Using Blockchain and Smart Contracts", IEEE Conference on Internet of Things,

Green Computing and Communications, Cyber, Physical and Social Computing, Smart Data, Blockchain, Computer and Information Technology, Congress on Cybermatics, Jul. and Aug. 2018, pp. 994-1000, IEEE.

Watkins, "Defining and Verifying Accredited Investors: Effect of Potential SEC Changes on North Carolina's Crowdfunding Statute, the NC PACES Act", Banking and Finance Law Commons, Mar. 1, 2017, pp. 1-33, vol. 21, Issue 1, Article 22, UNC School of Law.

"GAS explosion as NEO not divisible", NEO, 2018 or at least as early as Jun. 13, 2019, pp. 1-4.

"GoChain Development Updates—Upgradable Smart Contracts & Development Insights", GoChain, Dec. 31, 2018, pp. 1-4.

"Introduction to Smart Contracts A Simple Smart Contract", Solidity 0.509 documentation, at least as early as Jun. 17, 2019, pp. 1-11.

"List of All Functions", robin-stocks 1.0.0 documentation, at least as early as Jun. 13, 2019, pp. 1-14.

"Trading Glossary", TradeStation, at least as early as Jun. 13, 2019, pp. 1-29.

Araoz, "Proxy Libraries in Solidity", Zeppelin Blog, Mar. 6, 2017, pp. 1-6.

Augustol, "ERC930—Eternal Storage Standard", ethereum/EIPs, Mar. 14, 2018, pp. 1-7, Issue #930, GitHub.

Bayequentist, "Will the total supply of IOTA tokens ever increase?" Iota Beta, Nov. 30, 2017, pp. 1-3.

Beers, "Understand the What and Why of Stock Splits", Stock Trading Strategy & Education, Apr. 25, 2019, pp. 1-8, Investopedia.

Chawla, "How to write upgradeable contracts in solidity!", Apr. 25, 2018, pp. 1-15.

Editordavid, "Could Blockchain-Based Fractions of Digitized Stocks Revolutionize Markets", Slashdot, Mar. 10, 2019, pp. 1-14.

Eha, "Capital markets foe seeks an end run via blockchain", American Banker, Jan. 5, 2018, pp. 1-9.

Ganti, "Reverse Stock Split", Corporate Finance & Accounting, Apr. 1, 2019, pp. 1-8, Investopedia.

Gucluturk, "The DAO Hack Explained: Unfortunate Take-off of Smart Contracts", at least as early as Jun. 17, 2019, pp. 1-8.

Hamlin, "This Week in Blockfolio Signal", Blockfolio Blog, Apr. 26, 2019, pp. 1-11.

Haris, "Upgradable Smart Contracts Made Easy", Hacker Noon, Oct. 19, 2018, pp. 1-10.

Nadolinski et al., "Proxy Patterns", ZeppelinOS Blog, Apr. 19, 2018, pp. 1-16.

Palladino, "Malicious backdoors in Ethereum Proxies", Nomic Labs, Jun. 1, 2018, pp. 1-8.

Petethomas, "Blockchain startup R3 sues competitor Ripple", Hacker News Sep. 8, 2017, pp. 1-8.

Reeder, "Upgradeable Smart Contracts are Here!", GoChain, at least as early as Jun. 17, 2019, pp. 1-5.

Reeder, "Upgradeable Smart Contracts", gochain/gip, Aug. 2, 2018, pp. 1-2, Issue #22, GitHub.

Sag, "Delaware General Corporations Law (DGCL) compatible share token", GitHub, Feb. 14, 2018, pp. 1-6.

Spagnuolo, "Upgradeability using Unstructured Storage", Technical, Apr. 13, 2018, pp. 1-8, ZeppelinOS Blog.

Tanner, "Summary of Ethereum Upgradeable Smart Contract R&D", Indorse, Mar. 5, 2018, pp. 1-9.

Vogelsteller, "ERC-20 Token Standard", Nov. 19, 2015, pp. 1-4, GitHub.

Japanese Patent Office, "Notice of Reason for Rejection from JP Application No. 2021-506681", from Foreign Counterpart to U.S. Appl. No. 16/536,940, filed Sep. 10, 2021, pp. 1 through 16, Published: JP.

Saitoh et al. "All about the latest blockchain", Apr. 15, 2018, pp. 1 through 10.

* cited by examiner



**FIG. 1**



*FIG. 2A*



FIG. 2B



300

ISSUE SECURITY TOKEN
302

RECEIVE, FROM A REMOTELY LOCATED COMPUTING DEVICE, A
REQUEST TO TRANSFER THE SECURITY TOKEN
304

EXECUTE A PLURALITY OF COMPLIANCE RULES ASSOCIATED
WITH THE SECURITY TOKEN, WHEREIN AT LEAST ONE OF THE
COMPLIANCE RULES IS IMPLEMENTED USING AT LEAST ONE
SMART CONTRACT, WHEREIN THE AT LEAST ONE SMART
CONTRACT REFERENCES A GLOBAL REGISTRY
306

TRANSFER THE SECURITY TOKEN BASED ON THE EXECUTION OF
THE COMPLIANCE RULES, WHEREIN THE TRANSFER INCLUDES
UPDATING A TABLE OF BALANCES IN THE SECURITY TOKEN
308

RECORD A TRANSACTION OF THE SECURITY TOKEN ON A
DISTRIBUTED LEDGER
310

*FIG. 3*



FIG. 4

U.S. Patent     Jan. 4, 2022     Sheet 6 of 7     US 11,216,802 B2



*FIG. 5*

U.S. Patent          Jan. 4, 2022          Sheet 7 of 7          US 11,216,802 B2



**FIG. 6**

US 11,216,802 B2

**1**

# SELF-ENFORCING SECURITY TOKEN IMPLEMENTING SMART-CONTRACT-BASED COMPLIANCE RULES CONSULTING SMART-CONTRACT-BASED GLOBAL REGISTRY OF INVESTORS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Patent Application Ser. No. 62/717,575 filed on Aug. 10, 2018, entitled "SELF-ENFORCING SECURITY TOKEN IMPLEMENTING SMART-CONTRACT-BASED COMPLIANCE RULES CONSULTING SMART-CONTRACT-BASED GLOBAL REGISTRY OF INVESTORS"; U.S. Provisional Patent Application Ser. No. 62/871,543 filed on Jul. 8, 2019, entitled "SPLITTABLE SECURITY TOKEN"; and U.S. Provisional Patent Application Ser. No. 62/881,121 filed on Jul. 31, 2019, entitled "UPGRADEABLE SECURITY TOKEN"; all of which are hereby incorporated herein by reference.

This application is related to the following co-pending U.S. patent applications, which are hereby incorporated herein by reference:

U.S. patent application Ser. No. 16/536,866 entitled "SPLITTABLE SECURITY TOKEN" and filed on even date herewith, which is hereby incorporated herein by reference; and

U.S. patent application Ser. No. 16/536,963 entitled "UPGRADEABLE SECURITY TOKEN" and filed on even date herewith, which is hereby incorporated herein by reference.

## BACKGROUND

Currently, cryptographic tokens are used in connection with various aspects of blockchains. In examples, smart contracts implemented on an Ethereum blockchain enable the creation and issuance of tokens with complex behaviors attached to them. Ethereum Request for Comments 20 (ERC20) is a technical standard used for smart contracts (on the Ethereum blockchain) implementing tokens. The ERC20 standard is incorporated by reference in its entirety. Additionally, other methods may be implemented in order to satisfy Title 8 of the Delaware Code Relating to the General Corporation Law.

## SUMMARY

A network node that includes at least one processor, at least one memory, and at least one network interface is disclosed. The network node is configured to be within a plurality of network nodes communicatively coupled in a peer-to-peer network of network nodes implementing a distributed ledger. The network node is configured to be communicatively coupled to at least one remotely located computing device through the at least one network interface. The at least one processor is configured to receive, from a remotely located computing device, a request to transfer a security token. The at least one processor is also configured to execute a plurality of compliance rules associated with the security token. At least one of the compliance rules is implemented using at least one smart contract. The at least one smart contract references a global registry. The at least

**2**

one processor is also configured to transfer the security token based on the execution of the compliance rules.

## DRAWINGS

Understanding that the drawings depict only exemplary embodiments and are not therefore to be considered limiting in scope, the exemplary embodiments will be described with additional specificity and detail through the use of the accompanying drawings, in which:

FIG. **1** is a block diagram of an example system using security tokens implementing smart-contract-based compliance rules that reference a global registry of investors;

FIG. **2A** is a block diagram illustrating a data structure used in the system illustrated in FIG. **1**;

FIG. **2B** is a block diagram illustrating a hierarchy of entities in the system illustrated in FIG. **1**;

FIG. **3** is a flow diagram illustrating a method for transferring a self-enforcing security token;

FIG. **4** is a flow diagram illustrating a method for executing at least one compliance rule;

FIG. **5** is a block diagram illustrating an example computer system with which embodiments of the present disclosure may be utilized; and

FIG. **6** is a block diagram illustrating another example computing device with which embodiments of the present disclosure may be utilized.

In accordance with common practice, the various described features are not drawn to scale but are drawn to emphasize specific features relevant to the exemplary embodiments.

## DETAILED DESCRIPTION

In the following detailed description, reference is made to the accompanying drawings that form a part hereof, and in which is shown by way of illustration specific illustrative embodiments. However, it is to be understood that other embodiments may be utilized and that logical, mechanical, and electrical changes may be made. Furthermore, the method presented in the drawing figures and the specification is not to be construed as limiting the order in which the individual steps may be performed. The following detailed description is, therefore, not to be taken in a limiting sense.

Under regulations promulgated by the Securities and Exchange Commission (SEC), certain individuals may qualify to purchase tokens. In examples, this could apply to an asset that is regulated under SEC Regulation D, Regulation S, and/or Regulation A. Under these Regulations, certain individuals can qualify to transact at different times if they qualify under various exemptions to the regulations. Under U.S. federal securities laws, a company that offers or sells its securities must register the securities with the SEC or find an exemption from the registration requirements. For some exemptions, such as Rule 506 of Regulation D, a company may sell securities to an individual referred to as an accredited investor, which is defined in Rule 501 of Regulation D. There are also other exceptions under other parts of Regulation D, Regulation S, Regulation A, etc. As used herein, Regulation A refers to any of Rules 251-263 of Regulation A (as found in 17 C.F.R. § 230.251-230.263); Regulation D refers to any of Rules 501-506 of Regulation D (as found in 17 C.F.R. § 230.501-230.506); and Regulation S refers to any of Rules 901-905 of Regulation S (as found in 17 C.F.R. § 230.901-230.905).

Recently, the SEC has determined that cryptographic tokens may be considered securities based on individual

US 11,216,802 B2

3

circumstances. Many initial coin offerings (ICOs) are restricted to users that are outside the United States and other territories with strict securities regulation in order to avoid application of securities laws. However, this restriction limits the pool of investors and/or users that may purchase tokens.

In the examples described herein, a smart contract for a security token can reference (or include) at least one compliance rule to self-enforce compliance with applicable securities regulations. In examples, the at least one compliance rule includes commands to check for compliance with SEC Regulation D, Regulation S, or Regulation A. In some examples, at least one compliance rule verifies that specific users meet the requirements for purchase of a regulated token. In examples, at least one compliance rule determines whether the buyer qualifies as an accredited investors under Rule 501 of Regulation D.

One potential problem for security token transactions is the transfer of a security token to and/or from an investor that does not qualify under an exemption to the SEC regulations. Violations of SEC regulations can result in steep fines and/or criminal penalties. It is desirable to prevent security token transactions not complying with SEC regulations from being executed. Aside from possible fines and/or criminal penalties, an inadvertent violator of the SEC regulations may not be able to subsequently sell their security token(s) following a non-compliant purchase.

The examples described herein implement a self-enforcing security token. Specifically, the security token may include at least one compliance rule (or a pointer to compliance rule(s)) that reference a global registry of investors. The registry may include attributes of the investors so that the at least one compliance rule can determine whether a security token transaction complies, if necessary, with SEC regulations.

The examples described herein may be compatible with a custodial model where custodians hold security tokens on behalf of investors and/or broker dealers. However, the systems herein are also compatible with non-custodial models, e.g., where investors and/or broker dealers hold their security tokens directly with fewer or no intermediaries.

Various method names may be used herein as examples. It should be appreciated that any method names are illustrative in purpose, and not limiting. Additionally, optional devices and method steps are indicated with dashed lines in the Figures.

FIG. **1** is a block diagram of an example system **100** using security tokens **102** implementing smart-contract-based compliance rules **106** that reference a global registry **108** of investors. The system **100** may include one or more security tokens **102**, a global registry **108**, a system owner **112**, an issuer **114**, and at least one network node implementing a distributed ledger **122**. The system **100** may also include various optional entities and/or devices, as described below.

A security token **102** is a cryptographic token that represents a security. A security may be any fungible, negotiable financial instrument that holds some type of monetary value. A security may represent an ownership position, a creditor relationship, or rights to ownership as represented by an option. Examples of securities include, without limitation, a piece of real property, at least one commodity, a piece of personal property, at least one bond, at least one derivative, at least one future, at least one fund, at least one currency fund, at least one exchange traded fund, at least one mutual fund, at least one index fund, at least one bond fund, at least one commodity fund, and/or at least one real estate fund. In examples, each security token **102** may represent a single

4

share of a company. The security token **102** may be implemented as a smart contract on (e.g., stored on) a distributed ledger **122** (e.g., a blockchain).

An investor **120** may be a person or entity that has previously, or is considering, receiving or transferring a security token **102**. In examples, an investor **120** may be a customer of a broker dealer **118** (or directly of the custodian **116**), where the investor **120** may send orders to the broker dealer **118** (or directly to the custodian **116**) relating to the purchase and/or sale of one or more security tokens **102**. Alternatively, an investor **120** may be an "external investor" that does not need to connect to a broker dealer **118** or a custodian **116**. Instead, an external investor may call the relevant methods described herein to initiate security token transactions, e.g., methods in the token **102** itself and/or the global registry **108**, described below. An investor **120** may qualify under one or more exemptions to the SEC regulations (i.e., Regulation A, Regulation D, and/or Regulation S), thereby enabling the investor **120** to participate in security token **102** transactions as a buyer and/or a seller.

The term "security token transaction" or similar refers to any transfer of a security token **102**, and may be used to describe an issuance, offering, gift, purchase, sale, and/or employee compensation carried out with the transfer of the security token **102**. A security token **102** transaction may transfer a quantity of security tokens **102** from one or more input transaction addresses (belonging to one or more investors **120**, broker dealers **118**, and/or custodians **116**) to one or more output transaction addresses (belonging to one or more investors **120**, broker dealers **118**, and/or custodians **116**). As used herein, the terms "buyer" and "seller" refer to investors **120** that are transferring and receiving a security token **102**, respectively.

In examples, compliance rules **106** may not be automatically triggered for some (e.g., on-exchange) transactions where the security token **102** itself is not updated to reflect the transaction, e.g., because a security token exchange **124** may enforce applicable SEC regulations. Optionally, the security token exchange **124** may independently call the compliance rules **106**. In contrast, compliance rules **106** may be automatically triggered for peer-to-peer or other off-exchange transactions. In other words, security token **102** transactions invoking the transfer function **109** in the security token **102** may automatically trigger the compliance rules **106**, while transactions not invoking the transfer function **109** in the security token **102** (e.g., on-exchange) may not automatically trigger the compliance rules **106** (although the compliance rules **106** may be called by means other than the transfer function **109** in the security token **102**). For off-ledger transactions, if an investor **120** makes a deposit at a broker-dealer **118**, the security tokens **102** will be held on deposit at a custodian **116** that is whitelisted (according to the SEC Regulations). The security token exchange **124** would then facilitate trades off-ledger. Compliance issues may be handled in a traditional manner. Withdrawals to an investor **120** wallet may also trigger one or more compliance rules **106**.

Preferably, the system **100** includes at least one compliance rule **106** that is/are external to the security token **102**. Alternatively, the at least one compliance rule **106** may be stored in the security token **102**. Alternatively, configurations not using any compliance rules **106** are also possible, e.g., the default behavior might be to approve all transactions without respect to any compliance rules **106**. Optionally, one or more security tokens **102** in the system **100** may reference one or more compliance rules **106**, while one or

US 11,216,802 B2

5                                                                                6

more other security tokens 102 in the system 100 may not reference any compliance rules 106.

Additionally, the different compliance rule(s) 106 may be referenced depending on the types of entities involved in the security token 102 transaction. For example, custodian 116 to broker dealer 118 transactions, broker dealer 118 to custodian 116 transactions, custodian 116 to custodian 116 transactions, and/or broker dealer 118 to broker dealer 118 transactions (i.e., security token 102 transactions not involving investors 120) may reference few or no compliance rules 106. In contrast, security token 102 transactions involving investors 120 may reference more compliance rules 106 than security token 102 transactions not involving investors 120. Furthermore, different security tokens 102 may reference different compliance rules 106 that may or may not overlap, e.g., a first security token 102 may reference one or more first compliance rule(s) 106 relating to the exemptions to SEC Regulations A, D, and/or S, while a second security token 102 may only reference one or more second compliance rule(s) 106 relating to AML/KYC.

The broker dealer 118 may be a person or entity that purchases or sells security tokens 102 for its own account and/or on behalf of its customers. The term "onboarding" and its variants refers to the process of creating an account for a new customer, including collection of information, e.g., a broker dealer 118 may onboard an investor 120 as a new customer. The broker dealer 118 may be responsible for performing anti-money laundering and/or know-your-customer (AML/KYC) checks on its customers. Specifically, an identity services provider 126 may be one or more computing devices that provide AML/KYC services. AML services may include one or more steps to ensure that a potential (or current) customer is not in violation of relevant laws and regulations designed to combat money laundering, i.e., AML services seek to ensure that a potential (or current) customer is not taking steps to obscure the source of funds that were received from illegal or unethical activities. KYC services may include one or more steps to gather, review, and monitor information related to the identity and/or financial dealings of a potential (or current) customer. In examples, KYC services may include collecting basic identity data (e.g., name, contact information, etc.), verifying that the customer is who they say they are, and/or ensuring that the customer is not on any law enforcement watch lists. KYC services may also include performing a soft credit check (e.g., based on the customer's basic identity data), analyzing a customer's transactional behavior, and/or monitoring the customer's account for fraudulent behavior based on the customer's transaction behavior. AML/KYC may be required under various federal, state, and/or local laws, including SEC regulations.

The issuer 114 may be a person or entity that instructs the owner 112 to issue security tokens 102, i.e., the owner 112 may own one or more originating smart contracts 113 that deploy/issue security tokens 102. The system 100 may include up to many issuers 114. In examples, the issuer 114 may be a company where each security token 102 represents a share of the company.

The broker dealer 118 may have an account with a custodian 116, i.e., a person or entity that holds custody, possession, and/or ownership of security tokens 102 for one or more broker dealers 118. The custodian 116 may be a person or entity that holds custody, possession, and/or ownership of security tokens 102 on behalf of many broker dealers 118 (which broker dealers 118 may have many investors 120 as its customers). The system 100 may include many custodians 116 and/or many broker dealers 118.

An owner 112 may be a person or entity that owns, deploys, re-deploys, and/or transfers the smart contracts 102, 106, 128-134 in the global registry 108. In examples, the owner 112 may use a method call (e.g., that is executed by a virtual machine) to the originating smart contract 113 to deploy/issue security tokens 102. The owner 112 may also be referred to as the administrator of the system 100. For example, the owner 112 may have authority to place custodian 116 freezes. Optionally, the owner 112 may have authority to place security token 102 freezes, broker dealer 118 freezes, and/or investor 120 freezes. The different freezes may be implemented by changing settings in the global registry 108, and will be discussed below. Additionally, or alternatively, the custodian 116 and/or broker dealer 120 may have authority to place one or more types of freezes. The system 100 may only have a one or more owners 112. Optionally, the owner 112 may provide data services describing the "market" for a security token 102 based on the security token 102 transactions executed in the system 100, e.g., a feed indicating volume of security token 102 transactions, transaction price for the most recent security token 102 transaction, etc.

As described above, the terms owner 112, issuer 114, custodian 116, broker dealer 118, and investor 120 may refer to a person or entity filling the various roles in the system 100. Alternatively, these terms may refer to a computing device used by the owner 112, issuer 114, custodian 116, broker dealer 118, and investor 120, respectively. When referring to a computing device, each of the owner 112, issuer 114, custodian 116, broker dealer 118, and investor 120 may be implemented with one or more processors that execute instructions in a memory on the respective computing device. Each respective computing device may be a mobile device, such as a cell phone or tablet, personal computer, or a server configured to send and receive instructions and/or other data to other computing devices, e.g., via a network 138, such as the Internet.

A security token exchange 124 may be a marketplace or a business entity that operates the marketplace (or one or more computing devices operated by a security token exchange 124) in which security tokens 102, commodities, derivatives and/or other financial instruments are traded. In examples, the security token exchange 124 may record successfully executed transactions on the distributed ledger 122. The security token exchange 124 may be custodial, i.e., where custodians 116 hold and transact security tokens 102 on behalf of broker dealers 118 and/or investors 120.

The network node 140 may be a computing device implemented using one or more processors that execute instructions stored in memory to implement functionality described herein. In examples, a network node 140 may run a virtual machine (e.g., Ethereum Virtual Machine) that executes any of the smart contracts described herein.

The term "distributed ledger" refers to an electronic ledger that is distributed across multiple interconnected network nodes 140 (i.e., computing devices executing instructions stored in memory), where more than one of the network nodes 140 stores a copy of the distributed ledger 122. In examples, one or more network nodes 140 in a peer-to-peer network may implement the distributed ledger 122.

The distributed ledger 122 may implement one or more blockchains to validate the data stored within the distributed ledger 122. A blockchain is a verifiable permanent ledger constructed one block at a time with a proof-of-work seal (such as a hash) affixed to each block that validates that block. In a blockchain, the hash of the previous block is

US 11,216,802 B2

7

included in the current block, and therefore by recursion the current hash also validates all previous blocks back to the original genesis block. Inserting a hash into a blockchain permanently records that hash and acts as a notary verifying the time stamped proof-of-existence of the hashed data at the moment in time that block is added to the chain. Any future blocks add a layer of protection from manipulation of the data stored in the chain or a chain re-organization and therefore provide additional certainty that no changes can be made to blocks earlier in the chain. A blockchain is an implementation of a distributed ledger **122**, and may be public (e.g., viewable by anyone) or private (e.g., viewable only to authorized users or entities). Exemplary blockchains include, but are not limited to, the Bitcoin blockchain, the Ethereum blockchain, BigchainDB, Billon, Chain, Corda, Credits, Elements, Monax, Fabric, HydraChain, Hyperledger, Multichain, Openchain, Quorum, Ravencoin, Sawtooth, and Stellar. Preferably, the distributed ledger **122** is the public Ethereum blockchain, however, other implementations are possible. If a private blockchain is used, a hash of the private blockchain may be periodically committed to (i.e., recorded on) a public blockchain, e.g., the Ethereum blockchain or Bitcoin blockchain.

Additionally, or alternatively, the distributed ledger **122** may implement a directed acyclic graph (DAG), e.g., IOTA or Hashgraph that uses a gossip protocol to share information between network nodes **140** of the system **100**. Furthermore, consensus may be reached in the distributed ledger **122** without proof-of-work and can instead use proof-of-stake. Furthermore, any Merkle tree (or hash tree) that connects different sets of data using cryptographic hashes may be implemented by the distributed ledger **122**.

The term "wallet" refers to a software program, digital file, and/or memory used to store and/or manage digital assets, such as security tokens **102**. Although the present systems and methods are described herein using security tokens **102**, they are also compatible with any type of digital asset. In examples, a wallet may be defined by one or more private keys, one or more public keys derived from one or more private keys, and/or one or more transaction addresses derived from one or more private keys and/or one or more public keys. In examples, a wallet may be defined by one or more private account keys (and optional corresponding public account key(s)), each of which may have one or more child and/or grandchild transaction keys. The term "account" may be used to refer to an address on the distributed ledger **122**, e.g., an Ethereum address in a hierarchical deterministic (HD) wallet.

Security tokens **102** may be issued privately, e.g., as part of a pre-initial public offering (pre-IPO) to a dark pool of investors that qualify under the relevant exemptions to the SEC regulations. Alternatively, security tokens **102** may be issued as part of an initial public offering (IPO) under SEC regulations. The owner **112** may deploy/issue one or more security tokens **102**, e.g., with a security token offering (STO). Optionally, the issuer **114** may instruct the owner **112** to deploy/issue one or more security tokens **102**, e.g., with a security token offering (STO). An STO may include deploying/issuing or selling a security where the security is represented by a security token **102**. Optionally, an STO may include allocating them to one or more wallets, e.g., belonging to the owner **112** or issuer **114**. In examples, all deployed security tokens **102** may be initially allocated to a wallet belonging to the owner **112** or issuer **114** before allocation to individual investors **120**. Alternatively, the deployed security tokens **102** may be directly allocated to wallets

8

owned by the individual investors **120**. An STO may include one or more originating smart contracts **113** issuing one or more security tokens **102**.

Following initial deployment and allocation, the security token **102** may be used to transfer the asset that the security token **102** represents from one party to another, e.g., on a security token exchange (STX) or in a peer to peer (P2P) transaction (if permitted by the security token **102**). Records of issuance and/or subsequent transactions of the security token **102** may be committed to (i.e., recorded in) the security token **102** itself and/or the distributed ledger **122**.

The system **100** may be used to deploy, allocate and/or subsequently transfer various different types of security tokens **102**. In examples, company A may deploy X security tokens **102** that each represent a share of company A and have a symbol AAAX, company B may deploy Y security tokens **102** that each represent a share of company B and have a symbol BBBX, and company C may deploy Z security tokens **102** that each represent a share of company C and have a symbol CCCX. Furthermore, security tokens **102** AAAX, BBBX, and CCCX may all be deployed, allocated, and/or tradeable in the same system **100**.

Ethereum Request for Comments 20 (ERC20) is a standard defining a set of methods. To be compliant with ERC20, a cryptographic token (e.g., utility, cryptocurrency, or security) must implement these methods, although the owner of the token can implement the methods in their own way. One of the advantages of ERC20 is that each application, wallet, exchange, or interface doesn't have to be tailored to each specific token. Rather, if a project supports the ERC20 standard, it may support many different ERC20 tokens.

In order to comply with ERC20, the security token **102** may include token logic and/or parameters **104** that implements six required methods, including total Supply( ) balanceOf( ), transfer( ), transferFrom( ), approve( ), and allowance( ). These required methods describe how tokens can be transferred and how token-related data can be accessed. The token logic/parameters **104** may also implement various events to comply with ERC20, e.g., Transfer( ) and Approval( ). These events describe formatting guidelines for transfers and approvals. For example, the Transfer( ) method/function **109A-B** (in the token logic/parameters **104** or outside the token logic/parameters **104**) may be called when a security token **102** transaction is requested, and the Transfer( ) function **109** may further call method(s) in one or more smart contracts **130-134** in the global registry **108** and/or compliance rule(s) **106**, e.g., to check/verify that an address (e.g., Ethereum address) is associated with an investor **120**, custodian **116**, or broker dealer **118** in the system **100**. The token logic/parameters **104** may also implement one or more optional methods to comply with ERC20, such as name( ), symbol( ), and/or decimals( ). These optional methods can be used to assign the security token **102** a name and a symbol, as well as define the number of decimals the security token **102** uses, respectively. These methods and events may be executed by a virtual machine (e.g., the Ethereum Virtual Machine) on a network node **140**, and are further described in the ERC20 standard.

The token logic and/or parameters **104** may also include data that indicates the name of the security token **102**, how many security tokens **102** of the same type were deployed or issued, and/or a symbol for the security token **102**. In examples, the symbol of a security token **102** may be a multi-character (e.g., four or five) identifier for the security token **102** similar to a stock ticker symbol. The symbol of a security token **102** may be registered with Financial Industry

US 11,216,802 B2

9

Regulatory Authority (FINRA). The security token **102** symbol issued by a company may preferably be an extended version of the company's ticker symbol, e.g., by concatenating a particular character (e.g., Q, X, or Z) to the end of the company's ticker symbol.

The security token **102** may also include a table of balances **105**. The table of balances **105** may indicate balances of all holders of a particular type of security tokens **102**, e.g., the table of balances **105** may indicate what addresses (e.g., Ethereum addresses) hold what quantity of a security token **102**. Instead of indexing by investor **120** (or custodian **116** or broker dealer **118**) address, the table of balances **105** may be indexed in other ways, e.g., a hash of the investor's name, etc. The table of balances **105** for a security token **102** may be public, semi-public, or private, and may be anonymous such that balances of security tokens **102** held by a particular investor **120**, custodian **116**, or broker dealer **118** cannot be derived purely from publicly-available information.

The table of balances **105** may account for all security tokens **102** that have been deployed or issued. When a transfer of the security token **102** occurs (i.e., balances change), the table of balances **105** may be updated and distributed to each copy of the security token **102** stored on the different network nodes **140**. Optionally, the table of balances **105** may also include a length of time a particular security token **102** has been owned by a current holder (i.e., investor **120** or custodian **116**), e.g., based on previous transaction data of the particular security token **102**. In examples, the transfer of a security token **102** may include updating the table of balances **105** in the security token **102**. Table 1 is an example table of balances **105** that includes a key/value pair for each investor address:

TABLE 1

| Investor, Custodian, or Broker Dealer Address | Security Token Balance |
| --- | --- |
| 0x7d2a3d9f938e13cd947eb85a924bb34df8dd866 | 525 |
| 0x1d2a3d9f991e13c5da7ec05a1c7fe734df8dd84a | 50 |
| 0x1d2a3da66b8f13c5da7e9d5afc7fe734df8dd826 | 15000 |
| 0x1d2a3d9f938e13c4fa7ec0577c7fe734df8dd55e | 1100 |

However, security tokens **102** (unlike other types of tokens) may be regulated by the Securities and Exchange Commission (SEC) in the United States. Accordingly, it may be desirable to satisfy Title 8 of the Delaware Code Relating to the General Corporation Law, which is important because many publicly traded companies are incorporated in Delaware. Additional methods satisfying Title 8 are referred to as Title 8 methods herein and may be implemented in a variety of ways, e.g., with or without Ethereum Request for Comments 884 (ERC884). Specifically, the Title 8 methods allows for the creation of tokens where each token represents a single share issued by a Delaware corporation, i.e., such tokens may be designed to represent equity issued by any Delaware corporation, whether private or public.

Accordingly, the token logic and/or parameters **104** may implement one or more Title 8 methods (beyond the six required by ERC20): including addVerified( ), removeVerified( ), updateVerified( ), cancelAndReissue( ), isVerified( ), isHolder( ), holderCount( ), holderAt( ), hasHash( ), isSuperseded( ), and/or getCurrentFor( ). The token logic/parameters **104** may also implement one or more events (beyond the six required for ERC20 compatibility), e.g., verifiedAddressAdded( ), VerifiedAddressRemoved( ), VerifiedAddressUpdate( ), and/or VerifiedAddressSuperseded( ),

10

These Title 8 methods and events may be executed by a virtual machine on a network node **140**.

However, SEC regulations impose additional requirements for security tokens **102** that are not required or enforced by ERC20 and/or the Title 8 methods. In other words, ERC20 and Title 8, individually and combined, do not cause security tokens **102** to automatically self-enforce compliance with SEC regulations.

In order to self-enforce compliance with SEC regulations, the system **100** may implement functionality beyond the Title 8 methods. Specifically, the security token **102** may include at least one compliance rule pointer **107**, where each compliance rule pointer **107** indicates the address of at least one compliance rule **106** (that is implemented using one or more smart contracts). The at least one compliance rule pointer **107** may be updated, if necessary, to point to updated compliance rule(s) **106**.

At least one of the compliance rules **106** references the global registry **108** (that is external to the security token **102**), i.e., at least one of the compliance rules **106** accesses information stored in a data storage smart contract **128**. By storing the compliance rules **106** outside of the security token **102**, the at least one compliance rule **106** may be updated without modifying the security token **102** itself, e.g., if SEC regulations change and the at least one compliance rule **106** need to be updated. Alternatively, the at least one compliance rule **106** may be included in the security token **102** itself, in which case modifying (e.g., destroying and re-deploying) at least one compliance rule **106** would require modifying the security token **102**. Optionally, security token **102** transactions not using any compliance rules **106** are also possible, e.g., the default behavior might be to approve all transactions without respect to any compliance rules **106**

The term "smart contract" refers to a set of conditional logic that may be implemented in software, e.g., one or more sequential steps that are executed in response to one or more relevant conditions being satisfied. A smart contract may be stored at an address of a distributed ledger **122**. In examples, smart contracts may be programmed in the Solidity programming language. Smart contracts may be executed by a processor on a network node **140**, e.g., that is running a virtual machine, such as the Ethereum Virtual Machine (EVM). Multiple types of security tokens **102** (e.g., issued by different companies) can access the same smart-contract-based compliance rule(s) **106**, but more preferably each type of security token **102** will use one or more unique smart-contract-based compliance rule(s) **106**.

The compliance rules **106** may ensure that any transaction involving the security token **102** complies with the relevant SEC regulations. In examples, the compliance rules **106** may (1) verify that the buyer and/or the seller of the security token **102** qualify under at least one of SEC Regulations A, D, and S; (2) verify that AML, and/or KYC services have been performed for the buyer and/or seller; (3) verify that no freezes have been placed (discussed below) that would prevent the security token **102** from being transferred; and/or (4) verify that the particular security token **102** is not in a blackout period, i.e., a restriction that prevents the seller from selling the security token **102** for a certain period of time (e.g., one year) following acquisition of the security token **102**. Verifying whether the security token **102** is in a blackout period may include traversing previous security token **102** transactions in the distributed ledger **122** to find the acquisition date that the seller acquired the security token **102**, and comparing the acquisition date to the current date (e.g., by accessing a server's date) to determine the

US 11,216,802 B2

11

12

length of time that the seller has held the security token **102**. If the length of time (that the seller has held the security token **102**) equals or exceeds an applicable blackout period, the security token **102** is not in the blackout period.

At least one of the compliance rule(s) **106** may reference an external, global registry **108**, e.g., via the network **138**. The global registry **108** may be a collection of smart contracts **128-134**. The smart contracts **128-134** include a data storage smart contract **128** that stores data. The data stored in the data storage smart contract **128** may be relevant to compliance with SEC regulations (such as indications of whether an investor **120** qualifies under exemptions to the SEC Regulations); personally identifiable information (PII) of an investor **120**; an indication whether AML/KYC has been performed for the investor **120**; and/or whether a freeze has been placed on a security token **102**, custodian **116**, broker dealer **118**, and/or investor **120**.

The data storage smart contract **128** may interface with a custodian smart contract **130**, a broker dealer smart contract **132**, and/or an investor smart contract **134** in the global registry **108**. One advantage of implementing the global registry **108** using multiple smart contracts **128-134** is that it may be cheaper, in terms of transaction costs, to replace a portion of the code (e.g., the broker dealer smart contract **132**) instead of the replacing the code encompassed by all the smart contracts **128-134**, i.e., the cost of fixing bugs in the code may be reduced. Splitting the global registry **108** into multiple smart contracts **128-134** may also enable the global registry to comply with size limitations that may be imposed in certain distributed ledgers **122**, e.g., Ethereum.

The smart contracts **128-134** in the global registry **108** may be stored on a public distributed ledger **122**. Alternatively, the global registry **108** could be a traditional database that stores attributes of the security tokens **102**, custodians **116**, broker dealers **118**, and/or investors **120** in the system **100**, e.g., stored on a single computing device. Alternatively, the global registry **108** may be a database that stores attributes of the security tokens **102**, custodians **116**, broker dealers **118**, and/or investors **120** on the distributed ledger **122** without utilizing smart contracts **128-134**.

Optionally, an interface smart contract (not shown) may implement at least one method that can be used to access the custodian smart contract **130**, the broker dealer smart contract **132**, and/or the investor smart contract **134**. In other words, the optional interface smart contract may act as an interface to other devices in the system **100**. The methods implemented by the custodian smart contract **130** may be called by the owner **112**. The broker dealer smart contract **132** may implement at least one method to add, remove, and/or update investor elements in one or more data structures **110** in the global registry **108**. In examples, the methods implemented by the broker dealer smart contract **132** may be called by the custodian **116**. The methods implemented by the investor smart contract **134** may be called by a broker dealer **118**.

Therefore, in the preferred (but not only) configuration, only the owner **112** may call the methods implemented by the custodian smart contract **130**, only a custodian **116** may call the methods implemented by the broker dealer smart contract **132**, and only a broker dealer **118** may call the methods implemented by the investor smart contract **134**. Optionally, more than the owner **112**, custodian **116**, and broker dealer **118** can call the methods implemented in the custodian smart contract **130**, the broker dealer smart contract **132**, and the investor smart contract **134**, respectively. For example, a Transfer( ) function **109** or other smart contracts in the security token **102** (e.g., in the token

logic/parameters **104**) may call one or more methods in the custodian smart contract **130**, the broker dealer smart contract **132**, and/or the investor smart contract **134**.

Each of the custodian smart contract **130**, the broker dealer smart contract **132**, and the investor smart contract **134** can read or write (assuming correct data permissions) data in the data storage smart contract **128**. Specifically, one or more investor elements, custodian elements, and/or broker dealer elements may be created, modified, and/or removed from one or more data structures **110** in the data storage smart contract **128**.

Furthermore, the global registry **108** may include more than one custodian smart contract **130**, broker dealer smart contract **132**, and/or investor smart contract **134**. For example, the global registry **108** may include a first custodian smart contract **130**, broker dealer smart contract **132**, and/or investor smart contract **134** for security tokens **102** relating to a first asset type (e.g., equity shares), and a second custodian smart contract **130**, broker dealer smart contract **132**, and/or investor smart contract **134** for security tokens **102** relating to a second asset type (e.g., bonds).

In examples, one or more of the custodian smart contract **130**, broker dealer smart contract **132**, and/or investor smart contract **134** may be a pointer to other smart contract(s) (not shown) that implement the functionality. Such a configuration would allow for partial (and therefore cheaper) updates to the smart contracts **130-134** in the global registry **108**, i.e., the pointer in the custodian smart contract **130**, broker dealer smart contract **132**, and/or investor smart contract **134** could remain constant, so the calling security tokens **102** or entities **112-120** would not have to be updated each time the one of the smart contracts **130-134** is updated. In other words, one or more smart contracts **130-134** may each point to one or more dynamic (i.e., updatable) smart contracts (not shown) in the global registry **108**, e.g., the dynamic smart contract(s) could be destroyed and/or re-deployed without changing the particular smart contract **130-134** that is called by other smart contracts or entities in the system **100**.

A data structure **110** may store at least one investor element, each with personally identifiable information (PII) about a particular investor. Additionally, each investor element may include an accreditation date (i.e., the date that a determination was made that the investor **120** qualifies under one or more exemptions to the SEC Regulations), an expiration date of accreditation, an indication whether a freeze has been placed on the investor **120**, an address (e.g., Ethereum address) of the investor's broker dealer **118**, and/or the investor **120** country of origin. Optionally, each investor element may include other parameters, e.g., (1) whether the investor **120** qualifies under SEC Regulation A; (2) whether the investor **120** qualifies under SEC Regulation D; (3) whether the investor **120** qualifies under SEC Regulation S; (4) whether AML/KYC been performed by the broker dealer **118**; and/or (6) a length of time a particular security token **102** has been owned by the investor **120**, and any information that is relevant to compliance with SEC regulations governing the transfer of the security token **102**. The attributes in an investor element (e.g., a value in a slot in an investor element) may be stored as comma-separated values, a hash table, a mapping, a dictionary, and/or key/value pairs, etc., e.g., as illustrated in FIG. **2A**.

In examples, the data storage smart contract **128** may store at least one investor element for each investor **120**. The data storage smart contract **128** may store multiple investor elements for a particular investor **120** if the investor **120** is a customer of multiple different broker dealers **118**, i.e., the data storage smart contract **128** may store a first investor

US 11,216,802 B2

13

element for the investor 120 according to information collected by a first broker dealer 118 during a first onboarding, a second investor element for the investor 120 according to information collected by a second broker dealer 118 during a second onboarding, etc. In examples, only the broker dealer 118 associated with the investor element (or their agent) may update the information for that investor element, i.e., to prevent other broker dealers 118 from interfering with data (relevant to SEC Regulation compliance) that is collected by a broker dealer 118. Different investor elements for the same investor 120 (at different broker dealers 118) may be stored in the same data structure 110. Storing an investor element for each instance of the investor 120 per broker dealer 118 (that the investor 120 has an account with) may allow each broker dealer 118 to be responsible for its own compliance processes without having to rely information collected by other broker dealers 118.

It should be noted that, while the data storage smart contract 128 is described herein as storing a separate investor element for each instance of the investor 120 per broker dealer 118 that the investor 120 has an account with, other configurations in which the data storage smart contract 128 stores a single investor element (for an investor 120 having accounts with multiple broker dealers 118) are possible.

One or more of the attributes in an investor element may be derived from information about the investor 120 (e.g., under SEC Rule 17a-3(17)) collected by the broker dealer 118 during onboarding, e.g., customer name; tax identification number (e.g., Social Security number); address; telephone number; date of birth; driver's license, passport information or information from other government-issued identification; employment status and occupation; whether the customer is employed by a brokerage firm; annual income; net worth; and/or account investment objectives. Additionally, or alternatively, one or more pieces of personally identifiable information (PII) may be stored as attributes in an investor element. PII may include any data that can be used to distinguish individual identity, e.g., name, address, email address, tax identification number, etc. PII may be included in the data collected from an investor 120 by each broker dealer 118 during onboarding (e.g., as part of SEC Rule 17a-3(17) data collection) or otherwise. In examples, the PII (or the PII padded with filler data) may be encrypted into a PII hash that is stored as an investor attribute 110 in an investor element. Alternatively, the investor 120 may encrypt the PII (or the PII padded with filler data) into a PII hash that is stored as an investor attribute 110 in an investor element, e.g., if the investor 120 is an external investor that doesn't connect through a broker dealer 118 or a custodian 116.

Since the qualification status of an investor 120 (under exemptions to the SEC regulations) can change over time, the data storage smart contract 128 may be updated. In examples, updating the individual entries may include adding, removing, or modifying investor elements when appropriate. In examples, when a broker dealer 118 onboards an investor 120, a new investor element may be created and stored, e.g., in the data storage smart contract 128. In examples, when an investor 120 changes accreditation status (or information from which accreditation status is derived, e.g., income, net worth, etc.) or personally identifiable information (PII), the PII hash in the investor element for the investor 120 (and broker dealer 118) may be updated. In examples, when the investor 120 closes their account with a broker dealer 118, the corresponding investor element may be removed from the data storage smart contract 128.

14

As mentioned above, the data storage smart contract 128 may include an investor element for each instance of the investor 120 per broker dealer 118 that the investor 120 has an account with, i.e., the data storage smart contract 128 may store multiple investor elements for an investor 120 with accounts at multiple broker dealers 118. In examples, the investor element(s) for an investor 120 may only be created, updated, and/or removed by a broker dealer 118 that the investor 120 is associated with, however, other configurations are possible. Accordingly, each broker dealer 118 can preferably create, modify, or remove an investor element that is associated with investors 120 that are customers of the respective broker dealer 118. Creation, modification, and/or removal of an investor element may be performed by the investor smart contract 134. A broker dealer 118 may call a method implemented by the investor smart contract 134 directly. Alternatively, the broker dealer 118 may call a method implemented by an optional interface smart contract, and the optional interface smart contract may call a method implemented by the investor smart contract 134. Alternatively or additionally, an external investor may create, modify, and/or remove an investor element by calling method(s) implemented by the investor smart contract 134 directly or by an optional interface smart contract.

Optionally, one or more other types of elements may be stored in the data storage smart contract 128 that include attributes about various actors in the system 100. In examples, the other elements (i.e., other than investor elements) may include at least one custodian element, at least one broker dealer element, and/or at least one security token element. In examples, the broker dealer element for a broker dealer 118 may only be created, updated, and/or removed by a custodian 116 (e.g., by calling the broker dealer smart contract 132) that the broker dealer 118 is associated with, however, other configurations are possible. In examples, the custodian element for a custodian 116 may only be created, updated, and/or removed by the owner 112 (e.g., by calling the custodian smart contract 130), however, other configurations are possible. Optionally, an issuer element and/or security token exchange element may be stored for every issuer 114 and/or security token exchange 124 in the system. The attributes in one of the other elements (e.g., a value in a slot in an element) may be stored as comma-separated values, a hash table, a mapping, a dictionary, and/or key/value pairs, etc.

As will be discussed below, the system 100 may enable various freezes relating to the security token 102. In examples, the system 100 may allow a security token 102 freeze, a custodian 116 freeze, and/or an investor 120 freeze. Optionally, the system 100 may enable a broker dealer 118 freeze, a security token exchange 124 freeze, and/or an issuer 114 freeze. The freezes may use and/or modify attributes in one or more investor elements and/or one or more other types of elements, depending on the type of freeze. In examples, only investor 120 freezes, custodian 116 freezes, and security token 102 freezes are possible (not broker dealer 118 freezes, security token exchange 124 freezes, and/or issuer 114 freezes).

FIG. 2A is a block diagram illustrating a data structure 110 used in the system 100 illustrated in FIG. 1. One or more data structures 110 may be stored in the data storage smart contract 128. Each data structure 110 may include one or more elements 223A-M, where each element 223 corresponds to (i.e., include information about) a particular custodian 116, broker dealer 118, or investor 120. Optionally, security token elements 223 may also be stored in one or more data structures 110.

US 11,216,802 B2

15

In some configurations, all elements 223 in a particular data structure 110 correspond to the same type of entity, e.g., all elements 223 correspond to investors 120 in the system 100. In this configuration, the data storage smart contract 128 may include a first data structure 110 for all investors 120, a second data structure 110 for all custodians 116, a third data structure 110 for all broker dealers 118, and/or a fourth data structure 110 for all security tokens 102 in the system 100. Alternatively, a particular data structure 110 may include elements 223 corresponding to different types of entities, i.e., investor element(s) 223, custodian element(s) 223, and broker dealer element(s) 223 may be included in a single data structure 110.

Each element 223 may include two storage slots 215A-N where each storage slot is a fixed number of bytes. For example, a storage slot may be 32 bytes long (or any suitable length), e.g., each storage slot 215 may be slot in the Solidity programming language. Although each element 223 is illustrated in FIG. 2A as including two storage slots 215 (i.e., N=2M), an element 223 may include only a single storage slot 215 (i.e., N=M) or more than two storage slots 215 (i.e., N>2M).

Each storage slot 215 may include a key 219A-N and a value 221A-N, i.e., a key/value pair. Each key 219 may be a nested structure with a first level indicating the type of entity the element 223 corresponds to (e.g., custodian 116, broker dealer 118, investor 120, etc.) and a second level that indicates an address (e.g., Ethereum address) owned by the particular entity. In this way, the key 215 may be encoded (with the type of entity). Instead of indexing by address, the second level of the key 219 may be indexed in other ways, e.g., a hash of the entity/investor/security token name, etc. Optionally, the keys 219 may include more than two levels. If the element 223 includes two slots 215, the key 219 in the first storage slot 215 of the element 223 may be the same or different than the key 219 in the second slot 215 of the element 223.

The information included in the values 221 may vary depending on the type of entity the element 223 corresponds to. Each value 221 in the data structure 110 may be a nested structure with a first level indicating the type of entity the element 223 corresponds to (e.g., custodian 116, broker dealer 118, investor 120, etc.) and one or more additional levels indicating additional information. In this way, the value 221 may be encoded (with the type of entity) so that a computing device (e.g., a network node 140) will know how to interpret the data in the value 221. In other words, a computing device (e.g., a network node 140) will interpret the data in the value 221 differently based on the encoding, i.e., the type indicated in the value 221. Multiple parameters may be bit-shifted (and/or concatenated) so they fit in the same value 221.

For example, the value 221 in a first storage slot 215 in a particular investor element 223 may include one or more bits indicating "investor" in the first level and the PII hash for the investor 120 in the second level. Furthermore, the value 221 in the second storage slot 215 in the investor element 223 may include (1) one or more bits indicating "investor" in the first level; (2) one or more bits indicating date of accreditation (and/or expiration date of accreditation) in a second level, i.e., the date that a determination was made that the investor 120 qualifies under one or more exemptions to the SEC Regulations; (3) one or more bits indicating whether a freeze has been placed on the investor 120 in a third level, e.g., a single bit (e.g., isFrozen flag); (4) an address (e.g., Ethereum address) of the investor's broker dealer 118 in a fourth level; and/or (5) the investor 120 country of origin in

16

a fifth level. Optionally, the second value 221 in a particular investor element 223 may include other parameters, e.g., (1) whether the investor 120 qualifies under SEC Regulation A; (2) whether the investor 120 qualifies under SEC Regulation D; (3) whether the investor 120 qualifies under SEC Regulation S; (4) whether AML/KYC been performed by the broker dealer 118; and/or (6) a length of time a particular security token 102 has been owned by the investor 120.

Examples of other data structures 110 include custodian elements 223, broker dealer elements 223, and/or optional security token elements 223. Each custodian element 223 may include attribute(s) about a particular custodian 116. The value(s) 221 in a particular custodian element 223 may include one or more bits indicating "custodian" in the first level and one or more bits indicating whether a freeze has been placed on the custodian 116 in a second level, e.g., a single bit (e.g., isFrozen flag). Optionally, a custodian element 223 may reference an address (e.g., Ethereum address) of one or more investor elements 223, broker dealer elements 223, and/or security token elements 223 that the custodian element 223 is associated with. For example, a custodian element 223 may include an address (e.g., Ethereum address) of one or more broker dealers 118 that the custodian 116 is associated with.

Each broker dealer element 223 may include attribute(s) about a particular broker dealer 118. The value(s) 221 in a particular broker dealer element 223 may include one or more bits indicating "broker dealer" in the first level and one or more bits indicating whether a freeze has been placed on the broker dealer 118 in a second level, e.g., a single bit (e.g., isFrozen flag). Optionally, a broker dealer element 223 may reference an address (e.g., Ethereum address) of one or more investor elements 223, custodian element 223, and/or security token elements 223 that the broker dealer element 223 is associated with. For example, a broker dealer element 223 may include an address (e.g., Ethereum address) of one or more custodians 116 that the broker dealer 118 is associated with.

Each security token element 223 may include attribute(s) about a particular security token 102. The value(s) 221 in an optional security token element 223 may include one or more bits indicating "security token" in the first level and one or more bits indicating whether a freeze has been placed on the security token 102 in a second level, e.g., a single bit (e.g., isFrozen flag). Various other information about the security token 102 may be included in the value(s) a security token element 223.

Each optional issuer element 223 may include attribute(s) about a particular issuer 114. The value(s) 221 in a particular optional issuer element 223 may include one or more bits indicating "issuer" in the first level and one or more bits indicating whether a freeze has been placed on the issuer 114 in a second level, e.g., a single bit (e.g., isFrozen flag). Optionally, an issuer element 223 may reference addresses (e.g., Ethereum addresses) of one or more investors 120, custodians 116, broker dealers 118 and/or security token 102 that the issuer 114 is associated with.

FIG. 2B is a block diagram illustrating a hierarchy of entities in the system 100 illustrated in FIG. 1. Specifically, FIG. 2B shows relationships between one or more investors 120, optional one or more broker dealers 118, optional one or more custodians 116, and/or one or more owners 112 of the system 100.

In examples, the hierarchy in FIG. 2B may define data permissions in the system 100. The hierarchy may be stored in any suitable form and/or may be implicit in the data stored in various elements 223.

US 11,216,802 B2

17

When a security token 102 transaction is requested, the compliance rule pointer 107 in the security token 102 may point to at least one compliance rule 106 (e.g., smart contract(s)) that references an investor element 223 associated with the buyer and/or seller of the security token 102. Optionally, this may include the at least one compliance rule 106 passing an address (e.g., an Ethereum address that identifies an investor element 223) to the global registry 108. In examples, the at least one compliance rule 106 may perform one or more of the following actions: (1) ensure that the buyer and/or seller qualify under at least SEC Regulation A, D, or S; (2) ensure that AML/KYC has been performed for the buyer and/or seller in the security token 102 transaction; (3) ensure that the particular security token 102 is not in a blackout period (e.g., based on the length of time a particular security token 102 has been owned by the seller); and/or (4) ensure that no freezes have been placed on the buyer or seller.

A freeze may be placed on (or removed from) an investor 120 by changing data (e.g., a portion of a value 221) in a particular investor element 223 associated with the investor 120. Placing or removing a freeze on an investor 120 may require permissions based on the hierarchy in FIG. 2B. A custodian 116 may also place a freeze on an investor 120. In examples, a custodian 116A may have permission to place a freeze on investors 120A-D (for whom it holds security tokens 102) by changing data (e.g., a portion of a value 221) in the investor's 120A-D investor elements 223, i.e., since the custodian's 116A is associated with the investors 120A-D in the hierarchy. In contrast, a custodian 116B that is not associated with the investors 120A-D may preferably not have permission to place a freeze on the investors 120A-D since the custodian 116B is not associated with the investors 120A-D in the hierarchy. Optionally, a broker dealer 118A may have permission to place a freeze on its customer investors 120A-B, but may preferably not have permission to place a freeze on the investor 120A since the broker dealer 118 is not associated with investor 120A.

Optionally, an owner 112 of the system 100 may have permission to place a freeze on an investor 120 without regard to any hierarchy in FIG. 2B, e.g., in response to a court order when fraud is suspected. In some examples, if an investor 1201 is an external investor that is not a customer of any broker dealer 118 or custodian 116, the owner 112 (or issuer 114) alone may have permission to place a freeze on the investor 1201.

Alternatively, instead of the at least one compliance rule 106 referencing an investor element 223 in the data storage smart contract 128, the at least one compliance rule 106 may directly store one or more attributes relevant to SEC Regulation compliance. In examples, there may be a separate compliance rule 106 for every investor 120 that directly indicates whether the investor 120 qualifies under SEC Regulation A, D, or S; whether AML/KYC has been performed; whether the particular security token 102 is in a blackout period; and/or whether a freeze has been placed on the investor 120. In this configuration, the compliance rules 106 may be updated when information relevant to SEC Regulations changes (instead of, or in addition to, changing the investor element(s) 223).

In one configuration, when an investor 120 has a freeze placed on them, the investor 120 may not participate in any security token 102 transactions as a buyer or a seller, i.e., security tokens 102 held by (or on behalf of) the investor 120 may be frozen (temporarily not transferrable). In an alternative configuration, a freeze on an investor 120 may only prevent the investor 120 from participating in security token

18

102 transactions involving certain broker dealer(s) 118 and/or custodian(s) 116 that placed the freeze, i.e., security tokens 102 held, by the freeze-placing custodian 116 or broker dealer 118, on behalf of the investor 120 may be frozen (temporarily not transferrable). In examples, if a particular investor 120 has a freeze placed on them by a first custodian 116 or broker dealer 118, but not a second custodian 116 or broker dealer 118, the investor 120 may be prevented from participating in transactions via the first custodian 116 or broker dealer 118, but not the second custodian 116 or broker dealer 118. In that case, the first custodian 116 or broker dealer 118 is not liable for regulatory determinations (or lack thereof) of the second custodian 116 or broker dealer 118 and vice versa. Additionally, this prevents the first broker dealer 118 from tampering with an investor element 223 created and maintained by the second broker dealer 118 and vice versa.

A data structure 110 may store multiple investor elements 223 for an investor 120 that has accounts at multiple broker dealers 118. In examples, a first investor element 223A may describe a particular investor 120, according to data collected by a first broker dealer 118A, e.g., during onboarding performed by the first broker dealer 118A. Similarly, a different investor element 223B may describe the same particular investor 120, according to data collected by a different broker dealer 118B, e.g., during onboarding performed by the different broker dealer 118B. Additionally or alternatively, an investor element 1201 may be stored for an external investor that is not a customer of a broker dealer 118 or custodian 116.

When a security token 102 transaction is requested, in addition to referencing an investor element 223 associated with the buyer and/or seller, the at least one compliance rule 106 (e.g., smart contract(s)) may reference one or more custodian elements 223 and/or one or more broker dealer elements 223 associated with the buyer and/or seller of the security token 102 (and optionally a security token element 223 associated with the security token 102). Optionally, this may include the at least one compliance rule 106 passing an address(es) (that identify the custodian element(s) 223, the broker dealer element(s) 223, and/or security token element 223) to the global registry 108. In examples, in addition to the various checks based on the investor element(s) 223, the at least one compliance rule 106 may ensure that no freezes have been placed on the custodian(s) 116, broker dealer(s) 118, and/or security token 102 associated with the security token 102 transaction.

A freeze may be placed on (or removed from) a custodian 116 or a broker dealer 118 by changing data (e.g., a portion of a value 221) in a particular custodian element 223 or broker dealer element 223 associated with the custodian 116 or broker dealer 118, respectively. Placing or removing a freeze on a custodian 116 or broker dealer 118 may require permissions based on the hierarchy in FIG. 2B. In examples, a custodian 116 associated with a broker dealer 118 may have permission to place a freeze on the broker dealer 118. In contrast, a custodian 116 not associated with a broker dealer 118 may preferably not have permission to place a freeze on the broker dealer 118. Optionally, an owner 112 may have permission to place a freeze on a custodian 116 or broker dealer 118 without regard to the hierarchy in FIG. 2B, e.g., in response to a court order when fraud is suspected.

When a freeze is placed on a custodian 116, security tokens 102 held by the custodian 116 may be frozen (temporarily not transferrable). Similarly, when a freeze is placed

US 11,216,802 B2

19

on a broker dealer 118, security tokens 102 held by (or on behalf of) the broker dealer 118 may be frozen (temporarily not transferrable).

A freeze may be placed on (or removed from) a security token 102 by changing data (e.g., a portion of a value 221) in a particular security token element 223. In examples, placing or removing a freeze on a security token may be performed only by an owner 112 of the system 100, e.g., if fraud is suspected or if the security token 102 is suspected of sponsoring terrorism. Without limitation, an owner 112 may place or remove a freeze on a security token 102 in response to a court order. When a freeze is placed on a security token 102, all outstanding security tokens 102 (for that token type) may be frozen (temporarily not transferrable).

Optionally, a freeze may be placed on an issuer 114 or a security token exchange 124 by changing data (e.g., a portion of a value 221) in a particular issuer element 223 or security token exchange element 223, respectively. In examples, placing or removing a freeze on an issuer 114 or a security token exchange 124 may be performed only by an owner 112 of the system 100, e.g., if fraud is suspected or if an issuer 114 or security token exchange 124 is suspected of sponsoring terrorism. Without limitation, an owner 112 may place or remove a freeze on a security token 102 in response to a court order. When a freeze is placed on an issuer 114, all outstanding security tokens 102 (issued/deployed by or on behalf of the issuer 114) may be frozen (temporarily not transferrable). When a freeze is placed on a security token exchange 124, no security token 102 transactions may be executed on the security token exchange 124.

Alternatively, instead of the at least one compliance rule 106 referencing a custodian element 223, a broker dealer element 223, and/or security token element 223 in the data storage smart contract 128, the at least one compliance rule 106 may directly store some of the attributes. In examples, there may be a separate compliance rule 106 for every custodian 116, broker dealer 118, and security token 102 that directly states whether a freeze has been placed on the custodian 116, broker dealer 118, or security token 102, respectively. In this configuration, the compliance rules 106 may be updated when freezes has been placed on a custodian 116, broker dealer 118, or security token 102 (instead of, or in addition to, changing the custodian element 223, broker dealer element 223, and security token element 223 in the data storage smart contract 128).

The smart contracts 128-134 implementing the global registry 108 may be executed by a virtual machine (e.g., the Ethereum Virtual Machine) running on a network node 140. Each entity in the system 100 may have different data permissions (other than freeze indications) to the data storage smart contract 128. In examples, the owner 112 may own the at least one smart contracts 128-134 in the global registry 108 and/or the at least one compliance rule 106. The owner 112 may be able to call one or more of the following methods (e.g., in the custodian smart contract 130) to modify the data storage smart contract 128: setComplianceAddress( ) that sets an address (e.g., an Ethereum address) of the compliance rules 106, i.e., sets the compliance rule pointer 107; setRegistryAddress( ) that, for example, links an address of a smart contract, e.g., one of the smart contracts 128-134 implementing the global registry 108; setIssuer( ) that sets an address (e.g., an Ethereum address) of the owner 112 (or issuer 114) of a security token 102 in the system 100; addCustodian( ) that adds an address (e.g., an Ethereum address) of a new custodian 116 to the data storage smart contract 128; and removeCustodian( ) that

20

removes an address (e.g., an Ethereum address) of an existing custodian 116 from the data storage smart contract 128.

An owner 112 (or optionally issuer 114) may be able to call one or more of the following methods (e.g., in the security token 102 or the originating smart contract 113): issue( ) that issues security tokens 102; cancelAndReissue( ) that replaces lost security tokens 102; and allowPeerToPeer( ) that toggles peer-to-peer functionality. Optionally, an issuer 114 (or owner 112) may call a method (e.g., freezeCustodian( ) that sets an isFrozen flag in a custodian element 223. Optionally, an owner 112 may call a method (e.g., freezeInvestor( ) that sets an isFrozen flag in an investor element 223.

A custodian 116 may be able to call, directly or indirectly via an optional interface smart contract, one or more of the following methods (e.g., in the broker dealer smart contract 132) to modify the data storage smart contract 128: addBrokerDealer( ) that adds an address (e.g., an Ethereum address) managed by a broker dealer 118; removeBrokerDealer( ) that removes an address (e.g., an Ethereum address) managed by a broker dealer 118; and setBrokerDealerAccounts( ) that adds addresses (e.g., Ethereum addresses) of broker dealer 118 and account numbers assigned to broker dealers 118 by the custodian 116, e.g., a list of addresses. Optionally, a custodian 116 may call a method (e.g., freezeBrokerDealer( )) that sets an isFrozen flag in a broker dealer element 223 that the custodian is associated with. Optionally, a custodian 116 may call a method (e.g., freezeInvestor( )) that sets an isFrozen flag in an investor element 223 that the custodian 116 is associated with.

A broker dealer 118 may be able to call, directly or indirectly via an optional interface smart contract, one or more of the following methods (e.g., in the investor smart contract 134) to modify the data storage smart contract 128: addVerified( ) that adds an investor element 223 to the data storage smart contract 128; removeVerified( ) that removes an investor element 223 from the data storage smart contract 128; and updateVerified( ) that updates the PII hash in an investor element 223 in the data storage smart contract 128. Optionally, a broker dealer 118 may call a method (e.g., freezeInvestor( )) that sets an isFrozen flag in an investor element 223 that the broker dealer 118 is associated with.

An investor 120 may be able to call the following method (e.g., in the security token 102 or the originating smart contract 113): transfer( ) function 109 that transfers funds and/or security tokens 102 between two addresses, to the investor's 120 broker dealer 118 address held at the custodian 116 (even if peer to peer security token 102 transactions are enabled in the security token 102).

Additionally, the transfer function 109 may reference different compliance rule(s) 106 depending on the types of entities involved in the security token 102 transaction. For example, for security token 102 transactions not involving investors 120, the transfer function 109 may reference few or no compliance rules 106. In contrast, for security token 102 transactions involving investors 120, the transfer function 109 may reference more compliance rules 106 than security token 102 transactions not involving investors 120. Furthermore, for transactions for different security tokens 102, the transfer function 109 may reference different compliance rules 106 that may or may not overlap. For example, the transfer function 109 may reference one or more first compliance rule(s) 106 relating to the exemptions to SEC Regulations A, D, and/or S for transactions of a first security

US 11,216,802 B2

token **102**, but only one or more second compliance rule(s) **106** relating to AML/KYC for transactions of a second security token **102**.

FIG. **3** is a flow diagram illustrating a method **300** for transferring a self-enforcing security token **102**. The security token **102** is self-enforcing because it automatically complies with one or more exemptions to the SEC regulations, e.g., SEC Regulation A, D, and/or S. The method **300** may be performed by devices in the system **100** including, but not limited to, a network node **140**.

Optionally, a security token **102** may be issued **302**, e.g., in a security token offering (STO) that deploys many (e.g., hundreds, thousands, or millions of) security tokens **102**. The STO may be performed in response the owner **112** (or issuer **114**) calling a method (e.g., in the originating smart contract **113**) that is executed by a virtual machine (e.g., the Ethereum Virtual Machine (EVM)) running on a network node **140** that stores a copy of the distributed ledger **122**. The security tokens **102** deployed during the STO may be allocated to a single wallet (e.g., belonging to the issuer **114** or owner **112**) before being allocated to individual investor **120** wallets. Alternatively, the security tokens **102** deployed during the STO may be allocated directly to individual investor **120** wallets. The STO may be performed according to an originating smart contract **113** associated with a particular type of security tokens **102**. The originating smart contract **113** may be owned by the owner **112**.

A record of the issuance of the security token **102** may optionally be committed to the distributed ledger **122**. This record may include one or more input transaction addresses, one or more output transaction address, and/or a quantity of security tokens **102** being issued.

At least one processor in the network node **140** may be configured to receive **304** a request to execute a security token **102** transaction, i.e., a transaction to transfer the security token **102**. The request may be received (e.g., at the network node **140**) from an investor **120**, a broker dealer **118** on behalf of the investor **120**, or a custodian **116** on behalf of a broker dealer **118**. In any case, the request may be received from a computing device that is remotely located from the network node **140**.

The at least one processor in the network node **140** may also be configured to execute **306** a plurality of compliance rules **106** associated with the security token **102**. At least one of the compliance rules **106** may be implemented with one or more smart contracts that references the global registry **108**. The compliance rules **106** may be referenced by a compliance rule pointer **107** stored in the security token **102**. Alternatively, the compliance rules **106** may be stored in the security token **102**. The execution of the compliance rules **106** is described in FIG. **4**.

The at least one processor in the network node **140** may also be configured to transfer **308** the security token **102** based on the execution of the compliance rules **106**. In examples, the security token **102** may be transferred only if (1) the buyer and/or the seller of the security token **102** qualify under at least one of SEC Regulations A, D, and S; (2) AML and/or KYC services have been performed for the buyer and/or seller; (3) no freezes have been placed (discussed below) that would prevent the security token **102** from being transferred; and/or (4) the security token **102** is not in a blackout period. Otherwise, the security token **102** may not be transferred, and optionally, the requesting investor **120** may be notified. In examples, the transfer may include updating the table of balances **105** in the security token **102**.

Optionally, the at least one processor in the network node **140** may also be configured to record **310** a transaction of the security token **102** on a distributed ledger **122**, e.g., a security token **102** transaction may be committed to the distributed ledger **122**. When committed to the distributed ledger **122**, one or more input transaction addresses belonging to the seller, one or more output transaction address belonging to the buyer, and/or a quantity of security tokens **102** being transferred may be committed to the distributed ledger **122**.

FIG. **4** is a flow diagram illustrating a method **400** for executing at least one compliance rule **106**. The at least one compliance rule **106** may be implemented using at least one smart contract (or referenced by a compliance rule pointer **107**) in the security token **102**. The at least one compliance rule **106** may be executed by at least one processor running a virtual machine, e.g., at least one processor in a network node **140**.

The at least one compliance rule **106** may reference the data storage smart contract **128**, e.g., the at least one compliance rule **106** may reference an investor element **223** associated with the buyer and/or seller of the security token **102**. Optionally, the at least one compliance rule may also reference a custodian element **223**, a broker dealer element **223**, and/or a security token element **223** relevant to the security token **102** transaction.

The at least one processor in the network node **140** may ensure **402** that the buyer and/or seller qualify under at least SEC Regulation A, D, or S. This may include deriving a qualification (under an exemptions to the SEC Regulations) based on one or more of the following attributes in an investor element **223**: customer name; tax identification number (e.g., Social Security number); address; telephone number; date of birth; driver's license, passport information or information from other government-issued identification; employment status and occupation; whether the customer is employed by a brokerage firm; annual income; net worth; and/or account investment objectives. Each broker dealer **118** may be responsible (and have permissions) for updating attributes in investor elements **223** associated with its customer investors **120**. Additionally or alternatively, the investor **120** may be responsible for creating, updating, and/or removing the attributes in the investor element **223** associated with itself, e.g., if an investor **120** is an external investor.

The at least one processor in the network node **140** may also ensure **404** that AML and/or KYC has been performed for the buyer and/or seller of the security token **102** transaction, e.g., AML alone, KYC alone, or AML and KYC. The AML and/or KYC determination may be made by an identity services provider **126** based on information received at a broker dealer **118**, e.g., including PII collected during onboarding. Once the AML and/or KYC determination is made by the identify services provider **126** and sent to the broker dealer **118**, the broker dealer **118** may store an indication of the AML and/or KYC determination in the global registry **108**, e.g., as an attribute in an investor element **223** in a data structure **110** stored in the data storage smart contract **128**. Alternatively, the mere presence of an investor element **223** in a data structure **110** may indicate that AML and/or KYC was successfully performed without any flags that would prevent the investor **120** from participating in security token **102** transactions, i.e., the investor element **223** may only be created in the data structure **110** in response to AML and/or KYC being successfully performed without any flags that would prevent the investor **120** from participating in security token **102** transactions.

US 11,216,802 B2

23

The at least one processor in the network node **140** may also ensure **406** that the particular security token **102** is not in a blackout period (e.g., based on the length of time a particular security token **102** has been owned by the seller). This may include referencing information relevant to a security token **102** transaction that is not included in the global registry **108**. In examples, the at least one compliance rule **106** may traverse previous security token **102** transactions in the distributed ledger **122** to find the most recent transaction of the security token **102** involved in the current security token **102** transaction. The date of the most recent transaction may then be compared to the current date (e.g., by accessing a server's date) to determine the length of time that the seller has held the security token **102**. The length of time may be used to determine whether the security token **102** is in a blackout period. In examples, when the length of time is greater than the blackout period length, the security token **102** is not in a blackout period, and the security token **102** transaction may be executed. However, when the length of time is less than or equal to the blackout period length, the security token **102** is in a blackout period, and the security token **102** transaction may preferably not be executed.

Optionally, the at least one processor in the network node **140** may also ensure **408** that no freezes have been placed on the buying or selling investor **120**. A freeze may be placed on (or removed from) an investor **120** by changing data (e.g., a portion of a value **221**) in a particular investor element **223** associated with the investor **120**. When an investor **120** has a freeze placed on them, security tokens **102** held by (or on behalf of) the investor **120** may be frozen (temporarily not transferrable). In an alternative configuration, only security tokens **102** held by the freeze-placing custodian **116** or broker dealer **118** (on behalf of the investor **120**) may be frozen (temporarily not transferrable). A freeze may be placed on an investor **120** by a broker dealer **118** that the investor **120** has an account with, or a custodian **116** that investor's broker dealer **118** has an account with. An owner **112** may also place a freeze on an investor **120**. A freeze may be placed on an investor **120**, e.g., in response to a court order when fraud is suspected.

Optionally, the at least one processor in the network node **140** may also ensure **410** that no freezes have been placed on the custodian(s) **116**, broker dealer(s) **118**, and/or security token **102** associated with the security token **102** transaction. A freeze may be placed on (or removed from) a security token **102** by changing data (e.g., a portion of a value **221**) in a particular security token element **223**. In examples, placing or removing a freeze on a security token **102** may be performed only by an owner **112** of the system **100**, e.g., if fraud is suspected or if security token **102** is suspected of sponsoring terrorism. The owner **112** may place or remove a freeze on a security token **102** in response to a court order. When a freeze is placed, outstanding security tokens **102** (of the particular type that is frozen) may be frozen (temporarily not transferrable).

When a freeze is placed on a custodian **116**, security tokens **102** held by the custodian **116** may be frozen (temporarily not transferrable). Similarly, when a freeze is placed on a broker dealer **118**, security tokens **102** held by (or on behalf of) the broker dealer **118** may be frozen (temporarily not transferrable).

Computer System Overview

Embodiments of the present disclosure include various steps and operations, which have been described above. A variety of these steps and operations may be performed by hardware components or may be embodied in machine-executable instructions, which may be used to cause a

24

general-purpose or special-purpose processor programmed with the instructions to perform the steps. Alternatively, the steps may be performed by a combination of hardware, software, and/or firmware. As such, FIG. **5** is a block diagram illustrating an example computer system **500** with which embodiments of the present disclosure may be utilized. According to the present example, the computer system **500** includes an interconnect **502**, at least one processor **504**, at least one communication port **506**, at least one main memory **508**, at least one removable storage media **510**, at least one read only memory **512**, and at least one mass storage device **514**.

The at least one processor **504** can be any known processor. The at least one communication port **506** can be or include, In examples, any of an RS-232 port for use with a modem-based dialup connection, a 10/100 Ethernet port, or a Gigabit port using copper or fiber. The nature of the at least one communication port **506** may be chosen depending on a network such as a Local Area Network (LAN), Wide Area Network (WAN), or any network to which the computer system **500** connects. The at least one main memory **508** can be Random Access Memory (RAM), or any other dynamic storage device(s) commonly known in the art. The at least one read only memory **512** can be any static storage device(s) such as Programmable Read Only Memory (PROM) chips for storing static information such as instructions for the at least one processor **504**.

The at least one mass storage device **514** can be used to store information and instructions. In examples, hard disks (such as magnetic disk drives or solid state drive using serial/parallel ATA or SCSI interfaces), an optical disc, an array of disks such as a Redundant Array of Independent Disks (RAID), or any other mass storage devices may be used. Interconnect **502** can be or include one or more buses, bridges, controllers, adapters, and/or point-to-point connections. Interconnect **502** communicatively couples the at least one processor **504** with the other memory, storage, and communication blocks. Interconnect **502** can be a PCI/PCI-X or SCSI based system bus depending on the storage devices used. The at least one removable storage media **510** can be any kind of external hard-drives, floppy drives, Compact Disc-Read Only Memory (CD-ROM), Compact Disc-Re-Writable (CD-RW), Digital Video Disc-Read Only Memory (DVD-ROM), Blu-Ray Disc Read Only Memory (BD-ROM), Blu-Ray Disc Recordable (BD-R), Blu-Ray Disc Recordable Erasable (BD-RE).

The components described above are meant to exemplify some types of possibilities. In no way should the aforementioned examples limit the disclosure, as they are only exemplary embodiments.

FIG. **6** is a block diagram illustrating another example computing device **600** with which embodiments of the present disclosure may be utilized. The example computing device **600** may be used to implement any of the global registry **108**, owner **112**, issuer **114**, custodian **116**, broker dealer **118**, investor **120**, one of the network nodes **140** storing a copy of the distributed ledger **122**, security token exchange **124**, and/or a virtual machine (e.g., Ethereum Virtual Machine) executing any of the smart contracts described herein. The computing device **600** includes at least one memory **602**, at least one processor **604**, optional at least one network interface **606**, optional display device **608**, optional input device **610**, and optional power source **612**.

In examples, the at least one memory **602** can be any device, mechanism, or populated data structure used for storing information. In examples, the at least one memory **602** can be or include any type of volatile memory, non-

US 11,216,802 B2

25 26

volatile memory, and/or dynamic memory. In examples, the at least one memory **602** can be random access memory, memory storage devices, optical memory devices, magnetic media, floppy disks, magnetic tapes, hard drives, erasable programmable read-only memories (EPROMs), electrically erasable programmable read-only memories (EEPROMs), optical media (such as compact discs, DVDs, Blu-ray Discs) and/or the like.

In accordance with some embodiments, the at least one memory **602** may include one or more disk drives, flash drives, one or more databases, one or more tables, one or more files, local cache memories, processor cache memories, relational databases, flat databases, and/or the like. In addition, those of ordinary skill in the art will appreciate many additional devices and techniques for storing information, which can be used as the at least one memory **602**. The at least one memory **602** may be used to store instructions for running one or more applications or modules on the at least one processor **604**. In examples, the at least one memory **602** could be used in one or more examples to house all or some of the instructions needed to execute the functionality discussed herein, e.g., in FIGS. **3-4**.

The at least one processor **604** can be any known processor, such as a general purpose processor (GPP) or special purpose (such as a field-programmable gate array (FPGA), application-specific integrated circuit (ASIC) or other integrated circuit or circuitry), or any programmable logic device. In examples, any of the functionality disclosed herein (e.g., in FIGS. **3-4**) may be implemented by the at least one processor **604** and the at least one memory **602**.

In examples, the at least one optional network interface **606** includes or is coupled to at least one optional antenna for communication with a network (such as one of the at least one networks **112** of system **100**). In examples, the at least one optional network interface **606** includes at least one of an Ethernet interface, a cellular radio access technology (RAT) radio, a Wi-Fi radio, a Bluetooth radio, or a near field communication (NFC) radio. In examples, the at least one optional network interface **606** includes a cellular radio access technology radio configured to establish a cellular data connection (mobile Internet) of sufficient speeds with a remote server using a local area network (LAN) or a wide area network (WAN). In examples, the cellular radio access technology includes at least one of Personal Communication Services (PCS), Specialized Mobile Radio (SMR) services, Enhanced Special Mobile Radio (ESMR) services, Advanced Wireless Services (AWS), Code Division Multiple Access (CDMA), Global System for Mobile Communications (GSM) services, Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Worldwide Interoperability for Microwave Access (WiMAX), 3rd Generation Partnership Projects (3GPP) Long Term Evolution (LTE), High Speed Packet Access (HSPA), third generation (3G) fourth generation (4G), fifth generation (5G), etc. or other appropriate communication services or a combination thereof. In examples, the at least one optional network interface **606** includes a Wi-Fi (IEEE 802.11) radio configured to communicate with a wireless local area network that communicates with the remote server, rather than a wide area network. In examples, the at least one optional network interface **606** includes a near field radio communication device that is limited to close proximity communication, such as a passive near field communication (NFC) tag, an active near field communication (NFC) tag, a passive radio frequency identification (RFID) tag, an active radio fre-

quency identification (RFID) tag, a proximity card, or other personal area network device.

In examples, the optional at least one display device **608** includes at least one of a light emitting diode (LED), a liquid crystal display (LCD), a light emitting diode (LED) display, an organic light emitting diode (OLED) display, an e-ink display, a field emission display (FED), a surface-conduction electron-emitter display (SED), or a plasma display. In examples, the optional at least one input device **610** includes at least one of a touchscreen (including capacitive and resistive touchscreens), a touchpad, a capacitive button, a mechanical button, a switch, a dial, a keyboard, a mouse, a camera, a biometric sensor/scanner, a microphone, etc. In examples, the optional at least one display device **608** is combined with the optional at least one input device **610** into a human machine interface (HMI) for user interaction with the computing device **600**. In examples, at least one optional power source **612** is used to provide power to the various components of the computing device **600**.

Terminology

Brief definitions of terms, abbreviations, and phrases used throughout this application are given below.

The term "determining" may include calculating, computing, generating, processing, deriving, investigating, looking up (e.g., looking up in a table, a database or another data structure), ascertaining and the like. Also, "determining" may also include receiving (e.g., receiving information), accessing (e.g., accessing data in a memory) and the like. Also, "determining" may include resolving, selecting, choosing, establishing and the like.

The phrase "based on" does not mean "based only on," unless expressly specified otherwise. In other words, the phrase "based on" describes both "based only on" and "based at least on". Additionally, the phrase "based on" does not preclude intermediate steps, e.g., A is based on C may mean that B is based on C and A is based on B. Additionally, the term "and/or" means "and" or "or". In examples, "A and/or B" can mean "A", "B", or "A and B". Additionally, "A, B, and/or C" can mean "A alone," "B alone," "C alone," "A and B," "A and C," "B and C" or "A, B, and C."

The terms "connected", "coupled", and "communicatively coupled" and related terms are used in an operational sense and are not necessarily limited to a direct physical connection or coupling. Thus, In examples, two devices may be coupled directly, or via one or more intermediary media or devices. As another example, devices may be coupled in such a way that information can be passed there between, while not sharing any physical connection with one another. Based on the disclosure provided herein, one of ordinary skill in the art will appreciate a variety of ways in which connection or coupling exists in accordance with the aforementioned definition.

The phrases "in exemplary embodiments", "in example embodiments", "in some embodiments", "according to some embodiments", "in the embodiments shown", "in other embodiments", "embodiments", "in examples", "examples", "in some examples", "some examples" and the like generally mean the particular feature, structure, or characteristic following the phrase is included in at least one embodiment of the present disclosure, and may be included in more than one embodiment of the present disclosure. In addition, such phrases do not necessarily refer to the same embodiments or different embodiments.

If the specification states a component or feature "may," "can," "could," or "might" be included or have a character-

US 11,216,802 B2

27

istic, that particular component or feature is not required to be included or have the characteristic.

The term "responsive" includes completely or partially responsive.

The term "module" refers broadly to a software, hardware, or firmware (or any combination thereof) component. Modules are typically functional components that can generate useful data or other output using specified input(s). A module may or may not be self-contained. An application program (also called an "application") may include one or more modules, or a module can include one or more application programs.

The term "network" generally refers to a group of interconnected devices capable of exchanging information. A network may be as few as several personal computers on a Local Area Network (LAN) or as large as the Internet, a worldwide network of computers. As used herein, "network" is intended to encompass any network capable of transmitting information from one entity to another. In some cases, a network may be comprised of multiple networks, even multiple heterogeneous networks, such as one or more border networks, voice networks, broadband networks, financial networks, service provider networks, Internet Service Provider (ISP) networks, and/or Public Switched Telephone Networks (PSTNs), interconnected via gateways operable to facilitate communications between and among the various networks.

Also, for the sake of illustration, various embodiments of the present disclosure have herein been described in the context of computer programs, physical components, and logical interactions within modern computer networks. Importantly, while these embodiments describe various embodiments of the present disclosure in relation to modern computer networks and programs, the method and apparatus described herein are equally applicable to other systems, devices, and networks as one skilled in the art will appreciate. As such, the illustrated applications of the embodiments of the present disclosure are not meant to be limiting, but instead are examples. Other systems, devices, and networks to which embodiments of the present disclosure are applicable include, In examples, other types of communication and computer devices and systems. More specifically, embodiments are applicable to communication systems, services, and devices such as cell phone networks and compatible devices. In addition, embodiments are applicable to all levels of computing from the personal computer to large network mainframes and servers.

In conclusion, the present disclosure provides novel systems, methods, and arrangements for using security tokens implementing smart-contract-based compliance rules that reference a global registry of investors based on smart contracts. While detailed descriptions of one or more embodiments of the disclosure have been given above, various alternatives, modifications, and equivalents will be apparent to those skilled in the art without varying from the spirit of the disclosure. In examples, while the embodiments described above refer to particular features, the scope of this disclosure also includes embodiments having different combinations of features and embodiments that do not include all of the described features. Accordingly, the scope of the present disclosure is intended to embrace all such alternatives, modifications, and variations as fall within the scope of the claims, together with all equivalents thereof. Therefore, the above description should not be taken as limiting.

Example Embodiments

Example 1 includes a network node comprising: at least one processor; at least one memory communicatively

28

coupled to the at least one processor; at least one network interface communicatively couple to the at least one processor; wherein the network node is configured to be within a plurality of network nodes communicatively coupled in a peer-to-peer network of network nodes implementing a distributed ledger; wherein the network node is configured to be communicatively coupled to at least one remotely located computing device through the at least one network interface; wherein the at least one processor is configured to: receive, from a remotely located computing device, a request to transfer a security token; execute a plurality of compliance rules associated with the security token, wherein at least one of the compliance rules is implemented using at least one smart contract, wherein the at least one smart contract references a global registry; and transfer the security token based on the execution of the compliance rules.

Example 2 includes the network node of Example 1, wherein the security token is a cryptographic token that represents an external, tradeable asset.

Example 3 includes the network node of any of Examples 1-2, wherein the global registry includes at least one personally identifiable information (PII) hash for each of at least one investor involved in the requested transfer, wherein the PII hash is committed to a distributed ledger, wherein each PII hash is updated when PII of a respective one of the multiple investors changes.

Example 4 includes the network node of any of Examples 1-3, wherein the global registry comprises at least one of the following attributes: an indication of whether at least one of the at least one investor qualifies under Securities and Exchange Commission (SEC) Regulation A; an indication of whether at least one of the at least one investor qualifies under SEC Regulation D; and an indication of whether at least one of the at least one investor qualifies under SEC Regulation S.

Example 5 includes the network node of Example 4, wherein the global registry further comprises at least one of the following attributes: an indication of whether anti-money laundering and know-your-customer (AML/KYC) checks have been performed for at least one investor associated with the security token transaction.

Example 6 includes the network node of Example 5, wherein the global registry further comprises at least one of the following attributes: an indication of whether a freeze has been placed on any of the at least one investor; an indication of whether a freeze has been placed on a security token; an indication of whether a freeze has been placed on a custodian associated with the security token transaction; and an indication of whether a freeze has been placed on any broker dealer associated with the security token transaction.

Example 7 includes the network node of Example 6, wherein a freeze is placed on or removed from any of the at least one investor by modifying attributes in an investor element in the global registry; wherein a freeze is placed on or removed from the security token by modifying attributes in a security token element in the global registry; wherein a freeze is placed on or removed from the custodian by modifying attributes in a custodian element in the global registry; and wherein a freeze is placed on or removed from any broker dealer associated with the security token transaction by modifying attributes in a broker dealer element in the global registry.

Example 8 includes the sys network node term of any of Examples 6-7, wherein the global registry comprises a data storage smart contract that stores one or more of the attributes in the global registry.

US 11,216,802 B2

29

Example 9 includes the network node of any of Examples 1-8, wherein the security token stores a table that indicates a length of time a particular security token has been owned by the investor.

Example 10 includes the network node of any of Examples 1-9, wherein the security token is implemented using an originating smart contract.

Example 11 includes the network node of any of Examples 1-10, wherein a record of an issuance of the security token is recorded on the distributed ledger.

Example 12 includes the network node of any of Examples 1-11, wherein a record of the transfer is committed to the distributed ledger.

Example 13 includes a computerized method for transferring a self-enforcing security token, wherein the computerized method is performed by a network node configured to be included within a plurality of network nodes in a peer-to-peer network of network nodes implementing a distributed ledger, wherein the network node is configured to be communicatively coupled to other network nodes in the peer-to-peer network, the computerized method comprising: receiving, from a remotely located computing device, a request to transfer a security token; executing a plurality of compliance rules associated with the security token, wherein at least one of the compliance rules is implemented using at least one smart contract, wherein the at least one smart contract references a global registry; and transferring the security token based on the execution of the compliance rules.

Example 14 includes the computerized method of Example 13, wherein the security token is a cryptographic token that represents an external, tradeable asset.

Example 15 includes the computerized method of any of Examples 13-14, wherein the global registry includes at least one personally identifiable information (PII) hash for each of at least one investor involved in the requested transfer, wherein the PII hash is committed to a distributed ledger, wherein each PII hash is updated when PII of a respective one of the multiple investors changes.

Example 16 includes the computerized method of any of Examples 13-15, wherein the global registry comprises at least one of the following attributes: an indication of whether at least one of the at least one investor qualifies under Securities and Exchange Commission (SEC) Regulation A; an indication of whether at least one of the at least one investor qualifies under SEC Regulation D; and an indication of whether at least one of the at least one investor qualifies under SEC Regulation S.

Example 17 includes the computerized method of Example 16, wherein the global registry further comprises at least one of the following attributes: an indication of whether anti-money laundering and know-your-customer (AML/KYC) checks have been performed for at least one investor associated with the security token transaction; and an indication of a length of time a particular security token has been owned by the investor.

Example 18 includes the computerized method of Example 17, wherein the global registry further comprises at least one of the following attributes: an indication of whether a freeze has been placed on any of the at least one investor; an indication of whether a freeze has been placed on a security token; an indication of whether a freeze has been placed on a custodian associated with the security token transaction; and an indication of whether a freeze has been placed on any broker dealer associated with the security token transaction.

30

Example 19 includes the computerized method of Example 18, wherein a freeze is placed on or removed from any of the at least one investor by modifying attributes in an investor element in the global registry; wherein a freeze is placed on or removed from the security token by modifying attributes in a security token element in the global registry; wherein a freeze is placed on or removed from the custodian by modifying attributes in a custodian element in the global registry; and wherein a freeze is placed on or removed from any broker dealer associated with the security token transaction by modifying attributes in a broker dealer element in the global registry.

Example 20 includes the computerized method of any of Examples 18-19, wherein the global registry comprises a data storage smart contract that stores one or more of the attributes in the global registry.

Example 21 includes the computerized method of any of Examples 13-20, wherein the security token stores a table that indicates a length of time a particular security token has been owned by the investor.

Example 22 includes the computerized method of any of Examples 13-21, wherein the security token is implemented using an originating smart contract.

Example 23 includes the computerized method of any of Examples 13-22, wherein a record of an issuance of the security token is recorded on the distributed ledger.

Example 24 includes the computerized method of any of Examples 13-23, wherein a record of the transfer is committed to the distributed ledger.

Example 25 includes a system, comprising: a plurality of network nodes communicatively coupled in a peer-to-peer network of network nodes implementing a distributed ledger, each network node comprising: at least one processor; at least one memory communicatively coupled to the at least one processor; wherein the at least one processor is configured to: receive, from a remotely located computing device, a request to transfer a smart-contract-based security token; execute a plurality of smart-contract-based compliance rules associated with the security token; and transfer the security token based on the execution of the compliance rules, wherein the transfer comprises updating a table of balances in the security token; the security token stored on the distributed ledger, wherein the security token is a cryptographic token that represents an external, tradeable asset, wherein the security token references the plurality of smart-contract-based compliance rules that are associated with the security token, and wherein at least one of the smart-contract-based compliance rules references a smart-contract-based global registry; and the smart-contract-based global registry, comprising: at least one personally identifiable information (PII) hash for each of at least one investor; indications of whether at least one of the at least one investor qualifies under Securities and Exchange Commission (SEC) Regulation A, Regulation S, and Regulation D; and an indication of whether anti-money laundering and know-your-customer (AML/KYC) checks have been performed by a broker dealer associated with the security token transaction.

Example 26 includes the system of Example 25, wherein the global registry further comprises at least one of the following attributes: an indication of whether a freeze has been placed on any of the at least one investor; an indication of whether a freeze has been placed on a security token; an indication of whether a freeze has been placed on a custodian associated with the security token transaction; and an indication of whether a freeze has been placed on any broker dealer associated with the security token transaction.

US 11,216,802 B2

31

Example 27 includes the system of Example 26, wherein a freeze is placed on or removed from any of the at least one investor by modifying attributes in an investor element in the global registry; wherein a freeze is placed on or removed from the security token by modifying attributes in a security token element in the global registry; wherein a freeze is placed on or removed from the custodian by modifying attributes in a custodian element in the global registry; and wherein a freeze is placed on or removed from any broker dealer associated with the security token transaction by modifying attributes in a broker dealer element in the global registry.

Example 21 includes the system of any of Examples 25-27, wherein the security token stores a table that indicates a length of time a particular security token has been owned by a particular investor.

What is claimed is:

1. A network node comprising:

at least one processor;

at least one memory communicatively coupled to the at least one processor;

at least one network interface communicatively coupled to the at least one processor;

wherein the network node is configured to be within a plurality of network nodes communicatively coupled in a peer-to-peer network of network nodes implementing a distributed ledger;

wherein the network node is configured to be communicatively coupled to at least one remotely located computing device through the at least one network interface;

wherein the at least one processor is configured to:

receive, from a remotely located computing device, a request to transfer a security token;

execute a plurality of compliance rules associated with the security token;

wherein at least one of the plurality of compliance rules is implemented using at least one smart contract separate from an originating smart contract that implements the security token;

wherein the at least one smart contract is implemented on the distributed ledger and references a global registry;

transfer the security token based on the execution of the plurality of compliance rules;

wherein the global registry comprises at least one personally identifiable information (PII) hash for each of at least one investor associated with the transfer of the security token, wherein the at least one PII hash for each of the at least one investor is committed to the distributed ledger, wherein each of the at least one PII hash is updated when PII of a respective one of the at least one investor changes;

wherein the global registry further comprises at least one indication of:

whether an offering of the security token qualifies under Securities and Exchange Commission (SEC) Regulation A;

whether at least one of the at least one investor qualifies under SEC Regulation D;

whether the offering of the security token qualifies under SEC Regulation S; and

whether anti-money laundering and know-your-customer (AML/KYC) checks have been performed for the at least one investor associated with the transfer of the security token.

32

2. The network node of claim 1, wherein the security token is a cryptographic token that represents an external, tradeable asset.

3. The network node of claim 1, wherein the at least one indication of the global registry further comprises at least one indication of:

whether a freeze has been placed on any of the at least one investor;

whether a freeze has been placed on the security token;

whether a freeze has been placed on a custodian associated with the transfer of the security token; and

whether a freeze has been placed on any broker dealer associated with the transfer of the security token.

4. The network node of claim 3,

wherein a freeze is placed on or removed from any of the at least one investor by modifying attributes in an investor element in the global registry;

wherein a freeze is placed on or removed from the security token by modifying attributes in a security token element in the global registry;

wherein a freeze is placed on or removed from the custodian by modifying attributes in a custodian element in the global registry; and

wherein a freeze is placed on or removed from any broker dealer associated with the transfer of the security token by modifying attributes in a broker dealer element in the global registry.

5. The network node of claim 3, wherein the global registry comprises a data storage smart contract that stores the at least one indication in the global registry.

6. The network node of claim 1, wherein the security token stores a table that indicates a length of time a particular security token has been owned by a particular investor.

7. The network node of claim 1, wherein a record of an issuance of the security token is recorded on the distributed ledger.

8. The network node of claim 1, wherein a record of the transfer of the security token is committed to the distributed ledger.

9. A computerized method for transferring a self-enforcing security token, wherein the computerized method is performed by a network node configured to be included within a plurality of network nodes in a peer-to-peer network of network nodes implementing a distributed ledger, wherein the network node is configured to be communicatively coupled to other network nodes in the peer-to-peer network, the computerized method comprising:

receiving, from a remotely located computing device, a request to transfer a security token;

executing a plurality of compliance rules associated with the security token;

wherein at least one of the plurality of compliance rules is implemented using at least one smart contract separate from an originating smart contract that implements the security token;

wherein the at least one smart contract is implemented on the distributed ledger and references a global registry; and

transferring the security token based on the execution of the plurality of compliance rules;

wherein the global registry comprises at least one personally identifiable information (PII) hash for each of at least one investor associated with the transfer of the security token, wherein the at least one PII hash for each of the at least one investor is committed to the distributed ledger, wherein each of the at least one PII

US 11,216,802 B2

33

hash is updated when PII of a respective one of the at least one investor changes;

wherein the global registry further comprises at least one indication of:

whether an offering of the security token qualifies under Securities and Exchange Commission (SEC) Regulation A;

whether at least one of the at least one investor qualifies under SEC Regulation D;

whether the offering of the security token qualifies under SEC Regulation S;

whether anti-money laundering and know-your-customer (AML/KYC) checks have been performed for the at least one investor associated with the transfer of the security token; and

a length of time a particular security token has been owned by a particular investor.

10. The computerized method of claim 9, wherein the security token is a cryptographic token that represents an external, tradeable asset.

11. The computerized method of claim 9, wherein the global registry further comprises at least one indication of:

whether a freeze has been placed on any of the at least one investor;

whether a freeze has been placed on the security token;

whether a freeze has been placed on a custodian associated with the transfer of the security token; and

whether a freeze has been placed on any broker dealer associated with the transfer of the security token.

12. The computerized method of claim 11,

wherein a freeze is placed on or removed from any of the at least one investor by modifying attributes in an investor element in the global registry;

wherein a freeze is placed on or removed from the security token by modifying attributes in a security token element in the global registry;

wherein a freeze is placed on or removed from the custodian by modifying attributes in a custodian element in the global registry; and

wherein a freeze is placed on or removed from any broker dealer associated with the transfer of the security token by modifying attributes in a broker dealer element in the global registry.

13. The computerized method of claim 11, wherein the global registry comprises a data storage smart contract that stores the at least one indication in the global registry.

14. The computerized method of claim 9, wherein a record of an issuance of the security token is recorded on the distributed ledger.

15. The computerized method of claim 9, wherein a record of the transfer of the security token is committed to the distributed ledger.

16. A system, comprising:

a plurality of network nodes communicatively coupled in a peer-to-peer network of network nodes implementing a distributed ledger, each network node comprising:

at least one processor;

at least one memory communicatively coupled to the at least one processor;

wherein the at least one processor is configured to:

receive, from a remotely located computing device, a request to transfer a smart-contract-based security token;

execute a plurality of smart-contract-based compliance rules implemented on the distributed ledger and associated with the smart-contract-based security token, wherein the plurality of smart-

34

contract-based compliance rules are implemented in at least one smart contract separate from an originating smart contract implementing the smart-contract-based security token; and

transfer the smart-contract-based security token based on the execution of the plurality of smart-contract-based compliance rules, wherein the transfer comprises updating a table of balances in the smart-contract-based security token;

the smart-contract-based security token stored on the distributed ledger,

wherein the smart-contract-based security token is a cryptographic token that represents an external, tradeable asset;

wherein the smart-contract-based security token references the plurality of smart-contract-based compliance rules that are associated with the smart-contract-based security token; and

wherein at least one of the plurality of smart-contract-based compliance rules references a smart-contract-based global registry; and

the smart-contract-based global registry, comprising:

at least one personally identifiable information (PII) hash for each of at least one investor associated with the transfer of the security token, wherein the at least one PII hash for each of the at least one investor is committed to the distributed ledger, wherein each of the at least one PII hash is updated when PII of a respective one of the at least one investor changes;

indications of whether at least one of the at least one investor qualifies under Securities and Exchange Commission (SEC) Regulation D, and whether an offering of the security token qualifies under SEC Regulation A and S; and

an indication of whether anti-money laundering and know-your-customer (AML/KYC) checks have been performed by a broker dealer associated with the transfer of the smart-contract-based security token.

17. The system of claim 16, wherein the smart-contract-based global registry further comprises at least one indication of:

whether a freeze has been placed on any of the at least one investor;

whether a freeze has been placed on the smart-contract-based security token;

whether a freeze has been placed on a custodian associated with the transfer of the smart-contract-based security token; and

whether a freeze has been placed on any broker dealer associated with the transfer of the smart-contract-based security token.

18. The system of claim 17,

wherein a freeze is placed on or removed from any of the at least one investor by modifying attributes in an investor element in the smart-contract-based global registry;

wherein a freeze is placed on or removed from the smart-contract-based security token by modifying attributes in a smart-contract-based security token element in the smart-contract-based global registry;

wherein a freeze is placed on or removed from the custodian by modifying attributes in a custodian element in the smart-contract-based global registry; and

wherein a freeze is placed on or removed from any broker dealer associated with the transfer of the smart-con-

US 11,216,802 B2

35

36

tract-based security token by modifying attributes in a broker dealer element in the smart-contract-based global registry.

19. The system of claim 16, wherein the smart-contract-based security token stores a table that indicates a length of time a particular smart-contract-based security token has been owned by a particular investor.

* * * * *

# EXHIBIT 2

US011394560B2

## (12) United States Patent
### Wilkins et al.

(10) **Patent No.:**     **US 11,394,560 B2**
(45) **Date of Patent:**          ***Jul. 19, 2022**

(54) **CRYPTO INTEGRATION PLATFORM**

(71) Applicant: **tZERO IP, LLC**, New York, NY (US)

(72) Inventors: **Alec Wilkins**, Salt Lake City, UT (US); **Eric Nathaniel Fish**, Salt Lake City, UT (US); **Trent Norman Larson**, Bountiful, UT (US); **Patrick M. Byrne**, Salt Lake City, UT (US)

(73) Assignee: **tZERO IP, LLC**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/889,370**

(22) Filed: **Jun. 1, 2020**

(65) **Prior Publication Data**

US 2020/0322167 A1      Oct. 8, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 16/235,534, filed on Dec. 28, 2018, now Pat. No. 10,673,634, which is a
(Continued)

(51) **Int. Cl.**
**H04L 9/32**          (2006.01)
**G06Q 20/38**          (2012.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ **H04L 9/3247** (2013.01); **G06F 21/64** (2013.01); **G06Q 40/04** (2013.01); **H04L 63/126** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ................. H04L 9/3247; H04L 9/0825; H04L 2463/102; H04L 2209/56; H04L 63/126;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,598,028 | B1 | 7/2003 | Sullivan et al. |
| 6,629,082 | B1 | 9/2003 | Hambrecht et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1320877 A | 11/2001 |
| CN | 1366263 A | 8/2002 |

(Continued)

OTHER PUBLICATIONS

Anonymous, "Bitcoin", "https://en.wikipedia.org/w/index.php?title+Bitcoin&oldid+646184058", Feb. 8, 2015, pp. 1-39, XP055319200, Publisher: Wikipedia, The Free Encyclopedia. Retrieved on Nov. 14, 2016.

(Continued)

*Primary Examiner* — Vu V Tran
(74) *Attorney, Agent, or Firm* — Fogg & Powers LLC

(57)          **ABSTRACT**

A system, includes at least one processor; and at least one memory communicatively coupled to the at least one processor. The at least one processor is configured to receive an order to execute a trade of at least one transactional item associated with a first account, wherein the order, the first account, and a second account are associated with a common identifier; generate a first transaction to transfer the at least one transactional item from the first account to the second account; generate a second transaction that includes the order; verify that the first transaction was authorized by a same party as the second transaction; and authorize placement of the order on an exchange if the first transaction was authorized by the same party as the second transaction.

**20 Claims, 14 Drawing Sheets**



## US 11,394,560 B2

Page 2

### Related U.S. Application Data

continuation of application No. 15/017,359, filed on Feb. 5, 2016, now Pat. No. 10,171,245.

(60) Provisional application No. 62/113,931, filed on Feb. 9, 2015.

(51) **Int. Cl.**

| | |
|---|---|
| *H04L 9/08* | (2006.01) |
| *H04L 9/40* | (2022.01) |
| *G06Q 40/04* | (2012.01) |
| *G06F 21/64* | (2013.01) |

(52) **U.S. Cl.**
CPC .... *H04L 2209/56* (2013.01); *H04L 2463/102* (2013.01)

(58) **Field of Classification Search**
CPC .............. G06Q 40/04; G06Q 20/3825; G06Q 20/3829; G06F 21/64
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,668,325 B1 | 12/2003 | Collberg et al. | |
| 7,069,234 B1 | 6/2006 | Cornelius et al. | |
| 7,130,807 B1 | 10/2006 | Mikurak | |
| 7,587,358 B2 | 9/2009 | Hambrecht et al. | |
| 7,716,467 B1 | 5/2010 | Deffet et al. | |
| 8,024,258 B2 | 9/2011 | Gastineau et al. | |
| 8,117,112 B2 | 2/2012 | Hambrecht et al. | |
| 8,204,821 B2 | 6/2012 | Staib et al. | |
| 8,355,973 B2 | 1/2013 | Geller et al. | |
| 8,712,920 B2 | 4/2014 | Walker et al. | |
| 8,732,023 B2 | 5/2014 | Mikurak | |
| 9,020,850 B1 | 4/2015 | Anderson | |
| 9,177,313 B1 | 11/2015 | Silverman | |
| 9,397,985 B1 | 7/2016 | Seger, II et al. | |
| 9,704,143 B2 * | 7/2017 | Walker ................. | G06Q 20/065 |
| 10,171,245 B2 | 1/2019 | Wilkins et al. | |
| 10,552,829 B2 | 2/2020 | Wilkins et al. | |
| 10,673,634 B2 | 6/2020 | Wilkins et al. | |
| 2002/0128958 A1 | 9/2002 | Slone | |
| 2004/0064351 A1 | 4/2004 | Mikurak | |
| 2006/0064372 A1 * | 3/2006 | Gupta .................... | G06Q 40/00 |
| | | | 705/39 |
| 2007/0106892 A1 | 5/2007 | Engberg | |
| 2008/0228620 A1 * | 9/2008 | Johnson ................. | G06Q 40/06 |
| | | | 705/37 |
| 2008/0313068 A1 | 12/2008 | Sun | |
| 2009/0119197 A1 | 5/2009 | Littlewood | |
| 2009/0177591 A1 | 7/2009 | Thorpe et al. | |
| 2009/0292641 A1 | 11/2009 | Weiss | |
| 2011/0071935 A1 | 3/2011 | Balabon | |
| 2011/0164192 A1 | 7/2011 | Ozawa | |
| 2011/0295736 A1 | 12/2011 | Freer et al. | |
| 2013/0006840 A1 | 1/2013 | Cahn | |
| 2013/0086393 A1 | 4/2013 | Pogmore | |
| 2013/0218741 A1 | 8/2013 | Fenichel et al. | |
| 2013/0268772 A1 | 10/2013 | Golle | |
| 2013/0347093 A1 | 12/2013 | von Krogh | |
| 2014/0040099 A1 * | 2/2014 | Keitz .................... | G06Q 20/02 |
| | | | 705/37 |
| 2014/0052598 A1 | 2/2014 | Briem | |
| 2014/0201057 A1 | 7/2014 | Shuster | |
| 2015/0026072 A1 | 1/2015 | Zhou et al. | |
| 2015/0046337 A1 * | 2/2015 | Hu .................... | G06Q 20/0658 |
| | | | 705/65 |
| 2015/0220928 A1 | 8/2015 | Allen | |
| 2015/0262168 A1 | 9/2015 | Armstrong | |
| 2015/0332395 A1 | 11/2015 | Walker et al. | |
| 2016/0092988 A1 | 3/2016 | Letourneau | |
| 2016/0217436 A1 | 7/2016 | Brama | |
| 2016/0224949 A1 | 8/2016 | Thomas et al. | |

| | | | |
|---|---|---|---|
| 2016/0234026 A1 | 8/2016 | Wilkins et al. | |
| 2016/0260169 A1 | 9/2016 | Arnold et al. | |
| 2016/0261685 A1 | 9/2016 | Chen et al. | |
| 2016/0261690 A1 | 9/2016 | Ford | |
| 2016/0267474 A1 | 9/2016 | Lingham et al. | |
| 2016/0267566 A1 | 9/2016 | Levitt et al. | |
| 2016/0267605 A1 | 9/2016 | Lingham et al. | |
| 2016/0292680 A1 | 10/2016 | Wilson, Jr. et al. | |
| 2016/0321751 A1 | 11/2016 | Creighton, IV et al. | |
| 2016/0321752 A1 | 11/2016 | Tabacco et al. | |
| 2016/0350749 A1 | 12/2016 | Wilkins et al. | |
| 2017/0109744 A1 | 4/2017 | Wilkins et al. | |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1399756 A | 2/2003 |
| CN | 1439138 A | 8/2003 |
| CN | 1328675 A | 12/2004 |
| CN | 1853193 A | 10/2006 |
| CN | 101819614 A | 9/2010 |
| CN | 101860548 A | 10/2010 |
| CN | 102609841 A | 7/2012 |
| CN | 102742211 A | 10/2012 |
| CN | 102801710 A | 11/2012 |
| CN | 102938120 A | 2/2013 |
| CN | 103020861 A | 4/2013 |
| CN | 103797500 A | 5/2014 |
| GB | 2514716 A | 12/2014 |
| JP | 2002245251 A | 8/2002 |
| JP | 2003036348 A | 2/2003 |
| JP | 2005202977 A | 7/2005 |
| WO | 0184906 A2 | 11/2001 |
| WO | 2012123394 A1 | 9/2012 |
| WO | 2014063937 A1 | 5/2014 |
| WO | 2016178999 A1 | 11/2016 |
| WO | 2017131929 A1 | 8/2017 |

#### OTHER PUBLICATIONS

Anonymous, "Digital Signature", "https://en.wikipedia.org/w/index.php?title=Digital_signature&oldid=646145535", Feb. 8, 2015, pp. 1-11, XP055319249, Publisher: Wikipedia, The Free Encyclopedia. Retrieved on Nov. 14, 2016.

Australian Government IP Australia, "Examination report No. 1 for standard patent application from AU Application No. 2016307202", from Foreign Counterpart to U.S. Appl. No. 15/164,341, dated Jan. 5, 2021, pp. 1 through 7, Published: AU.

Australian Government IP Australia, "Examination report No. 1 for standard patent application from AU Application No. 2020203257", from Foreign Counterpart to U.S. Appl. No. 15/017,359, dated Jul. 23, 2021, pp. 1 through 3, Published: AU.

Bhanot et al, "Distributed Ledgers: Possibilities and Challenges in Capital Markets Applications", "Cognizant 20-20 Insights", "https://www.cognizant.com/whitepapers/distributed-ledgers-possibilities-and-challenges-in-capital-markets-applications-codex1974.pdf", Dated Jun. 1, 2016, Retrieved on Feb. 20, 2018, pp. 1-10, Publisher: Cognizant.

BTC Inc, "Overstock Plans to Open Blockchain-Based Stock Exchange to to Other Publicly Traded Companies", "https://distributed.com/news/overstock-plans-to-open-blockchain-based-stock-exchange-t-totother-publicly-traded-companies/", Retrieved on Mar. 27, 2018, pp. 1-6, Publisher: BTC Media.

China National Intellectual Property Administration, "Notice on the First Office Action from CN Application No. 201680009478.8", from Foreign Counterpart to U.S. Appl. No. 15/017,359, dated Feb. 3, 2020, pp. 1-13, Published: CN.

Del Castillo, "Overstock Raises $10.9 Million in First Blockchain Stock Issuance", "CoinDesk", "https://www.coindesk.com/overstock-first-blockchain-stock-issuance/", Updated Dec. 16, 2016, Retrieved Feb. 20, 2018, pp. 1-5.

European Patent Office, "Communication pursuant to Article 94(3) EPC from EP Application No. 16835564.2", from Foreign Counterpart to U.S. Appl. No. 15/164,341, dated Feb. 25, 2021, pp. 1 through 8, Published: EP.

**US 11,394,560 B2**

Page 3

## (56)  References Cited

### OTHER PUBLICATIONS

European Patent Office, "Communication pursuant to Article 94(3) from EP Application No. 16766103.2 dated Mar. 15, 2019", from Foreign Counterpart to U.S. Appl. No. 15/017,359, pp. 1-9, Published: EP.

European Patent Office, "Decision to refuse a European Patent application from EP Application No. 16766103.2", from Foreign Counterpart to U.S. Appl. No. 15/017,359, dated Feb. 1, 2021, pp. 1 through 30, Published: EP.

European Patent Office, "EP Extended Search Report from EP Application No. 16835564.2, dated Jan. 8, 2019"; from Foreign Counterpart of U.S. Appl. No. 15/164,341; pp. 1-7; Published: EP.

European Patent Office, "EPO Comm Re Examiner's Re Call with Associate from EP Application No. 16766103.2", from Foreign Counterpart to U.S. Appl. No. 15/017,359, dated Nov. 10, 2020, pp. 1 through 6, Published: EP.

European Patent Office, "Extended European Search Report from EP Application No. 16789835.2, dated Nov. 9, 2018"; from Foreign Counterpart of U.S. Appl. No. 15/141,582; pp. 1-7; Dated: Nov. 9, 2018; Published: EP.

European Patent Office, "Summons to attend oral proceedings pursuant to Rule 115(1) EPC from EP Application No. 16766103.2", from Foreign Counterpart to U.S. Appl. No. 15/017,359, Apr. 30, 2020, pp. 1 through 2, Published: EP.

European Patent Office, "Summons to attend oral proceedings pursuant to Rule 115(1) EPC from EP Application No. 16766103.2", from Foreign Counterpart to U.S. Appl. No. 15/017,359, Jan. 17, 2020, pp. 1-8, Published: EP.

Finextra, "Overstock Looks to Issue Bitcoin-Style Stocks", "Finextra", "https://www.finextra.com/newsarticle/27294/overstock-looks-to-issue-bitcoin-style-stocks", Dated Apr. 29, 2015, Retrieved on Feb. 20, 2018, pp. 1-3.

Guagliardo et al, "Blockchain and Public Securities: Shedding Light on 'Going Dark'", "Power of Intelligence, Insight Center: Publications", "http://www.pepperlaw.com/publications/blockchain-and-public-securities-shedding-light-on-going-dark-2016-09-27/", Dated Sep. 27, 2016, Retrieved on Feb. 20, 2018, pp. 1-3. Publisher: Pepper Hamilton LLC.

Intellectual Property Office of Singapore, "Examination Report from SG Application No. 11201706289W dated Mar. 5, 2019", from Foreign Counterpart to U.S. Appl. No. 15/017,359, pp. 1-5, Published: SG.

Intellectual Property Office of Singapore, Invitation to Respond to Written Opinion from SG Application No. 11201706289W, dated Apr. 16, 2018, from Foreign Counterpart of U.S. Appl. No. 15/017,359, Dated Apr. 16, 2018, pp. 1-6, Published in: SG.

Intellectual Property Office of Singapore, "Invitation to Respond to Written Opinion from SG Application No. 111201708960W dated Jun. 11, 2018", from Foreign Counterpart of U.S. Appl. No. 15/141,582, pp. 1-7, Jun. 11, 2018; Published: SG.

Intellectual Property Office of Singapore, "Notice of Eligibility for Grant and Examination Report from SG Application No. 11201709186S dated Jul. 18, 2019", from Foreign Counterpart to U.S. Appl. No. 15/164,341, pp. 1-7, Published: SG.

Intellectual Property Office of Singapore, "Written Opinion from SG Application No. 11201709186S dated Jul. 23, 2018"; from Foreign Counterpart of U.S. Appl. No. 15/164,341; pp. 1-6; Dated Jul. 23, 2018; Published: SG.

International Bureau, "International Preliminary Report on Patentability from PCT Application No. PCT/US2016/034130 dated Dec. 7, 2017", from Foreign Counterpart to U.S. Appl. No. 15/164,341, pp. 1-7, Published: WO.

International Bureau, "International Preliminary Report on Patentability from PCT Application No. PCT/US2016/069544 dated Jul. 12, 2018", from Foreign Counterpart to U.S. Appl. No. 15/396,030, pp. 1-7, Published: WO.

International Bureau, "Notice of International Preliminary Report on Patentability," from PCT Application No. PCT/US2016/016845, dated Aug. 24, 2017, pp. 1-10, Published in WO.

International Search Authority, "International Preliminary Report on Patentability from PCT Application No. PCT/US2016/030122 filed Apr. 29, 2016, from Foreign Counterpart to U.S. Appl. No. 15/141,582" dated Nov. 16, 2017, pp. 1-10, Published in: WO.

International Search Authority, "International Search Report for PCT App No. PCT/US2016/030122", Foreign Counterpart to U.S. Appl. No. 15/141,582, dated Jul. 29, 2016, pp. 1-11, Published in: WO.

International Search Authority, "International Search Report for PCT/US16/34130", "Foreign counterpart to U.S. Appl. No. 15/164,341", dated Jan. 27, 2017, pp. 1-8, Published in: WO.

International Searching Authority, "International Search Report and Written Opinion from PCT Application No. PCT/US16/69544 dated Mar. 24, 2017", from Foreign Counterpart to U.S. Appl. No. 15/396,030, pp. 1-12, Published: WO.

International Searching Authority, "International Search Report and Written Opinion from PCT Application No. PCT/US2016/016845 dated Nov. 23, 2016", from Foreign Counterpart to U.S. Appl. No. 15/017,359, pp. 1-14, Published: WO.

Japanese Patent Office, "Notice of Reason for Rejection from JP Application No. 2017559778", from Foreign Counterpart to U.S. Appl. No. 15/017,359, dated Oct. 3, 2019, pp. 1-7, Published: JP.

Korean Intellectual Property Office, "Final Office Action from KR Application No. 10-2017-7024248", from Foreign Counterpart to U.S. Appl. No. 15/017,359, dated Oct. 22, 2020, pp. 1 through 7, Published: KR.

Korean Intellectual Property Office, "Final Office Action from KR Application No. 10-2017-7024248", from Foreign Counterpart to U.S. Appl. No. 15/017,359, dated Sep. 17, 2020, pp. 1 through 7, Published: KR.

Korean Intellectual Property Office, "Office Action from KR Application No. 10-2017-7024248", from Foreign Counterpart to U.S. Appl. No. 15/017,359, dated Jun. 1, 2020, pp. 1 through 8, Published: KR.

Korean Patent Office, "Office Action from KR Application No. 10-2017-7033513", from Foreign Counterpart to U.S. Appl. No. 15/164,341, dated Jan. 11, 2021, pp. 1 through 6, Published: KR.

Marcogliese et al, "Bitcoins and Blockchain—The Use of Distributed Ledger Technology for the Issuance of Digital Securities", "Cleary M & A and Corporate Governance Watch, Mergers and Acquisitions, Corporate Governance, Shareholder Activism", "Posted in SEC Guidance", "https://www.clearymawatch.com/2016/01/bitcoins-and-blockchain-the-use-of-distributed-ledger-technology-for-the-issuance-of-digital-securities/", Dated Jan. 4, 2016, Retrieved on Feb. 20, 2018, pp. 1-7. Publisher: Cleary Gottlieb Steen & Hamilton LLP.

Metz, "SEC Approves Plan to Issue Stock via Bitcoin's Blockchain", "Wired, Business", "https://www.wired.com/2015/12/sec-approves-plan-to-issue-company-stock-via-the-bitcoin-blockchain/", Dated Dec. 15, 2016, Retrieved on Mar. 27, 2018, pp. 1-7.

Mills et al., "Distributed ledger technology in payments, clearing, and settlement", Finance and Economics Discussion Series Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, Washington, D.C., 2016, pp. 1-37.

Nitchman, "First Public Offering Using Blockchain Planned", "XBRL", "https://www.xbrl.org/first-public-offering-using-blockchain-planned/", Posted on Mar. 18, 2016, Retrieved on Feb. 20, 2018, pp. 1-3, Publisher: XBRL International Inc.

Prisco, "Overstock Files Crypto Stock Exchange Prospectus with the SEC", "Bitcoin Magazine", "https://bitcoinmagazine.com/articles/overstock-files-crypto-stock-exchange-prospectus-sec-1430258150/", Dated Apr. 28, 2015, Retrieved on Feb. 20, 2018, pp. 1-5.

Richards, "Wall Street Left Out in Overstock's US $500M Stocks Issue", "CoinTelegraph", "https://cointelegraph.com/news/wall-street-left-out-in-overstocks-us500m-stocks-issue", Dated Apr. 28, 2015, Retrieved on Feb. 20, 2018, pp. 1-4, Publisher: Cointelegraph.

Suga, "Bitcoin ECDSA Quick cash exploitations with bungled ECDSA signature modules in Bitcoin system", The 31st Symposium on Cryptography and Information Security, Jan. 2014, pp. 1-8, The Institute of Electronics, Information and Communication Engineers.

## US 11,394,560 B2

Page 4

(56)             **References Cited**

OTHER PUBLICATIONS

U.S. Patent and Trademark Office, "Corrected Notice of Allowability", U.S. Appl. No. 15/164,341, dated Nov. 22, 2019, pp. 1-4, Published: US.

U.S. Patent and Trademark Office, "Corrected Notice of Allowability", U.S. Appl. No. 16/235,534, dated Mar. 11, 2020, pp. 1 through 6, Published: US.

U.S. Patent and Trademark Office, "Notice of Allowance", U.S. Appl. No. 15/017,359, dated Aug. 13, 2018, pp. 1-37, Published: US.

U.S. Patent and Trademark Office, "Notice of Allowance", U.S. Appl. No. 15/164,341, dated Sep. 20, 2019, pp. 1-24, Published: US.

U.S. Patent and Trademark Office, "Notice of Allowance", U.S. Appl. No. 16/235,534, dated Jan. 23, 2020, pp. 1-20, Published: US.

U.S. Patent and Trademark Office, "Office Action", U.S. Appl. No. 15/017,359, dated Dec. 12, 2017, pp. 1-42, Published: US.

U.S. Patent and Trademark Office, "Office Action", U.S. Appl. No. 15/164,341, dated Feb. 14, 2019, pp. 1-18, Published: US.

U.S. Patent and Trademark Office, "Office Action", U.S. Appl. No. 16/235,534, dated Sep. 6, 2019, pp. 1-34, Published: US.

U.S. Patent and Trademark Office, "Restriction Requirement" U.S. Appl. No. 15/141,582; dated Jun. 19, 2018; pp. 1-6, Published in: US.

U.S. Patent and Trademark Office, "Third-Party Submission Under 37 CFR 1.290 Concise Description of Relevance", U.S. Appl. No. 15/396,030, May 30, 2017, pp. 1-192, Published: US.

Vakta et al., "Blockchain Disruption in Security Issuance", "CAPGEMINI", "https://www.capgemini.com/wp-content/uploads/2017/07/blockchain_securities_issuance_v6_web.pdf", Dated Jul. 12, 2017, Retrieved Mar. 27, 2018, pp. 1-16.

Van Eyk, "Overstock.com Seeks to Build New Stock Market", "Bitcoin Magazine", "https://bitcoinmagazine.com/articles/overstock-com-seeks-build-new-stock-market-1412623808/", Dated Oct. 6, 2014, Retrieved on Feb. 20, 2018, pp. 1-5.

Watanabe et al., "Technology and Challenged of Blockchain Platforms", The Institute of Electronics, Information and Communication Engineers, IEICE Tech. Rep., Jul. 2017, pp. 1-12, vol. 117, No. 114, IEICE.

Zacks, "MasterCard (MA) Files for Blockchain Patents, Introduces AI", "Zacks Equity Research", "https://www.yahoo.com/news/mastercard-ma-files-blockchain-patents-151203016.html", Dated Dec. 1, 2016, Retrieved on Feb. 20, 2018, pp. 1-8.

China National Intellectual Property Administration, "Notice on the First Office Action from CN Application No. 201680030320.9", from Foreign Counterpart to U.S. Appl. No. 15/164,341, dated Nov. 2, 2021, pp. 1 through 13, Published: CN.

European Patent Office, "Summons to attend oral proceedings pursuant to Rule 115(1) EPC from EP Application No. 16766103.2", from Foreign Counterpart to U.S. Appl. No. 15/017,359, dated Apr. 30, 2020, pp. 1 through 2, Published: EP.

Canadian Intellectual Property Office, "Office Action" from CA Application No. 2,975,528, dated Jan. 27, 2022, from Foreign Counterpart to U.S. Appl. No. 15/017,359, pp. 1 through 5, Published: CA.

Korean Patent Office, "Final Office Action from KR Application No. 10-2020-7033976", dated Jan. 25, 2022, from Foreign Counterpart to U.S. Appl. No. 15/017,359, pp. 1 through 5, Published: KR.

Japanese Patent Office, "Notice of Reason for Rejection" from JP Application No. 2021-085872, from Foreign Counterpart to U.S. Appl. No. 15/017,359, filed Mar. 16, 2022, pp. 1 through 7, Published: JP.

Korean Patent Office, "Office Action KR Application No. 10-2020-7033976", from Foreign Counterpart to U.S. Appl. No. 15/017,359, filed Apr. 6, 2022, pp. 1 through 10, Published: KR.

* cited by examiner



**FIG. 1**



FIG. 2



FIG. 3

U.S. Patent        Jul. 19, 2022        Sheet 4 of 14        US 11,394,560 B2



FIG. 4

U.S. Patent     Jul. 19, 2022     Sheet 5 of 14     US 11,394,560 B2



FIG. 5

U.S. Patent    Jul. 19, 2022    Sheet 6 of 14    US 11,394,560 B2



FIG. 6



**FIG. 7**



*FIG. 8*



*FIG. 9*



*FIG. 10*



*FIG. 11*



FIG. 12

U.S. Patent    Jul. 19, 2022    Sheet 13 of 14    US 11,394,560 B2



FIG. 13



*FIG. 14*

US 11,394,560 B2

**1**

## CRYPTO INTEGRATION PLATFORM

### CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation application of U.S. patent application Ser. No. 16/235,534 entitled "CRYPTO INTEGRATION PLATFORM" and filed on Dec. 28, 2018 (currently pending) which is a continuation application of U.S. patent application Ser. No. 15/017,359 entitled "CRYPTO INTEGRATION PLATFORM" and filed on Feb. 5, 2016 (currently pending) which is a non-provisional of and claims priority to U.S. Provisional Application No. 62/113,931, filed on Feb. 9, 2015, entitled "CRYPTO INTE-GRATION PLATFORM," which is hereby incorporated by reference in its entirety for all purposes.

### TECHNICAL FIELD

Various embodiments of the present disclosure generally relate to trading. More specifically, various embodiments of the present disclosure relate to systems and methods for trading digital transactional items such as assets, liabilities, commodities, and/or currencies using distributed and cryptographic ("crypto") techniques.

### BACKGROUND

Recent increasing adoption of crypto currencies (e.g., Bitcoin) worldwide creates challenges for existing trading systems. For example, market data and ownership data are stored differently. Additionally, existing trading systems use protocols for pre-trade communications and execution that are not compatible with trading systems that trade digital transactional items.

The present disclosure overcomes these and other limitations of existing trading systems, and provides other benefits as will become clearer to those skilled in the art from the following description.

### BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present disclosure will be described and explained through the use of the accompanying drawings in which:

FIG. **1** illustrates an example of a network-based operating environment in accordance with various embodiments of the disclosure;

FIG. **2** illustrates a set of components in a Crypto Integration Platform according to one or more embodiments of the present disclosure;

FIG. **3** is a diagram illustrating interaction of components used in trading digital transactional items;

FIG. **4** is a diagram illustrating an architecture of a Crypto Integration Platform;

FIG. **5** is a flowchart illustrating a process of trading digital transactional items from the perspective of a broker-dealer;

FIG. **6** is a flowchart illustrating a process of trading digital transactional items;

FIG. **7** is a flowchart illustrating a process of trading digital transactional items;

FIG. **8** illustrates a process of integrating a customer into the Crypto Integration Platform to allow the customer to trade digital transactional items;

FIG. **9** illustrates a process of creating an order to trade digital transactional items;

**2**

FIG. **10** illustrates a process of receiving and processing an order to purchase digital transactional items;

FIG. **11** illustrates a process of receiving and processing an order to sell digital transactional items;

FIG. **12** illustrates a process of canceling a transaction to sell or purchase digital transactional items;

FIG. **13** illustrates a process of settling and clearing transactions for the purchase or sale of digital transactional items; and

FIG. **14** illustrates an example of a computer system with which some embodiments of the present disclosure may be utilized.

### DETAILED DESCRIPTION

Various embodiments of the present disclosure generally relate to trading digital transactional items, more particularly digital assets, such as securities. More specifically, various embodiments of the present disclosure relate to systems and methods for trading digital securities using distributed and cryptographic techniques, and, in particular, a Crypto Integration Platform. The Crypto Integration Platform receives orders to trade digital transactional items such as digital assets, liabilities, commodities, and/or currencies (e.g., digital securities, digital interests in securities, crypto currencies) for other digital transactional times such as digital representations of funds (e.g., tokens, cash, cash equivalents such as crypto currencies) on a cryptographic ("crypto") exchange (i.e., an exchange that trades digital transactional items) from broker-dealers and translates the orders into crypto orders.

The Crypto Integration Platform aggregates market information from the crypto exchanges and serves as a router to locate the best price in the crypto market for the digital asset or liability involved in the transaction. Prior to matching orders, the Crypto Integration Platform secures both the digital transactional items (i.e., the funds for a buy order and the digital assets or liabilities for a sell order) and cryptographically signs the transactions. Once a potential matching order has been located, the Crypto Integration Platform verifies that the funds and the digital assets/liabilities are available for trade (e.g., associated with addressed accounts owned by the buyer and the seller) and clears and settles the transaction instantaneously by associating the funds and digital assets or liabilities with corresponding addressed accounts.

Benefits of the Crypto Integration Platform include guaranteed settlement, transparency of ownership and easy money movement, and secure settlements. Cryptographically signing the transactions ensures authentication, authorization, and provenance.

The Crypto Integration Platform provides, among other things, an interface between legacy trading systems and crypto exchanges that trade digital transactional items. In doing so, the Crypto Integration Platform takes a protocol for trading and communication between broker-dealers, Alternative Trading Systems ("ATS"), and exchanges, and transforms the message so that the trade can be consummated using cryptographic techniques. For example, one protocol is the Financial Information eXchange protocol or "FIX" protocol. The Crypto Integration Platform allows broker-dealers to integrate the technology described herein on the backend of legacy trading systems, opening up legacy trading systems to crypto exchanges. Thus, the Crypto Integration Platform allows more companies to enjoy access to capital and more investors to enjoy access to shares of the participating companies. Messages in the FIX protocol are

US 11,394,560 B2

3

used in many examples in the present disclosure. However, the Crypto Integration Platform can receive and transform messages in protocols other than the FIX protocol to be consummated using cryptographic techniques.

The Crypto Integration Platform uses crypto ledgers or distributed ledgers (e.g., block chains) to verify ownership and availability of the digital transactional items being exchanged. The Crypto Integration Platform, or components of it, may be used by securities issuers to conduct initial public offerings and other SEC-registered public offerings of securities, and by the general public to trade those securities in secondary market transactions.

The digital transactional items traded on crypto exchanges may be transferred to other owners using cryptographic techniques such as public-key cryptography and bidirectional encryption, as well known in the art. Public-key cryptography requires a key pair, where the two keys are mathematically linked. One key is a public key that is freely shared among nodes in a peer-to-peer network. The other key is a private key that is not shared with the public. The public key is used to encrypt plaintext and to verify a digital signature. The private key is used to decrypt cipher text and to digitally sign transactions. Transaction messages may be digitally signed by the sender's private key to authenticate the sender's identity. Then, the sender's digitally-signed transaction message may be decrypted using the sender's public key to verify that the sender originated the transaction.

Ownership of the digital transactional items may be based on ownership entries in distributed ledgers that are maintained by network nodes. The distributed ledgers (e.g., block chain for Bitcoin) record entries for each change of ownership of each digital transactional item and may be mathematically linked to the key pairs. To sell a digital asset or digital liability, a transaction message (e.g., in packets or other data structures) may be broadcast to nodes on a peer-to-peer network. The transaction message can be signed by the seller's private key and may include information such as a history of the chain of title of the digital asset or digital liability, the number of shares or items being transferred and the purchaser's public key-based address. When a majority of the nodes in the network agree that the sender has the proper chain of title, ownership is changed to the purchaser and the ledger is updated to indicate the transaction.

Integrating a crypto trading system (i.e., a system that trades digital assets or liabilities on a crypto exchange) into a traditional trading system creates challenges that the present disclosure addresses. For example, this disclosure introduces a process in which orders to trade digital assets or liabilities are submitted via a legacy system. In another example, this disclosure introduces a process to ensure that a crypto trading order originally received into the legacy system is authorized by the same entity as the original order. Additionally, this disclosure introduces a system and method for matching cryptographic transactions based on non-shared private keys and shared public keys.

The techniques introduced here can be embodied as special-purpose hardware (e.g., circuitry), as programmable circuitry appropriately programmed with software and/or firmware, or as a combination of special-purpose and programmable circuitry. Hence, embodiments may include a machine-readable medium having stored thereon instructions that may be used to program a computer (or other electronic devices) to perform a process. The machine-readable medium may include, for example, floppy diskettes, optical disks, compact disc read-only memories (CD-

4

ROMs), magneto-optical disks, read-only memories (ROMs), random access memories (RAMs), erasable programmable read-only memories (EPROMs), electrically erasable programmable read-only memories (EEPROMs), magnetic or optical cards, flash memory, or other type of media/machine-readable medium suitable for storing electronic instructions.

FIG. 1 illustrates an example of a network-based operating environment 100 in which some embodiments of the present disclosure may be used. As illustrated in FIG. 1, operating environment 100 includes applications 105A-105N running on one or more computing devices 110A-110M (such as a mobile device, a mobile phone, a tablet computer, a mobile media device, a mobile gaming device, a vehicle-based computer, a dedicated terminal, a public terminal, desktop or laptop computer, a kiosk, etc.). In some embodiments, applications 105A-105N are used for carrying out operations such as generating orders, and checking account balances may be stored on the computing devices or may be stored remotely. These computing devices can include mechanisms for receiving and sending traffic by connecting through network 120 to Crypto Integration Platform 125 and broker-dealer(s) 115.

Computing devices 110A-110M are configured to communicate via network 120 with broker-dealer(s) 115 and Crypto Integration Platform 125. In some embodiments, computing devices 110A-110M can retrieve or submit information to Crypto Integration Platform 125 and run one or more applications with customized content retrieved by Crypto Integration Platform 125 and broker-dealer 115. For example, computing devices 110A-110M each can execute a browser application or a customized client to enable interaction between the computing devices 110A-110M and Crypto Integration Platform 125 and broker-dealer 115.

Broker-dealer(s) 115 are entities (i.e., natural persons, companies, or other organizations) that engage in the business of trading assets (e.g., securities, mutual fund shares, etc.) for their own account or on behalf of their customers. When executing trade orders on behalf of a customer, the entity acts as a broker. When executing trades for its own account, the entity acts as a dealer. Broker-dealer(s) 115 may receive orders from computing devices 110A-110M or create their own orders. Broker-dealer(s) 115 may communicate orders to Crypto Integration Platform 125 via network 120. The orders sent by broker-dealer(s) 115 may use the FIX protocol or other protocols and/or formats.

Crypto Integration Platform 125 can run on one or more servers and can be used to trade digital transactional items. In some embodiments, as illustrated, Crypto Integration Platform 125 includes a Crypto Adapter 130, Crypto Bridge 135, and Crypto Matching Component 140.

Crypto Adapter 130 receives orders for trading digital transactional items from broker-dealer(s) 115 and, in some embodiments, directly from computing devices 110A-110M. The orders are received by Crypto Adapter 130 in a conventional protocol/format commonly used by broker-dealer(s) 115 (e.g., FIX messages). Crypto Adapter 130 translates the orders into cryptographic transactions, verifies ownership of assets and funds in the orders using Crypto Ledger(s) 160, cryptographically signs the cryptographic transactions to transfer assets and funds, and verifies that the cryptographic transaction is authorized by the same customer authorizing the FIX order. Crypto Bridge 135 aggregates and provides market data from Crypto Exchange(s) 155 to broker-dealer(s) 115. Crypto Matching Component 140 matches buy and sell orders of the digital assets, executes the orders, and returns execution reports to

US 11,394,560 B2

5                                                                                          6

broker-dealer(s) 115 in the existing broker-dealer(s)'s format. Thus, the Crypto Integration Platform 125 seamlessly integrates into the operations of current broker-dealer(s) 115 to allow broker-dealer(s) 115 to trade securities on Crypto Exchange(s) 155 without knowledge of public or private keys, ledgers, and block chains.

Crypto Integration Platform 125 is communicably coupled with one or more ATS 150, Crypto Exchange(s) 155, and Crypto Ledger(s) 160 through network 145.

Network 120 and network 145 can be the same network or can be separate networks and can be any combination of local area and/or wide area networks, using wired and/or wireless communication systems. Either network 120 or network 145 could be or could use any or more of the following protocols/technologies: Ethernet, IEEE 802.11 or Wi-Fi, worldwide interoperability for microwave access (WiMAX), cellular telecommunication (e.g., 3G, 4G, 5G), CDMA, cable, digital subscriber line (DSL), etc. Similarly, the networking protocols used on network 120 and network 145 may include multiprotocol label switching (MPLS), transmission control protocol/Internet protocol (TCP/IP), User Datagram Protocol (UDP), hypertext transport protocol (HTTP), simple mail transfer protocol (SMTP) and file transfer protocol (FTP). Data exchanged over network 120 and network 145 may be represented using technologies, languages and/or formats including hypertext markup language (HTML) or extensible markup language (XML). In addition, all or some links can be encrypted using conventional encryption technologies such as secure sockets layer (SSL), transport layer security (TLS), and Internet Protocol security (Ipsec).

ATS(s) 150 are non-exchange trading systems that find counterparties for transactions by matching buyers and sellers. ATS(s) 150 are an alternative to traditional stock exchanges. Examples of ATS(s) 150 include electronic communication networks (ECNs), crossing networks, dark pools, and call markets. ATS(s) 150 receive digitally signed FIX orders from Crypto Integration Platform 125, find potential buy/sell order matches to trade digital assets, and contain a state of the order book which records the state of the orders.

Crypto Exchanges(s) 155 are exchanges that trade digital transactional items such as digital shares of stock, bonds, or currency. Digital shares of stock may be of the same class of stock as securities listed on traditional exchanges. Ownership of the digital transactional items in Crypto Exchange(s) 155 can be recorded on one or more distributed ledgers such as Crypto Ledger(s) 160. Crypto Exchange(s) 155 receive digitally signed crypto transactions (e.g., orders, cancellations) from Crypto Integration Platform 125.

Crypto Ledger(s) 160 record economic transactions such as the sale of digital assets or liabilities in exchange for funds. Crypto Ledger(s) 160 vary per unit. For example, Bitcoin uses a distributed public ledger called the block chain. When Crypto Ledger(s) 160 receives a transaction signed with the proper key from Crypto Integration Platform 125 and the transaction is verified by network nodes, the Crypto Ledger(s) 160 moves the digital transactional items to the proper address (e.g., the proper wallet) by recording the transaction (e.g., adding a block chain into the ledger).

Various data stores can be used to manage storage and access to digital securities, user information, and other data. The data stores may be distributed data stores such as Crypto Ledger(s) 160. The data stores may be a data repository of a set of integrated objects that are modeled using classes defined in database schemas. Data stores may further include flat files that can store data. Crypto Integration Platform 125 and/or other servers may collect and/or access data from the data stores.

FIG. 2 illustrates a set of components within Crypto Integration Platform 125 according to one or more embodiments of the present disclosure. According to the embodiments shown in FIG. 2, Crypto Integration Platform can include memory 205, one or more processor(s) 210, Crypto Adapter 215, Crypto Bridge 220, and Crypto Matching Component 225. Other embodiments may include some, all, or none of these modules and components along with other modules, applications, and/or components. Still yet, some embodiments may incorporate two or more of these modules and components into a single module and/or associate a portion of the functionality of one or more of these modules with a different module. For example, in one embodiment, Crypto Bridge 220 and Crypto Matching Component 225 can be combined into a single component.

Memory 205 can be any device, mechanism, or populated data structure used for storing information. In accordance with some embodiments of the present disclosure, memory 205 can be or include, for example, any type of volatile memory, nonvolatile memory, and dynamic memory. For example, memory 205 can be random access memory, memory storage devices, optical memory devices, magnetic media, floppy disks, magnetic tapes, hard drives, erasable programmable read-only memories (EPROMs), electrically erasable programmable read-only memories (EEPROMs), compact discs, DVDs, and/or the like. In accordance with some embodiments, memory 205 may include one or more disk drives, flash drives, one or more databases, one or more tables, one or more files, local cache memories, processor cache memories, relational databases, flat databases, and/or the like. In addition, those of ordinary skill in the art will appreciate many additional devices and techniques for storing information which can be used as memory 205.

Memory 205 may be used to store instructions for running one or more applications or modules on processor(s) 210. For example, memory 205 could be used in one or more embodiments to house all or some of the instructions needed to execute the functionality of Crypto Adapter 215, Crypto Bridge 220, and Crypto Matching Component 225.

Crypto Adapter

Crypto Adapter 215 serves as the interface between broker-dealers and crypto exchanges. Crypto Adapter 215 communicates with Crypto Bridge 220 to provide market data to the broker-dealers from the crypto exchanges. Crypto Adapter 215 also integrates new customers by storing a customer identifier provided by the broker-dealer and generating two separate key pairs. Each key pair has one private key and one public key. The two parts of the key pair are mathematically linked. The public key of a key pair may be published without compromising security, whereas the private key of a key pair must not be revealed to anyone not authorized to read messages or perform digital signatures.

The two key pairs are used to create two addressed accounts associated with the customer identifier. The addressed accounts may be referred to as "wallets." Both wallets represent digital accounts. The first wallet, referred to at times, herein as the customer portfolio wallet, stores digital transactional items such as digital assets and liabilities (e.g., digital shares of stocks) and digital funds (e.g., digitized dollars, tokens, crypto currency). In some embodiments, the customer associated with the customer identifier owns the key pair for the wallet, but authorizes Crypto Adapter 215 to use the key pair to complete transactions on behalf of the customer. In other embodiments, Crypto

US 11,394,560 B2

7

Adapter **215** or a third party owns the customer portfolio wallet. The second wallet, referred to at times herein as the customer committed wallet, stores digital transactional times that the customer has placed in buy or sell orders that have not yet been completed (e.g., "committed" assets or funds). Crypto Adapter **215** either owns the keys for the customer committed wallet or is authorized to use the keys to the customer committed wallet. In some embodiments, a parent wallet may be created that includes many different customer portfolio wallet and customer committed wallet keys. The parent wallet may include keys for different public ledgers thereby providing one master account for a broker-dealer.

Crypto Adapter **215** can receive a request from a broker-dealer to obtain the balance of the wallets. Using the customer identifier, Crypto Adapter **215** can identify the correct customer portfolio wallet and customer committed wallet. Then, Crypto Adapter **215** can use the corresponding public key for the customer portfolio wallet and the customer committed wallet to obtain the balance for each wallet from one or more crypto ledgers.

Crypto Adapter **215** can receive a FIX order message (or similar message) that includes a buy, sell, or cancel order associated with a customer identifier from broker-dealers. If the order is a buy order, the FIX order message indicates that the broker-dealer has U.S. dollars (or other currency) for the transaction on deposit. Therefore, Crypto Adapter **215** issues a representation that funds from the customer are being held at the broker-dealer specifically to settle the trade. The representation can be a digital liability or IOU from the broker-dealer. Such digital representation may be stored in or associated with the customer portfolio wallet. In some embodiments, the funds could be sent via a crypto currency transaction from a wallet (i.e., addressed account) of a broker-dealer to the customer portfolio wallet.

Crypto Adapter **215** creates a crypto committed transaction (i.e., a transaction involving buying or selling digital assets or liabilities on the crypto exchange) for the buy order which includes information for the transfer of digital liabilities from a source account (i.e., customer portfolio wallet) to a destination account (i.e., customer committed wallet) and signs the crypto committed transaction with the private key of the customer portfolio wallet. The crypto committed transaction may include the USD token, the customer identifier, and/or the public key of the committed wallet. After the transaction is signed by the Crypto Adapter **215** and verified by the network nodes, the transfer of the USD token to the customer committed wallet is completed and the transaction is updated in the crypto ledger.

In addition to creating a crypto committed transaction, Crypto Adapter **215** creates a FIX order transaction. To create the FIX order transaction, Crypto Adapter **215** takes a non-crypto FIX order, maps the customer to a set of wallets and keys using the customer identifier, and creates and signs the FIX transaction with the customer portfolio wallet private key. The FIX transaction may be enriched with the output of the crypto order transaction, specifically a transaction identifier or hash of the crypto transaction order. The FIX order transaction can include a message type (e.g., buy, sell), order identifier, funding transaction hash, return account, and a public key. Before sending the FIX order transaction to the ATS, the signature authorizing the FIX order transaction is compared to the signature authorizing the crypto committed transaction. If the signatures match, then the order can be sent to the ATS. Thus, signing the FIX order transaction and the crypto order transaction with the same private key allows Crypto Adapter **215** to mathematically verify that the order originated from the same entity.

8

This prevents attackers from monitoring the public ledger and trying to create fraudulent orders which appear to be backed by a committed order.

Crypto Adapter **215** routes the signed FIX order transaction to an ATS to find a potentially matching sell order. Crypto Adapter **215** routes the signed crypto committed transaction to Crypto Bridge **220**, which eventually routes the signed crypto committed transaction to a crypto exchange to find a matching sell order. As discussed below, Crypto Bridge **220** compares the signatures on the FIX order transaction and the crypto committed transaction. Public-key cryptography can be used to determine whether the signatures match. Crypto Adapter **215** also creates and delivers execution reports to the broker-dealer informing the broker-dealer that the buy order is pending. Crypto Adapter **215** also receives execution reports from the Crypto Matching Component **225** that Crypto Adapter **215** forwards to broker dealers.

Crypto Adapter **215** processes sell orders in much the same manner as buy orders except that Crypto Adapter **215** does not issue a USD token or other digital representation because the digital security is backed by the organization that issued it.

Crypto Adapter **215** receives cancel orders from broker-dealers. Crypto Adapter **215** receives a cancel order request and maps customer identifiers to customer committed wallets. After obtaining wallet balances from one or more crypto ledgers, Crypto Adapter creates a FIX cancel transaction and signs the transaction with the customer committed wallet private key. After Crypto Adapter **215** verifies that the FIX cancel transaction was signed by the same private key as the original crypto order transaction (e.g., using public-key cryptography), a crypto cancel transaction order is created. Crypto Adapter **215** signs the crypto cancel transaction with the customer committed wallet private key to effectuate the transfer of the funds or assets to the customer portfolio wallet by the crypto ledger. Signing the crypto cancel transaction ensures that the entity originating the cancel order is authorized to do so. This prevents attackers from surreptitiously removing orders to front run the transactions.
Crypto Bridge

Crypto Bridge **220** receives requests for market data on the crypto exchanges from Crypto Adapter **215**. Crypto Bridge **220** aggregates information from the crypto exchanges and serves as a router to locate the best price in the crypto market for the security involved in the transaction. The Crypto Bridge can aggregate the data by monitoring crypto ledgers to generate a current snapshot of the order book by subscribing to order information which is visible on the public ledger. The crypto exchanges may have different distributed ledgers. Crypto Bridge **220** further provides a single interface for broker-dealers by normalizing different distributed ledgers. For example, various distributed ledgers may be used and these distributed ledgers may have different application programming interfaces with different associated keys. Crypto Bridge **220** accesses the data from all the distributed ledgers and provides the data in one standard format. Thus, broker-dealers enjoy access to a crypto exchange without dealing with disparate wallet and key generation, committed transactions, retrieval of balances, among other things.
Crypto Matching Component

Crypto Matching Component **225** receives a match request from an ATS that identifies two committed orders (i.e., orders in which the digital transactional items have been transferred to the customer committed wallets) that are potentially a match. The match request includes the order

US 11,394,560 B2

9

identifiers for each committed transaction. Crypto Matching Component **225** maps order identifiers to the committed customer portfolio wallet for each order. Crypto Matching Component **225** obtains the balances of the customer committed wallets from the crypto ledger to ensure that from the selling side, the asset or liability is available and committed for the transaction, and from the buying side, that the funds are available and committed for the transaction. Crypto Matching Component matches the request response and includes the counterparty hashes or signatures from the customer portfolio wallets. Crypto Matching Component then settles and clears the transactions by deducting from the customer committed wallets and crediting the customer portfolio wallets for each party using the counterparty hashes or signatures from the customer portfolio wallets.

FIG. **3** is a diagram illustrating interaction of components used in trading digital assets. As shown in FIG. **3**, customers (**302**, **304**, **306**, **308**, **310**, **312**, **314**, **316**) interface with broker-dealers (**318**, **320**). The broker-dealers receive orders from the customers to trade non-digital assets or liabilities on traditional exchanges as well as orders to trade digital assets or liabilities on crypto exchanges (**332**, **334**). If an order involves trading digital transactional items, the order is routed to the Crypto Adapter (**322**) in a standard format for broker-dealers such as FIX orders. Using cryptographic techniques, the Crypto Adapter (**322**) transfers the digital transactional items corresponding to the order from the customer portfolio wallet to the customer committed wallet, which creates a "signed crypto transaction." The signed crypto transaction is sent to the Crypto Bridge (**328**). Then, the Crypto Adapter (**322**) creates and signs a FIX transaction order which is sent to one or more ATSs (**324**, **326**). The Crypto Adapter (**322**) verifies that the FIX transaction and the crypto transaction were authorized by the same party by comparing cryptographic signatures.

Assuming that the signatures match, Crypto Matching Component (**330**) receives a potential match for the orders from one or the ATSs (**324**, **326**) or one of the Crypto Exchanges (**332**, **334**). In some embodiments, the orders can be sent to more than one ATS and/or more than one Crypto Exchanges. The Crypto Matching Component verifies that the digital transactional items are available and instantaneously clears and settles the transaction.

FIG. **4** is a diagram illustrating an architecture of a Crypto Integration Platform **125**. As shown, broker-dealers (**402**) communicate with the Crypto Integration Platform **125** (**408**, **410**, **412**) via one or more networks (**404**, **406**). The Crypto Integration Platform **125** communicates with crypto ledgers (**416**, **418**) via one or more networks (**414**). Once an order to purchase or sell digital transactional items, or to cancel an order, is received by broker-dealers (**402**), adapter (**408**) creates a transaction on the legacy system that will be sent to an ATS and to a cryptographic exchange. Information including wallet keys, user information, and transactions are created and stored in databases (**420**, **422**, **424**) and on various distributed ledgers (**416**, **418**). Assets are verified and moved into the customer committed wallets and the transactions are signed. Market data is gathered from distributed public ledgers such as the block chain. As shown with the multiple crypto ledgers (**416**, **418**), the transaction is agnostic to the type of distributed ledger used to record the transaction. Bridge (**410**) normalizes the market data from the various cryptographic exchanges. Orders are matched in the matching component (**412**).

FIG. **5** is a flowchart illustrating a process **500** of trading digital assets from the perspective of a broker-dealer, using the Crypto Integration Platform. Receiving operation **502**

10

receives an order from a customer at a computing device of a broker-dealer. The order may include an order to buy or sell one or more digital transactional items, or an order to cancel a pre-existing order. Upon receiving the order, the broker-dealer may create an order message in the FIX protocol (or other protocol) and send the order to the Crypto Integration Platform in sending operation **504**. After the Crypto Integration Platform checks the customer account balances (i.e., balances of the customer portfolio wallet and the customer committed wallet) and commits the digital funds or asset to the order, the broker-dealer receives execution reports with the status of the order (e.g., order pending, order executed, order canceled) in receiving operation **506**. The execution reports are provided in the same format that the broker-dealer receives from trades that take place on typical exchanges.

FIG. **6** is a flowchart illustrating a process **600** of trading digital transactional items from the perspective of the Crypto Integration Platform. In some embodiments, the operations performed in FIG. **6** can be performed by the Crypto Adapter. In some embodiments, fewer or more operations may be performed or the operations may be performed in different orders.

Creating operation **602** creates a first addressed account (e.g., customer portfolio wallet) and a second addressed account (e.g., customer committed wallet) for a customer. The first and second addressed accounts can each have an associated key pair and may both be associated with a customer identifier. Various digital transactional items owned by the customer can be associated with the first and second addressed accounts. Receiving operation **604** receives an order to buy or sell digital transactional items such as a digital security.

Signing operation **606** can electronically sign a first transaction to transfer the digital transactional items from the first addressed account to the second addressed account with a private key associated with the first addressed account. Signing operation **606** can also electronically sign a second transaction with the private key of the first addressed account, a second transaction. Verifying operation **608** verifies that the first transaction was signed with the same private key as the second transaction. Authorizing operation **610** authorizes placement of the digital transactional items on a cryptographic exchange after verifying that the first transaction was signed with the same private key as the second transaction.

FIG. **7** is a flowchart illustrating a process **700** of trading digital transactional items from the perspective of the Crypto Integration Platform. In some embodiments, the operations performed in FIG. **7** can be performed by the Crypto Matching Component. In some embodiments, fewer or more operations may be performed or the operations may be performed in different orders.

Receiving operation **702** receives a request to match a buy transaction with a sell transaction. The buy transaction can include a buy order to purchase digital transactional items for a specified amount (e.g., an amount corresponding to a value of the digital transactional items) and the sell transaction can include a sell order to sell the digital transactional items for an amount. The customer purchasing the digital transactional items can have two addressed accounts: a first customer portfolio wallet and a first customer committed wallet. The customer selling the digital transactional items can also have two addressed accounts: a second customer portfolio wallet and a second customer committed wallet.

The buy transaction can have an associated first signature that corresponds to the first addressed account (e.g., first

US 11,394,560 B2

11

customer portfolio wallet) that identifies the buy order. The sell transaction can have an associated second signature corresponding to a second addressed account (e.g., second customer portfolio wallet) that identifies the sell order. The amount of funds can be associated with a third addressed account associated with the first customer (e.g., first customer committed wallet) and the one or more digital transactional items can be associated with a fourth addressed account associated with the second customer (e.g., second customer committed wallet).

Mapping operation **704** maps the buy transaction to the third addressed account (e.g., first customer committed wallet) and the sell transaction to a fourth addressed account (e.g., second customer committed wallet);

Sending operation **706** sends a match request response to the cryptographic exchange. The match request can include the first signature and the second signature to commit the buy transaction. Transferring operation **708** transfers the digital transactional items to the first addressed account (e.g., first customer portfolio wallet). Transferring operation **710** transfers the amount to the second addressed account (e.g., second customer portfolio wallet) to settle and clear the buy transaction and the sell transaction.

Creating a Customer

FIG. **8** illustrates a process **800** of integrating a new customer into the Crypto Integration Platform to allow the customer to trade digital securities. When a user signs up (**802**), the broker-dealer, via a user interface ("UI"), collects customer data such as name, bank account information, and securities owned by the customer (**804**). The customer data may be verified in a Know Your Customer ("KYC") process (or other process) (**806**) that receives data from the customer (**808**) and verifies the identity of the customer (**810**). The KYC process may be completed by an outside vendor or by the broker-dealer. If the identity of the customer is verified, the broker-dealer creates the customer in the broker-dealer's system (**812**). The broker-dealer may assign a customer identifier such as a customer identification number or other identifier to the customer.

Once the broker-dealer assigns the customer identifier to the customer, the customer identifier and customer data can be sent to the Crypto Adapter where the customer identifier and the customer data are stored in one or more databases (**814**). The Crypto Adapter can generate a key pair (e.g., a public key and a private key pair) for the customer (**816**) and create a customer portfolio wallet associated with the key pair and the customer identifier (**816**). The customer portfolio wallet can hold (i.e., be associated with) any digital transactional item such as funds (e.g., digital currency or a representation of currency) and digital assets or liabilities (e.g., digital shares of stock) owned by the customer.

Additionally, a second set of key pairs and a second digital wallet associated with the second set of key pairs and the customer identifier is created (**818**). The customer committed wallet may be used to secure digital transactional items committed in future orders, akin to an escrow account. Balances of the customer portfolio wallet and the customer committed wallet are recorded in distributed ledgers and can be accessed using the key pairs. In some embodiments, a third party may be commissioned to create the customer portfolio wallet and the customer committed wallet and to generate the corresponding key pairs. Once the customer portfolio wallet and customer committed wallet are created, the Crypto Adapter indicates to the broker-dealer that the customer is successfully created (**820**). The broker-dealer can receive the indication of successful creation of the customer (**822**).

12

Creating an Order

FIG. **9** illustrates a process **900** of creating an order to trade digital securities. The customer may login to the broker-dealer via a user interface ("UI"). After the customer logs in (**902**), broker-dealer may request Crypto Level 1 data (i.e., market data for securities trading on cryptographic exchanges such as the last bid and ask price for one or more securities) (**904**). This type of data can be used by traders to make buy, bid, and ask decisions for future trades. The request for the Crypto Level 1 data may be routed to the Crypto Bridge (**906**), which aggregates the data from one or more cryptographic exchanges. The Crypto Bridge retrieves the Crypto Level 1 data from the cryptographic exchanges (**908**, **910**) and normalizes the data to produce the Crypto Level 1 data in a format used by existing systems of broker-dealers (**912**). In some embodiments, the broker-dealer requests additional data such as Crypto Level 2 data, which provides additional market data such as a history of the orders that have occurred over a period of time. The Crypto Bridge publishes, sends or otherwise makes the Crypto Level 1 data available to the interface of the broker-dealer (**914**).

The broker-dealer may request the balance of the assets (i.e., securities and digital funds) of the customer portfolio wallet and the customer committed wallet (**916**). The Crypto Adapter then uses the customer identifier sent by the broker-dealer to map the customer identifier to the customer portfolio wallet and the customer committed wallet (**918**). The customer portfolio wallet data and the customer committed wallet data are recorded with distributed crypto ledgers as opposed to a database owned by an exchange in typical trading systems today (e.g., New York Stock Exchange owns its trading data) (**918**). Therefore, to provide the wallet data to the broker-dealers, the Crypto Adapter gathers the wallet data from crypto ledgers.

To determine the balance of the customer and/or customer committed wallets, distributed ledgers are searched using the key pairs for the customer portfolio and/or customer committed wallets, respectively (**920**, **922**). Once the balance is determined (**924**), the Crypto Adapter then provides the balance, including digital funds and digital assets, of both the customer portfolio wallet, which includes any settled balances, and the customer committed wallet to the user interface of the broker-dealer (**926**). The broker-dealer can display the balances associated with the customer portfolio wallet and/or the customer committed wallet (**928**) and may then receive a buy or sell order from the customer (**930**). The broker-dealer can determine whether the order is a buy order (**930**, **932**) or a sell order (**930**, **934**).

Processing a Buy Order

FIG. **10** illustrates a process **1000** of receiving and processing an order to purchase digital assets, liabilities, or other digital transactional items. The broker-dealer receives a buy order (**1002**) and determines based on the balance of the customer portfolio wallet, whether the customer has the buying power to make the purchase. Assuming the customer has the buying power to make the purchase; the broker-dealer confirms the order with the customer (**1004**) and places a hold on the cash or cash-equivalent that the broker-dealer has on deposit for the customer (**1006**). Next, the broker-dealer creates an order message using legacy trading protocols for pre-trade communications and trade execution, such as a FIX order message or equivalent order message (**1008**). For purposes of this example, a FIX order message will be used.

When the Crypto Adapter receives the FIX order message, the Crypto Adapter maps the customer identifier to

US 11,394,560 B2

13                                                                    14

both the customer portfolio wallet and the customer committed wallet (**1010**). Next, the Crypto Adapter creates a digital representation of the funds such as a USD token, which represents that cash from the customer is being held at the broker-dealer specifically to settle the trade (i.e., a digital liability or IOU from the broker-dealer generally in the amount of the quantity multiplied by the price of the asset) (**1012**). The Crypto Adapter issues the token to the customer portfolio wallet on behalf of the broker-dealer, which is recorded to the distributed ledger (**1014**, **1016**).

Thereafter, the Crypto Adapter retrieves the customer portfolio wallet balance, which now includes the USD token, and the customer committed wallet balance from the crypto ledger (**1018**). The crypto ledger looks up the balances and provides the balances to the Crypto Adapter (**1020**, **1022**). The Crypto Adapter determines whether the balance for the order is available (**1024**). If the balance is available, the Crypto Adapter creates and signs a crypto commitment transaction with the customer's private key for the customer portfolio wallet to transfer the USD token in the customer committed wallet (**1026**). The crypto committed transaction includes information such as a record of which address was used to send the USD token to the customer portfolio wallet, the amount of the USD token, and the address of the customer committed wallet. After receiving the signed crypto committed transaction and verifying it, the crypto ledger moves the USD token into the customer committed wallet by recording the transaction (**1028**) and the recordation is provided to the Crypto Adapter (**1030**). The USD token remains in the committed wallet pending either the settlement or cancellation of the transaction.

Once the USD token is moved from the customer portfolio wallet to the customer committed wallet (**1032**), the Crypto Adapter creates a FIX order transaction (which will eventually be sent to the ATS) and signs the FIX order transaction using the private key for the customer portfolio wallet (**1034**). The Crypto Adapter compares the signature from the crypto committed transaction with the signature from the FIX order transaction and determines whether the signatures match (**1036**). The Crypto Adapter may use asymmetric public key cryptography to determine whether the signatures match.

By verifying that the FIX order transaction was signed by the same party who signed the crypto committed transaction, the Crypto Integration Platform can provide certainty that the FIX order transaction is associated with the crypto committed transaction and therefore that the digital funds are available for the transaction. Additionally, the committed order is public information, so the public can see that the order has a committed balance.

If the signature from the committed transaction matches the signature from the FIX order transaction, the ATS and/or the cryptographic exchange places the order (**1038**) and creates an execution report (**1040**), which includes an order identifier. The Crypto Adapter maps the order identifier to the crypto committed transaction hash (**1042**). Next, assuming the order is placed successfully (**1044**), the Crypto Adapter creates an execution report indicating that the order is pending and issues the execution report to the broker-dealer (**1046**). The broker-deal can update its system to reflect that the order is successfully pending (**1048**). As illustrated, the Crypto Integration Platform allows a broker-dealer to trade on a cryptographic exchange simply by sending a FIX order message.

Processing a Sell Order

FIG. **11** illustrates a process **1100** of receiving and processing an order to sell digital assets, digital liabilities, or other digital transactional items on a cryptographic exchange. The process for the order to sell is similar to the process for the order to purchase assets, with one exception: there is no need to create a digital liability because the asset is backed by a corporate network.

The broker-dealer receives a sell order (**1102**) and determines based on the balance of the customer portfolio wallet provided by the Crypto Adapter whether the customer owns the asset to sell. Assuming the customer owns the asset to sell, the broker-dealer confirms the order with the customer (**1104**). Next, the broker-dealer creates a FIX order message or equivalent order message for pre-trade communications and trade execution (**1106**). For purposes of this example, a FIX order message will be used.

When the Crypto Adapter receives the FIX order message, the Crypto Adapter maps the customer identifier to the customer portfolio wallet and the customer committed wallet (**1108**). Next, the Crypto Adapter gathers the customer portfolio wallet balance and the customer committed wallet balance from the crypto ledger (**1110**, **1112**, **1114**). Assuming the digital assets or liabilities for sale are associated with the customer portfolio wallet (**1116**), the Crypto Adapter creates a crypto committed transaction and signs the crypto committed transaction using the private key for the customer portfolio wallet (**1118**). The crypto committed transaction may include a record of which address was used to send the digital assets to the customer portfolio wallet, an amount of the assets being committed to the trade, and the address of the customer committed wallet. After the signed crypto committed transaction is received and verified, the crypto ledger moves the asset into the customer committed wallet (**1120**) and creates a transaction response (**1122**). The asset remains in the customer committed wallet pending either the settlement or cancellation of the transaction.

Once the asset is moved from the customer portfolio wallet to the customer committed wallet successfully (**1124**), the Crypto Adapter creates a FIX order transaction and signs the FIX order transaction using the private key for the customer committed wallet (**1126**). The Crypto Adapter compares the signature from the committed transaction with the signature from the FIX order transaction and determines whether the signatures match (**1128**). As discussed above, asymmetric public key cryptography can be used to ensure that the signatures match.

By verifying that the FIX order transaction was signed by the same party as the crypto committed transaction, the Crypto Integration Platform can provide certainty that the FIX order transaction is associated with the committed transaction and therefore that the asset is available for the transaction.

If the signature from the committed transaction matches the signature from the FIX order transaction, the cryptographic exchange places the order (**1130**) and creates an execution report (**1132**), which includes an order identifier. The Crypto Adapter maps the order identifier to the crypto commitment transaction hash (**1134**). Next, assuming success (**1136**), the Crypto Adapter creates an execution report indicating that the order is pending and issues the execution report to the broker-dealer (**1138**). The broker-dealer can update its system to indicate that the order is successfully pending (**1140**).

Processing a Cancel Order

FIG. **12** illustrates a process **1200** of canceling a transaction to sell or purchase digital transactional items. If the order to cancel is successful, the digital transactional items (e.g., assets or digital funds) in a customer committed wallet pending a sale or purchase are moved back to the customer

US 11,394,560 B2

**15**

portfolio wallet If the digital transactional items have not yet been moved to the customer committed wallet, the cancel order ensures that the digital transactional items will not be moved to the customer committed wallet. The Crypto Integration Platform allows for cancellation of an order by showing that the cancellation is being ordered by the same entity that signed the original FIX transaction.

The broker-dealer receives a request to cancel an order (**1202**) and sends the request, including the customer identifier, to the Crypto Adapter (**1204**). When the Crypto Adapter receives the request to cancel the order, the Crypto Adapter maps the customer identifier to the customer portfolio wallet and the customer committed wallet (**1206**). Next, the Crypto Adapter checks the customer portfolio wallet balance and the customer committed wallet balance by querying the crypto ledger (**1208**, **1210**). The crypto ledger looks up the customer's wallet balances (**1210**) and provides a response to the Crypto Adapter (**1212**).

Then, the Crypto Adapter determines whether the contents of the cancel order are in the customer committed wallet (i.e., the assets to be sold or the digital currency to be used for a purchase) (**1214**). If the contents of the cancel order are not in the customer committed wallet (i.e., the order has already been part of a settlement process), the cancel order is not carried out. If the contents of the cancel order are in the customer committed wallet, the Crypto Adapter creates a FIX cancel transaction and signs the FIX cancel transaction with the private key used to sign the original order that transferred the digital funds or assets into the customer committed wallet (i.e., the private key for the customer portfolio wallet) (**1216**). The original order is identified by the order identifier that is returned by the crypto matching component and/or the crypto order transaction.

Next, the Crypto Adapter compares the signature from the crypto committed transaction associated with the order with the signature from the FIX cancel transaction and determines whether the signatures match (**1218**). If the signature from the crypto cancel transaction matches the signature from the FIX cancel transaction, the cryptographic exchange cancels the order and creates an execution report, which includes an order identifier (**1220**). The cryptographic exchange creates an execution report **1222** for the Crypto Adapter. The Crypto Adapter maps the order identifier to the crypto cancel transaction hash (**1224**). Next, assuming a successful cancel of the order on the cryptographic exchange (**1226**), the Crypto Adapter creates and signs a crypto cancel transaction with the private key used to sign the cancel order and the order that transferred the digital funds or assets into the customer committed wallet (i.e., the private key for the customer committed wallet) (**1228**). The crypto ledger moves the digital funds or asset from the customer committed wallet into the customer portfolio wallet (**1230**) and creates a transaction response (**1232**). Assuming success (**1234**), the Crypto Adapter then creates an execution report indicating that the order is canceled and issues the execution report to the broker-dealer (**1236**). The broker-dealer then updates its system with the success cancellation of the order (**1238**).

Matching Orders

FIG. **13** illustrates a process **1300** of settling and clearing transactions for the purchase or sale of digital assets. The ATS identifies a potential match between a committed buy order and a committed sell order (**1302**) and sends a match request to the Crypto Matching Component to verify that the potential match is truly a match (i.e., that the wallet balances associated with each order identifiers are available) (**1304**).

**16**

The Crypto Matching Component receives the match request (**1306**), maps the order identifiers to the respective committed wallets (**1308**), and queries the crypto ledger for the customer committed wallet balances associated with both the buy order and the sell order (**1310**). The Crypto Ledger retrieves the balances (**1312**), creates a balance response (**1314**), and provides the balance response to the Crypto Matching Component (**1316**). The Crypto Matching Component verifies that the balances are available (**1318**). Assuming the corresponding buy and sell balances are present in the customer committed wallets; the Crypto Matching Component creates a match request to match the orders (**1320**). The match request includes the signature for the counterparty's customer portfolio wallet and/or counterparty hash for each order which identifies the original order and is publicly distributed on the ledger (**1320**). For example, the hash for the sell order is the identifier created when moving the asset from the customer portfolio wallet into the customer committed wallet. Similarly, the hash for the buy order is the identifier created during the transaction that moved the USD token into a committed state.

Once the cryptographic exchange receives the match request response indicating a match, the cryptographic exchange matches the transaction, commits the matched transaction (**1322**) by recording the exchange of assets/funds to the respective counterparty's customer portfolio wallets and creates the order execution (**1330**), which is routed to the Crypto Bridge and communicated to the broker dealer. Simultaneously or nearly simultaneously, the Crypto Matching Component settles and clears transactions using the counterparty hash (**1324**). The settlement and clearing of the transactions includes deducting the digital funds or assets from the purchasing or selling customer's committed wallet, respectively (**1326**), and crediting the purchasing and selling customer portfolio wallets with assets and digital funds, respectively (**1328**). The cryptographic exchange routes the order execution to the Crypto Bridge (**1332**), which routes the results of successful transaction to the broker-dealer (**1334**).

Various embodiments of the present disclosure are described below.

1. A computerized method comprising:

creating, by a computer, a first addressed account and a second addressed account, each having a common identifier and each associated with a first customer;

receiving, from a remote computing device, an order for exchanging one or more digital transactional items associated with the first addressed account, wherein the order is associated with the common identifier;

electronically signing, with a private key associated with the first addressed account, a first transaction to transfer the one or more digital transactional items from the first addressed account to the second addressed account;

electronically signing, with the private key associated with the first addressed account, a second transaction;

verifying that the first transaction was signed with the same private key as the second transaction; and

authorizing placement of the order on a cryptographic exchange upon verifying that the first transaction was signed with the same private key as the second transaction.

2. The computerized method of claim **1**, wherein the second addressed account is associated with a second key pair which includes a second public key and a second private key.

US 11,394,560 B2

17

3. The computerized method of claim **1**, further comprising:

receiving confirmation, from a distributed ledger, that the one or more digital transactional items associated with the order are associated with the first addressed account by using the first public key; and

upon receiving the confirmation that the one or more digital transactional items associated with the order are associated with the first addressed account, creating the first transaction and the second transaction.

4. The computerized method of claim **1**, further comprising communicating, to a distributed ledger, a balance of the first addressed account and the second addressed account.

5. The computerized method of claim **1**, wherein the order is an order to purchase a digital asset or a digital liability, the computerized method further comprising:

receiving, from the remote computing device, information indicating that funds are available to purchase the digital asset or the digital liability, wherein the one or more digital transactional items is a digital representation of the funds; and

associating the digital representation of the funds with the first addressed account as the one or more digital transactional items.

6. The computerized method of claim **1**, wherein the order is an order to sell the one or more digital transactional items, wherein the one or more digital transactional items is one or more digital assets or one or more digital liabilities, the computerized method further comprising:

receiving, from the remote computing device, information indicating that assets corresponding to the one or more digital assets or liabilities corresponding to the one or more digital liabilities are available to sell.

7. The computerized method of claim **1**, further comprising creating a third addressed account, wherein the third digital addressed account includes a first key pair associated with the first addressed account and a second key pair associated with the second addressed account.

8. The computerized method of claim **1**, further comprising:

creating the first transaction, wherein the first transaction includes at least one of: the one or more digital transactional items, the identifier, and a public key of the second addressed account;

creating a hash of the first transaction; and

creating the second transaction, wherein the second transaction includes at least one of: a type of the order, the identifier, a public key of the second addressed account, and the hash of the first transaction.

9. The computerized method of claim **1**, further comprising

sending the first transaction to the cryptographic exchange; and

sending the second transaction to an alternative trading system.

10. The computerized method of claim **9**, further comprising:

receiving a notification that the order has been matched to a second order on the cryptographic exchange; and

creating an execution report.

11. The computerized method of claim **1**, wherein the first addressed account is a customer portfolio account, wherein the second addressed account is a customer committed account.

18

12. The computerized method of claim **1**, wherein the first transaction includes at least one of: funds in an amount corresponding to a value of the first transaction or a representation of the funds in the amount corresponding to the value of the first transaction and a public key of the first addressed account, and wherein the second transaction includes at least one of: a public key of the second addressed account, a type of the order, the identifier, a public key of the second addressed account, and a hash of the first transaction.

13. A computerized method comprising

receiving, from a broker-dealer, a request to match a buy transaction with a sell transaction,

wherein the buy transaction includes a buy order to purchase one or more digital transactional items for an amount corresponding to a value of the one or more digital transactional items and the sell transaction includes a sell order to sell the one or more digital transactional items for the amount,

wherein the buy transaction has an associated first signature that corresponds to a first addressed account that identifies the buy order, wherein the sell transaction has an associated second signature corresponding to a second addressed account that identifies the sell order, the first addressed account being associated with a first customer and the second addressed account being associated with a second customer,

wherein the amount is associated with a third addressed account associated with the first customer and the one or more digital transactional items are associated with a fourth addressed account associated with the second customer;

mapping, by a computer, the buy transaction to the third addressed account and the sell transaction to the fourth addressed account;

sending, to the cryptographic exchange, a match request response including the first signature and the second signature to commit the buy transaction; and

transferring the one or more digital transactional items to the first addressed account and transferring the amount to the second addressed account to settle and clear the buy transaction and the sell transaction.

14. The method of claim **13**, further comprising

receiving confirmation, from a distributed ledger, that the amount is associated with the third addressed account and that the one or more digital transactional items are associated with the fourth addressed account prior to sending the match request response.

15. The computerized method of claim **13**, wherein the one or more digital transactional items include one or more of digital assets or digital liabilities, wherein the amount includes an amount of currency, cryptographic currency, or a representation of the currency or the cryptographic currency corresponding to a value of the one or more digital transactional items.

16. The computerized method of claim **13**, further comprising publishing, to a remote computing device, results of settling and clearing the buy transaction and the sell transaction.

17. The computerized method of claim **13**, wherein the first signature is a private key associated with the first addressed account, wherein the second signature is a private key associated with the second addressed account.

US 11,394,560 B2

19 20

18. The computerized method of claim 13, wherein:

the first addressed account is a customer portfolio account associated with the first customer,

the second addressed account is a customer portfolio account associated with the second customer,

the third addressed account is a customer committed account associated with the first customer, and

the fourth addressed account is a customer committed account associated with the second customer.

19. A cryptographic integration system, comprising:

at least one processor; and

at least one computer readable storage medium having instructions stored thereon, which when executed by the at least one processor causes the cryptographic integration system to:

receive an order to execute a trade for one or more digital transactional items associated with a first addressed account, wherein the order, the first addressed account, and a second addressed account are associated with an identifier;

generate a first transaction to transfer the one or more digital transactional items from the first addressed account to the second addressed account;

generate a second transaction that includes the order,

verify that the first transaction was authorized by a same party as the second transaction; and

authorize placement of the order on a cryptographic exchange after verifying that the first transaction was authorized by the same party as the second transaction.

20. The cryptographic integration system of claim 19, wherein the first transaction is authorized by the same party as the second transaction when the first transaction and the second transaction are signed by a same key.

21. The cryptographic integration systems of claim 20, wherein the key is a private key of the first addressed account, and wherein the second transaction includes a hash of the first transaction.

22. The cryptographic integration system of claim 19, wherein the instructions, which when executed by the at least one processor further cause the cryptographic integration system to:

receive, from the cryptographic exchange, a request to match the order with a second order, wherein the second order is associated with a second identifier; and

transfer the one or more digital transactional items to an addressed account associated with the second identifier and transfer one or more other digital transactional items into the first addressed account to settle and clear the order.

23. The cryptographic integration system of claim 19, further comprising a cryptographic adapter component adapted for:

sending the first transaction to the cryptographic exchange; and

sending the second transaction to an alternative trading system.

24. A non-transitory computer-readable storage medium including a set of instructions that, when executed by one or more processors, cause a machine to:

create a first addressed account and a second addressed account, each having a common identifier and each associated with a first customer;

receive an order for exchanging one or more digital transactional items associated with the first addressed account, wherein the order is associated with the common identifier;

electronically sign, with a private key associated with the first addressed account, a first transaction to transfer the one or more digital transactional items from the first addressed account to the second addressed account;

electronically sign, with the private key associated the first addressed account, a second transaction;

verify that the first transaction was signed with the same private key as the second transaction; and

authorize placement of the order on a cryptographic exchange upon verifying that the first transaction was signed with the same private key as the second transaction.

25. A non-transitory computer-readable storage medium including a set of instructions that, when executed by one or more processors, cause a machine to:

receive, from a broker-dealer, a request to match a buy transaction with a sell transaction,

wherein the buy transaction includes a buy order to purchase one or more digital transactional items for an amount corresponding to a value of the one or more digital transactional items and the sell transaction includes a sell order to sell the one or more digital transactional items for the amount,

wherein the buy transaction has an associated first signature that corresponds to a first addressed account that identifies the buy order, wherein the sell transaction has an associated second signature corresponding to a second addressed account that identifies the sell order, the first addressed account being associated with a first customer and the second addressed account being associated with a second customer,

wherein the amount is associated with a third addressed account associated with the first customer and the one or more digital transactional items are associated with a fourth addressed account associated with the second customer;

map the buy transaction to the third addressed account and the sell transaction to a fourth addressed account;

send, to the cryptographic exchange, a match request response including the first signature and the second signature to commit the buy transaction; and

transfer the one or more digital items to the first addressed account and transferring the amount to the second addressed account to settle and clear the buy transaction and the sell transaction.

Computer System Overview

Embodiments of the present disclosure include various steps and operations, which have been described above. A variety of these steps and operations may be performed by hardware components or may be embodied in machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor programmed with the instructions to perform the steps. Alternatively, the steps may be performed by a combination of hardware, software, and/or firmware. As such, FIG. 14 is an example of a computer system 1400 with which embodiments of the present disclosure may be utilized. According to the present example, the computer system 1400 includes an interconnect 1410, at least one processor 1420, at least one communication port 1430, a main memory 1440, a removable storage media 1450, a read only memory 1460, and a mass storage device 1470.

US 11,394,560 B2

21

Processor(s) **1420** can be any known processor. Communication port(s) **1430** can be or include, for example, any of an RS-232 port for use with a modem-based dialup connection, a 10/100 Ethernet port, or a Gigabit port using copper or fiber. The nature of communication port(s) **1430** may be chosen depending on a network such as Local Area Network (LAN), Wide Area Network (WAN), or any network to which the computer system **1400** connects.

Main memory **1440** can be Random Access Memory (RAM), or any other dynamic storage device(s) commonly known in the art. Read only memory **1460** can be any static storage device(s) such as Programmable Read Only Memory (PROM) chips for storing static information such as instructions for processor **1420**.

Mass storage device **1470** can be used to store information and instructions. For example, hard disks such as the Adaptec® family of SCSI drives, an optical disc, an array of disks such as RAID, such as the Adaptec family of RAID drives, or any other mass storage devices may be used.

Interconnect **1410** can be or include one or more buses, bridges, controllers, adapters, and/or point-to-point connections. Interconnect **1410** communicatively couples processor(s) **1420** with the other memory, storage, and communication blocks. Interconnect **1410** can be a PCI/PCI-X or SCSI based system bus depending on the storage devices used.

Removable storage media **1450** can be any kind of external hard-drives, floppy drives, Compact Disc-Read Only Memory (CD-ROM), Compact Disc-Re-Writable (CD-RW), Digital Video Disc-Read Only Memory (DVD-ROM).

The components described above are meant to exemplify some types of possibilities. In no way should the aforementioned examples limit the disclosure, as they are only exemplary embodiments.

Terminology

Brief definitions of terms, abbreviations, and phrases used throughout this application are given below.

The terms "connected" or "coupled" and related terms are used in an operational sense and are not necessarily limited to a direct physical connection or coupling. Thus, for example, two devices may be coupled directly, or via one or more intermediary media or devices. As another example, devices may be coupled in such a way that information can be passed therebetween, while not sharing any physical connection with one another. Based on the disclosure provided herein, one of ordinary skill in the art will appreciate a variety of ways in which connection or coupling exists in accordance with the aforementioned definition.

The phrases "in some embodiments," "according to some embodiments," "in the embodiments shown," "in other embodiments," "embodiments," and the like generally mean the particular feature, structure, or characteristic following the phrase is included in at least one embodiment of the present disclosure, and may be included in more than one embodiment of the present disclosure. In addition, such phrases do not necessarily refer to the same embodiments or different embodiments.

If the specification states a component or feature "may," "can," "could," or "might" be included or have a characteristic, that particular component or feature is not required to be included or have the characteristic.

The term "responsive" includes completely or partially responsive.

The term "module" refers broadly to a software, hardware, or firmware (or any combination thereof) component. Modules are typically functional components that can generate useful data or other output using specified input(s). A module may or may not be self-contained. An application program (also called an "application") may include one or more modules, or a module can include one or more application programs.

22

The term "network" generally refers to a group of interconnected devices capable of exchanging information. A network may be as few as several personal computers on a Local Area Network (LAN) or as large as the Internet, a worldwide network of computers. As used herein, "network" is intended to encompass any network capable of transmitting information from one entity to another. In some cases, a network may be comprised of multiple networks, even multiple heterogeneous networks, such as one or more border networks, voice networks, broadband networks, financial networks, service provider networks, Internet Service Provider (ISP) networks, and/or Public Switched Telephone Networks (PSTNs), interconnected via gateways operable to facilitate communications between and among the various networks.

Also, for the sake of illustration, various embodiments of the present disclosure have herein been described in the context of computer programs, physical components, and logical interactions within modern computer networks. Importantly, while these embodiments describe various embodiments of the present disclosure in relation to modern computer networks and programs, the method and apparatus described herein are equally applicable to other systems, devices, and networks as one skilled in the art will appreciate. As such, the illustrated applications of the embodiments of the present disclosure are not meant to be limiting, but instead are examples. Other systems, devices, and networks to which embodiments of the present disclosure are applicable include, for example, other types of communication and computer devices and systems. More specifically, embodiments are applicable to communication systems, services, and devices such as cell phone networks and compatible devices. In addition, embodiments are applicable to all levels of computing from the personal computer to large network mainframes and servers.

In conclusion, the present disclosure provides novel systems, methods, and arrangements for trading digital transactional items. While detailed descriptions of one or more embodiments of the disclosure have been given above, various alternatives, modifications, and equivalents will be apparent to those skilled in the art without varying from the spirit of the disclosure. For example, while the embodiments described above refer to particular features, the scope of this disclosure also includes embodiments having different combinations of features and embodiments that do not include all of the described features. Accordingly, the scope of the present disclosure is intended to embrace all such alternatives, modifications, and variations that fall within the scope of the claims, together with all equivalents thereof. Therefore, the above description should not be taken as limiting.

What is claimed is:

1. A system, comprising:

at least one processor;

at least one memory communicatively coupled to the at least one processor; and

wherein the at least one processor is configured to:

receive an order to execute a trade of at least one transactional item associated with a first account, wherein the order, the first account, and a second account are associated with a common identifier;

US 11,394,560 B2

23

cryptographically sign, using a cryptographic key, a first transaction to transfer the at least one transactional item from the first account to the second account;

cryptographically sign, using the cryptographic key, a second transaction that includes the order;

verify that the first transaction and the second transaction were both cryptographically signed using the cryptographic key; and

authorize placement of the order on an exchange if the first transaction and the second transaction were both cryptographically signed using the cryptographic key.

2. The system of claim 1, wherein the at least one processor is configured to:

receive a request to match the order with a second order from the exchange, wherein the second order is associated with a second identifier; and

transfer the at least one transactional item to an account associated with the second identifier and transfer at least one other transactional item into the first account to settle and clear the order.

3. The system of claim 1, wherein the at least one processor is configured to:

send the first transaction to the exchange; and

send the second transaction to an alternative trading system.

4. The system of claim 1, wherein the first transaction is authorized by a same party as the second transaction when the first transaction and the second transaction are both cryptographically signed by the cryptographic key.

5. The system of claim 4, wherein the cryptographic key is a private key of the first account, and wherein the second transaction includes a hash of the first transaction.

6. The system of claim 1, wherein the at least one transactional item includes at least one of a digital asset, a digital liability, an amount of currency, an amount of cryptographic currency, or a representation of the currency or the cryptographic currency.

7. The system of claim 1, wherein:

the first account is a customer portfolio account associated with a first customer associated with the common identifier; and

the second account is a customer committed account associated with the first customer.

8. A non-transitory computer-readable storage medium including a set of instructions that, when executed by at least one processor, cause a machine to:

receive an order to execute a trade of at least one transactional item associated with a first account, wherein the order, the first account, and a second account are associated with a common identifier;

cryptographically sign, using a cryptographic key, a first transaction to transfer the at least one transactional item from the first account to the second account;

cryptographically sign, using the cryptographic key, a second transaction that includes the order;

verify that the first transaction and the second transaction were both cryptographically signed using the cryptographic key; and

authorize placement of the order on an exchange if the first transaction and the second transaction were both cryptographically signed using the cryptographic key.

24

9. The non-transitory computer-readable storage medium of claim 8, wherein the set of instructions, when executed by the at least one processor, cause the machine to:

receive a request to match the order with a second order from the exchange, wherein the second order is associated with a second identifier; and

transfer the at least one transactional item to an account associated with the second identifier and transfer at least one other transactional item into the first account to settle and clear the order.

10. The non-transitory computer-readable storage medium of claim 8, wherein the set of instructions, when executed by the at least one processor, cause the machine to:

send the first transaction to the exchange; and

send the second transaction to an alternative trading system.

11. The non-transitory computer-readable storage medium of claim 8, wherein the first transaction is authorized by a same party as the second transaction when the first transaction and the second transaction are both cryptographically signed by the cryptographic key.

12. The non-transitory computer-readable storage medium of claim 8, wherein the at least one transactional item includes at least one of a digital asset, a digital liability, an amount of currency, an amount of cryptographic currency, or a representation of the currency or the cryptographic currency.

13. The non-transitory computer-readable storage medium of claim 8, wherein:

the first account is a customer portfolio account associated with a first customer associated with the common identifier; and

the second account is a customer committed account associated with the first customer.

14. A method, comprising:

receiving an order to execute a trade of at least one transactional item associated with a first account, wherein the order, the first account, and a second account are associated with a common identifier;

cryptographically signing, using a cryptographic key, a first transaction to transfer the at least one transactional item from the first account to the second account;

cryptographically signing, using the cryptographic key, a second transaction that includes the order;

verifying that the first transaction and the second transaction were both cryptographically signed using the cryptographic key; and

authorizing placement of the order on an exchange if the first transaction and the second transaction were both cryptographically signed using the cryptographic key.

15. The method of claim 14, further comprising:

receiving a request to match the order with a second order from the exchange, wherein the second order is associated with a second identifier; and

transferring the at least one transactional item to an account associated with the second identifier and transfer at least one other transactional item into the first account to settle and clear the order.

16. The method of claim 14, further comprising:

sending the first transaction to the exchange; and

sending the second transaction to an alternative trading system.

17. The method of claim 14, wherein the first transaction is authorized by a same party as the second transaction when the first transaction and the second transaction are both cryptographically signed by the cryptographic key.

US 11,394,560 B2

25 26

18. The method of claim 14, wherein the at least one transactional item includes at least one of a digital asset, a digital liability, an amount of currency, an amount of cryptographic currency, or a representation of the currency or the cryptographic currency.

19. The method of claim 14, wherein:

the first account is a customer portfolio account associated with a first customer associated with the common identifier; and

the second account is a customer committed account associated with the first customer.

20. The non-transitory computer-readable storage medium of claim 8, wherein the cryptographic key is a private key of the first account, and wherein the second transaction includes a hash of the first transaction.

\*   \*   \*   \*   \*

# EXHIBIT 3

**Exhibit 3**

U.S. Patent No. 11,216,802: "Self-enforcing security token implementing smart-contract-based compliance rules consulting smart-contract-based global registry of investors"

| No. | Claims | Securitize DS Protocol |
|-----|--------|------------------------|
| 1[pre] | A network node comprising: | DS Protocol utilizes a network node, as described below. |
| 1[a] | at least one processor; | DS Protocol is intended to work over a blockchain, such as Ethereum. A processor is inferred based on DS Protocol's reliance on blockchain-based systems. A blockchain-based system will require one or more processors. |
| 1[b] | at least one memory communicatively coupled to the at least one processor; | At least one memory communicatively coupled to the at least one processor is inferred based on DS Protocol's reliance on blockchain-based systems. A blockchain-based system will require at least one memory coupled to the processor. |
| 1[c] | at least one network interface communicatively coupled to the at least one processor; | At least one network interface communicatively coupled to the at least one processor is inferred based on DS Protocol's reliance on blockchain-based systems. A blockchain-based system on a blockchain will require a network interface in order to send and receive data on a blockchain. |
| 1[d] | wherein the network node is configured to be within a plurality of network nodes communicatively coupled in a peer-to-peer network of network nodes implementing a distributed ledger; | DS Protocol permits trades amongst investors and broker dealers and direct P2P trades on a blockchain such as Ethereum, which is a distributed ledger. This requires that DS Protocol be configured within a plurality of network nodes communicatively coupled in a peer-to-peer network of network nodes implementing a distributed ledger. |

1

| No. | Claims | Securitize DS Protocol |
|---|---|---|
| 1[e] | wherein the network node is configured to be communicatively coupled to at least one remotely located computing device through the at least one network interface; | DS Protocol allows third party issuers and investors to interact with others on a blockchain. This involves the use of at least one remotely located computing device that is communicatively coupled through the at least one network interface.<br><br>Source: DS Protocol Interfaces Released, *available at* https://medium.com/@jorge.serna/ds-protocol-first-code-release-7470e4d45ae6 |
| 1[f] | wherein the at least one processor is configured to: | See above re processor. |
| 1[g] | receive, from a remotely located computing device, a request to transfer a security token; | DS Protocol's Compliance Service handles transfer() and transferFrom() validation calls from DS Token contract. These transfer requests are received from a remotely located computing device (third party issuers or investors) in order to transfer security tokens.<br><br>Source: DS Protocol – The Compliance Service Elements, *available at* https://medium.com/securitize/ds-protocol-the-basic-elements-23fabcb5c85f |

| No. | Claims | Securitize DS Protocol |
|---|---|---|
| 1[h] | execute a plurality of compliance rules associated with the security token; | DS Token transfers are intended to execute a plurality of compliance rules that are associated with the security token. "To ensure that DS Token transfers are kept within regulatory and issuer constraints, the transfer() and transferFrom() functions are adapted to rely on the controls provided by the Compliance Service." The transfer control functions of the Compliance Service implement a number of different compliance rules.<br><br>Source: DS Protocol – The Basic Elements, *available at* https://medium.com/securitize/ds-protocol-the-basic-elements-23fabcb5c85f<br><br>Transfers will only be possible if approved by the Compliance Service, which can implement a number of different properties and requirements, including "the kind of registration (or exemption) that the issuer has applied for, to the countries it is destined to, or certain restrictions being driven from the nature of the asset being tokenized."<br><br>Source: DS Protocol – The Compliance Service, *available at* https://medium.com/securitize/ds-protocol-the-compliance-service-b6fe472d625d |
| 1[i] | wherein at least one of the plurality of compliance rules is implemented using at least one smart contract separate from an originating smart contract that implements the security token; | The DS Token is its own smart contract. The Compliance Service implements specific compliance rules applicable to a DS Token as per the Issuer requirements via separate smart contracts. These compliance rules are separate from the DS Token. DS Apps are additional Smart Contracts that can be registered with, but are separate from, a DS Token.<br><br>Source: DS Protocol – The Basic Elements, *available at* https://medium.com/securitize/ds-protocol-the-basic-elements-23fabcb5c85f |

3

| No. | Claims | Securitize DS Protocol |
|---|---|---|
| 1[j] | wherein the at least one smart contract is implemented on the distributed ledger and references a global registry; | DS Protocol is implemented on a blockchain such as Ethereum, which is a distributed ledger.<br><br>The Compliance Service, which executes at least one smart contract implemented on the distributed ledger, references the Registry Service. The Registry Service holds an on-chain register of the investors that hold a given DS Token, which serves as a global registry.<br><br>Source: DS Protocol – The Trust and Registry Services https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |
| 1[k] | transfer the security token based on the execution of the plurality of compliance rules; | The Compliance Rules Engine executes the different restrictions defined by an issuer according to relevant regulations. The Compliance Service will prevent transfers from occurring if they do not meet the set regulations but will transfer the security token if it meets the compliance rules that are executed.<br><br>"…the Compliance Service handles the standard ERC20transfer() and transferFrom() calls from the DS Token contract, as well as calls that are specific to the DS Protocol like preTransferCheck(), issueTokens(), issueTokensWithLocking(), and seize()…"<br><br>Source: DS Protocol – The Compliance Service, *available at* https://medium.com/securitize/ds-protocol-the-compliance-service-b6fe472d625d |

| No. | Claims | Securitize DS Protocol |
|---|---|---|
| 1[l] | wherein the global registry comprises at least one personally identifiable information (PII) hash for each of at least one investor associated with the transfer of the security token, wherein the at least one PII hash for each of the at least one investor is committed to the distributed ledger, wherein each of the at least one PII hash is updated when PII of a respective one of the at least one investor changes; | Each investor is given its own unique identifier that is built from a hash of personal information. The investor information that is added to the Registry Service can be updated by modifying the on-chain attributes stored for each investor.<br><br>"The Registry Service keeps an on-chain register of the investors that may hold the DS Token. To protect investor privacy, the stored data does not include personal identification information, only the relevant attributes to determine the investor category (relevant for regulatory purposes)."<br><br>Source: DS Protocol – The Trust and Registry Services https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |
| 1[m] | wherein the global registry further comprises at least one indication of: | See above re global registry. |
| 1[n] | whether an offering of the security token qualifies under Securities and Exchange Commission (SEC) Regulation A; | The Registry Service stores information relating to whether an investor is accredited, which may relate to SEC Regulation A.<br><br>Source: DS Protocol – The Trust and Registry Services https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |
| 1[o] | whether at least one of the at least one investor qualifies under SEC Regulation D; | The Registry Service stores information relating to whether an investor is accredited, which may relate to SEC Regulation D.<br><br>Source: DS Protocol – The Trust and Registry Services https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |

5

| No. | Claims | Securitize DS Protocol |
|-----|--------|------------------------|
| 1[p] | whether the offering of the security token qualifies under SEC Regulation S; and | The Registry Service stores information relating to the country of an investor, which may relate to SEC Regulation S.<br><br>Source: DS Protocol – The Trust and Registry Services https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |
| 1[q] | whether anti-money laundering and know-your-customer (AML/KYC) checks have been performed for the at least one investor associated with the transfer of the security token. | The Registry Service stores information relating to whether an investor is KYC_APPROVED, which may relate to anti-money laundering and know-your-customer checks.<br><br>Source: DS Protocol – The Trust and Registry Services https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |

| **Claim 3** | | |
|---|---|---|
| 3[pre] | The network node of **claim 1**, wherein the at least one indication of the global registry further comprises at least one indication of: | See above re claim 1. |
| 3[a] | whether a freeze has been placed on any of the at least one investor; | DS Protocol Registry Service stores per-investor attributes (KYC_APPROVED, ACCREDITED, QUALIFIED, PROFESSIONAL), each carrying a value of PENDING, APPROVED, or REJECTED. An authorized Issuer or Exchange writes them via setAttribute(id, attributeId, value, expiry, proofHash). The information stored on the global registry indicates whether a freeze has been placed on the at least one investor. <br><br>Source: DS Protocol – The Trust and Registry Services https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |
| 3[b] | whether a freeze has been placed on the security token; | DS Protocol uses DS Token methods to permit issuers to freeze a security token due to applicable regulatory requirements. The token contract itself can overload transfer() and transferFrom() so that it can check to see if the token can be exchanged between specific wallet addresses. If the security token cannot be exchanged, it achieves a freeze on the security token. <br><br>Source: DS Protocol – The Trust and Registry Services, *available at* https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |

7

| 3[c] | whether a freeze has been placed on a custodian associated with the transfer of the security token; and | The Registry Service can serve as a whitelist of authorized wallets and supports any entity that has its own unique identifier and can have one or more wallets assigned to it. This whitelist can include custodians associated with the transfer of the security token. The information stored on the global registry can indicate whether a freeze has been placed on a custodian.<br><br>Source: DS Protocol – The Trust and Registry Services, *available at* https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |
|---|---|---|
| 3[d] | whether a freeze has been placed on any broker dealer associated with the transfer of the security token. | The Registry Service can serve as a whitelist of authorized wallets and supports any entity that has its own unique identifier and can have one or more wallets assigned to it. This whitelist can include broker dealer associated with the transfer of the security token. The information stored on the global registry can indicate whether a freeze has been placed on a broker dealer.<br><br>Source: DS Protocol – The Trust and Registry Services, *available at* https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |

8

| Claim 4 | | |
|---|---|---|
| 4[pre] | The network node of **claim 3**, | See above re claim 3. |
| 4[a] | wherein a freeze is placed on or removed from any of the at least one investor by modifying attributes in an investor element in the global registry; | DS Protocol Registry Service stores per-investor attributes (KYC_APPROVED, ACCREDITED, QUALIFIED, PROFESSIONAL), each carrying a value of PENDING, APPROVED, or REJECTED. An authorized Issuer or Exchange writes them via setAttribute(id, attributeId, value, expiry, proofHash). Modifying the registry attributes from APPROVED to REJECTED achieves a freeze on the investor. <br><br> Source: DS Protocol – The Trust and Registry Services, *available at* https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |
| 4[b] | wherein a freeze is placed on or removed from the security token by modifying attributes in a security token element in the global registry; | DS Protocol uses DS Token methods to permit issuers to freeze a security token due to applicable regulatory requirements. The token contract itself can overload transfer() and transferFrom() so that it can check to see if the token can be exchanged between specific wallet addresses. If the security token cannot be exchanged, it achieves a freeze on the security token. It is inferred that modifications to the attributes stored on the registry can achieve a freeze on the security token. <br><br> Source: DS Protocol – The Trust and Registry Services, *available at* https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |

9

| 4[c] | wherein a freeze is placed on or removed from the custodian by modifying attributes in a custodian element in the global registry; and | The Registry Service can serve as a whitelist of authorized wallets and supports any entity that has its own unique identifier and can have one or more wallets assigned to it. This whitelist can include custodians associated with the transfer of the security token. It is inferred that modifications to the attributes stored on the registry can achieve a freeze on the custodian.<br><br>Source: DS Protocol – The Trust and Registry Services, *available at* https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |
|---|---|---|
| 4[d] | wherein a freeze is placed on or removed from any broker dealer associated with the transfer of the security token by modifying attributes in a broker dealer element in the global registry. | The Registry Service can serve as a whitelist of authorized wallets and supports any entity that has its own unique identifier and can have one or more wallets assigned to it. This whitelist can include broker dealer associated with the transfer of the security token. It is inferred that modifications to the attributes stored on the registry can achieve a freeze on the broker dealer.<br><br>Source: DS Protocol – The Trust and Registry Services, *available at* https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |

10

| Claim 5 | | |
|---|---|---|
| 5[pre] | The network node of **claim 3**, | See above re claim 3. |
| 5[a] | Wherein the global registry comprises a data storage smart contract that stores the at least one indication in the global registry. | The Registry Service is a specific DS Protocol Service, which is a foundational smart contract component that powers DS Protocol.<br><br>"…the Registry Service holds investor attributes that can identify an investor as a member of a generic category: an accredited U.S. investor, a retail Germany investor, etc."<br><br>DS Protocol Registry Service stores per-investor attributes (KYC_APPROVED, ACCREDITED, QUALIFIED, PROFESSIONAL), each carrying a value of PENDING, APPROVED, or REJECTED. An authorized Issuer or Exchange writes them via setAttribute(id, attributeId, value, expiry, proofHash). Modifying the registry attributes from APPROVED to REJECTED achieves a freeze on the investor.<br><br>Source: DS Protocol – The Trust and Registry Services, *available at* https://medium.com/securitize/ds-protocol-the-trust-and-registry-services-91d1c4630f78 |

11

# EXHIBIT 4

**Exhibit 4**

U.S. Patent No. 11,394,560: "Crypto Integration Platform"

| No. | Claims | Securitize Vault Registrar |
|-----|--------|----------------------------|
| 14[pre] | A method, comprising: | Vault Registrar executes a method, as described below. |
| 14[a] | receiving an order to execute a trade of at least one transactional item associated with a first account, wherein the order, the first account, and a second account are associated with a common identifier; | Vault Registrar acts as a "programmable escrow / smart wallet." An operator deploys a new contract, *i.e.,* an order, for a token. The protocol transfers a DS Token or RWA from an investor's first account to a second account, *i.e.,* a vault, that is attributable to the same investor, a common identifier.<br><br>"Investor signs the typical deposit() transaction (or similar semantics) that will move the assets from their wallet to a vault."<br><br>"Instead of depositing tokenized securities into a shared pool, this pattern keeps the tokens inside a dedicated vault (smart contract) that is bound to a specific investor."<br><br>Source: Vault Registrar: bringing "smart escrow" and one-click looping to regulated RWAs, *available at* https://medium.com/securitize/vault-registrar-bringing-smart-escrow-and-one-click-looping-to-regulated-rwas-0b0e8823d5c8 |

1

| No. | Claims | Securitize Vault Registrar |
|---|---|---|
| 14[b] | cryptographically signing, using a cryptographic key, a first transaction to transfer the at least one transactional item from the first account to the second account; | An investor cryptographically signs an authorization (a signed permission) to create a vault and transfer a transactional item, a DS Token or RWA stored in a first account, to the vault, a second account. "Investor signs the typical deposit() transaction (or similar semantics) that will move the assets from their wallet to a vault." Source: Vault Registrar: bringing "smart escrow" and one-click looping to regulated RWAs, *available at* https://medium.com/securitize/vault-registrar-bringing-smart-escrow-and-one-click-looping-to-regulated-rwas-0b0e8823d5c8 The Vault registration call involves public cryptographic keys and a key pair. "Investors are no longer implicitly trusting protocol flows — they are cryptographically authorizing vault creation" Source: Vault Registrar, Revisited: Explicit Authorizations, Standardization, and Multichain Support, *available at* https://medium.com/securitize/vault-registrar-revisited-explicit-authorizations-standardization-and-multichain-support-a5f355c873d2 |

2

| No. | Claims | Securitize Vault Registrar |
|---|---|---|
| 14[c] | cryptographically signing, using the cryptographic key, a second transaction that includes the order; | The vault registration call involves public cryptographic keys and a key pair.<br><br>"Investors are no longer implicitly trusting protocol flows — they are cryptographically authorizing vault creation"<br><br>Source: Vault Registrar, Revisited: Explicit Authorizations, Standardization, and Multichain Support, *available at* https://medium.com/securitize/vault-registrar-revisited-explicit-authorizations-standardization-and-multichain-support-a5f355c873d2<br><br>The second transaction includes the order, or protocol contract. The contract sends the transaction. "The EIP-712 message that investors sign contains an *operator* field. That operator must be the exact *msg.sender* of the *registerVault()* call on-chain — if they don't match, the signature is invalid. In practice this means: your protocol contract — the factory or entrypoint that calls *registerVault()* — is the operator. . .The contract itself sends the transaction, so the contract is the address that needs OPERATOR_ROLE."<br><br>Source: Building for DeFi Integration: The Vault Registrar Sandbox, *available at* https://medium.com/securitize/building-for-defi-integration-the-vault-registrar-sandbox-78ea507cc753 |

| No. | Claims | Securitize Vault Registrar |
|---|---|---|
| 14[d] | verifying that the first transaction and the second transaction were both cryptographically signed using the cryptographic key; and | The VaultRegistrar contract: verifies the caller is an authorized operator, checks the investor is an authorized holder, confirms the investor holds permissioned tokens, then automatically registers the vault as attributed to that investor. The VaultRegistrar verifies that the investor (the first transaction) is authorized and the caller is an authorized operator (the second transaction). It does so via the cryptographic signatures. <br><br> "Each vault is bound to a single investor identity, so a protocol doesn't need to implement additional accounting to keep the transfer agent view consistent." <br><br> "Investor signs the typical deposit() transaction (or similar semantics) that will move the assets from their wallet to a vault." <br><br> Source: Vault Registrar: bringing "smart escrow" and one-click looping to regulated RWAs, *available at* https://medium.com/securitize/vault-registrar-bringing-smart-escrow-and-one-click-looping-to-regulated-rwas-0b0e8823d5c8 <br><br> "The EIP-712 message that investors sign contains an *operator* field. That operator must be the exact *msg.sender* of the *registerVault()* call on-chain — if they don't match, the signature is invalid." <br><br> "…investor signatures that name that contract as operator will be accepted by the VaultRegistrar." <br><br> "The registration is gated by a cryptographic signature from the investor, ensuring that custody always maps back to a verified identity and it is done following investors instructions." <br><br> Source: Building for DeFi Integration: The Vault Registrar Sandbox, *available at* https://medium.com/securitize/building-for-defi-integration-the-vault-registrar-sandbox-78ea507cc753 |

| No. | Claims | Securitize Vault Registrar |
|---|---|---|
| 14[e] | authorizing placement of the order on an exchange if the first transaction and the second transaction were both cryptographically signed using the cryptographic key. | "Investor signs the typical deposit() transaction (or similar semantics) that will move the assets from their wallet to a vault." Source: Vault Registrar: bringing "smart escrow" and one-click looping to regulated RWAs, *available at* https://medium.com/securitize/vault-registrar-bringing-smart-escrow-and-one-click-looping-to-regulated-rwas-0b0e8823d5c8 "…investor signatures that name that contract as operator will be accepted by the VaultRegistrar." Source: Building for DeFi Integration: The Vault Registrar Sandbox, *available at* https://medium.com/securitize/building-for-defi-integration-the-vault-registrar-sandbox-78ea507cc753 Vault Registrar supports two models that include signed vault authorization and signer verification with CPI identity. Source: Vault Registrar, Revisited: Explicit Authorizations, Standardization, and Multichain Support, *available at* https://medium.com/securitize/vault-registrar-revisited-explicit-authorizations-standardization-and-multichain-support-a5f355c873d2 |