IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SECURITIZE I, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 26-722 (GBW) |
| | ) | |
| TZERO GROUP, INC. and TZERO IP, LLC, | ) | |
| | ) | |
| Defendants/Counterclaim-Plaintiff. | ) | |

**SECURITIZE I, INC.'S OPENING BRIEF**
**<u>IN SUPPORT OF ITS MOTION TO DISMISS</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff/Counterclaim-Defendant Securitize I, Inc.*

OF COUNSEL:

David J. Lisson
Micah G. Block
Thomas C. Horn
Natalie J. Stoecklein
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, CA 94063
(650) 752-2000

Rachael S. Bacha
Zhikun (David) Jiang
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

August 21, 2026

# TABLE OF CONTENTS

PAGE


I. NATURE AND STAGE OF PROCEEDINGS ........ 1

II. SUMMARY OF THE ARGUMENT ........ 1

III. STATEMENT OF FACTS ........ 2

IV. LEGAL STANDARD ........ 4

V. ARGUMENT ........ 5

A. The ’560 Patent Claims Are Unpatentable ........ 5

1. Step 1: The Claims Are Directed to the Abstract Idea of an Escrow ........ 6

2. Step 2: The Claims Lack an Inventive Concept ........ 8

B. The ’496 and ’802 Patent Claims Are Unpatentable ........ 10

1. Step 1: The Claims Are Directed to the Abstract Idea of Complying with Rules When Trading a Security ........ 11

2. Step 2: The Claims Lack an Inventive Concept ........ 13

C. The ’078 Patent Claims Are Unpatentable ........ 16

1. Step 1: The Claims Are Directed to the Abstract Idea of Updating an Investor’s Compliance Status ........ 17

2. Step 2: The Claims Lack an Inventive Concept ........ 18

D. The ’996 Patent Claims Are Unpatentable ........ 20

1. Step 1: The Claims Are Directed to the Abstract Idea of Restricting the Transfer of an Asset to a Verified Recipient on a Whitelist ........ 22

2. Step 2: The Claims Lack an Inventive Concept ........ 23

E. The Allegations in the Counterclaims Do Not Defeat Dismissal ........ 25

VI. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

PAGE

**Cases**

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016) .................... 7

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014).................... passim

*Alto Dynamics, LLC v. Wayfair LLC*,
687 F. Supp. 3d 179 (D. Mass. 2023).................... 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................... 4

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).................... 4

*Beteiro, LLC v. DraftKings Inc.*,
104 F.4th 1350 (Fed. Cir. 2024) .................... 11, 12

*Bilski v. Kappos*,
561 U.S. 593 (2010).................... 4, 12, 17, 22

*Boom! Payments Inc. v. Stripe, Inc.*,
839 F. App'x 528 (Fed. Cir. 2021) .................... 6, 7, 8, 10

*Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*,
955 F.3d 971 (Fed. Cir. 2020) .................... 16

*Bprotocol Found. v. Universal Navigation, Inc.*,
2026 WL 369394 (S.D.N.Y. Feb. 10, 2026).................... passim

*Brumfield, Tr. for Ascent Tr. v. IBG LLC*,
97 F.4th 854 (Fed. Cir. 2024) .................... 9, 25

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) .................... 15

*Caselas, LLC v. VeriFone, Inc.*,
2024 WL 2720092 (Fed. Cir. May 28, 2024) .................... 22

*ChargePoint, Inc. v. SemaConnect, Inc.*,
920 F.3d 759 (Fed. Cir. 2019) .................... 20

*Checksum Ventures, LLC v. Dell Inc.*,
412 F. Supp. 3d 906 (N.D. Ill. 2019) .................... 23

*Cornell Univ. v. Illumina, Inc.*,
2012 WL 1885129 (D. Del. May 23, 2012)........................................................................ 4

*Customedia Techs., LLC v. Dish Network Corp.*,
951 F.3d 1359 (Fed. Cir. 2020) ................................................................................ 14, 19

*Fast 101 PTY Ltd. v. Citigroup Inc.*,
424 F. Supp. 3d 385 (D. Del.)................................................................................................ 5

*Identitii Ltd. v. JPMorgan Chase & Co.*,
2026 WL 1506530 (D. Del. May 29, 2026)................................................................ passim

*In re AuthWallet, LLC*,
2023 WL 3330298 (Fed. Cir. May 10, 2023) .................................................................... 23

*In re Chorna*,
656 F. App'x 1016 (Fed. Cir. 2016) ........................................................................................ 9

*In re Elbaum*,
2021 WL 3923280 (Fed. Cir. Sept. 2, 2021) ........................................................................ 9

*Int'l Bus. Machines Corp. v. Zillow Group, Inc.*,
50 F.4th 1371 (Fed. Cir. 2022) ...................................................................... 4, 8, 14, 25

*Island Intell. Prop. LLC v. TD Ameritrade, Inc.*,
2022 WL 17546958 (E.D. Tex. Sept. 28, 2022)..................................................................... 9

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
811 F.3d 1314 (Fed. Cir. 2016) .......................................................................................... 14

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ...................................................................... 8, 13, 16, 18

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
696 F. App'x 1014 (Fed. Cir. 2017) ................................................................................ 16, 19

*Rady v. Bos. Consulting Grp., Inc.*,
2024 WL 1298742 (Fed. Cir. Mar. 27, 2024)........................................................ 7, 13, 15, 18

*SafeCast Ltd. v. Google LLC*,
703 F. Supp. 3d 1041 (N.D. Cal. 2023) ............................................................................ 12

*Sanderling Mgmt. Ltd. v. Snap Inc.*,
65 F.4th 698 (Fed. Cir. 2023) ............................................................................................ 20

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) .......................................................................................... 25

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) .......... 5, 25

*Simio, LLC v. FlexSim Software Prods., Inc.*,
983 F.3d 1353 (Fed. Cir. 2020) .......... 4, 25

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
873 F.3d 1364 (Fed. Cir. 2017) .......... 16, 19

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed. Cir. 2017) .......... passim

*Universal Secure Registry LLC v. Apple Inc.*,
10 F.4th 1342 (Fed. Cir. 2021) .......... 7, 9, 22, 24

**Statutes**

35 U.S.C. § 101 .......... 4

**Rules**

Regulation D,
47 Fed. Reg. 11251 (Mar. 16, 1982) .......... 13

tZERO's Asserted Patents are all directed to basic economic activity: (a) an escrow, (b) complying with rules when trading a security, (c) updating an investor's compliance status, and (d) restricting the transfer of an asset to a verified recipient on a whitelist.[1] These are "fundamental economic practice[s] long prevalent in our system of commerce." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 219 (2014). While the patents claim the use of pre-existing blockchain technology to facilitate those practices, they do not recite any improvement to blockchain technology itself. They are thus directed to patent-ineligible abstract ideas, as this Court's recent ruling on similar claims confirms. *Identitii Ltd. v. JPMorgan Chase & Co.*, 2026 WL 1506530, at *8 (D. Del. May 29, 2026) (Williams J.) (finding claims directed to the performance of financial transactions on a blockchain invalid). Accordingly, the Court should dismiss tZERO's Amended Counterclaims with prejudice.

## I. NATURE AND STAGE OF PROCEEDINGS

On June 22, 2026, Securitize filed its Complaint for declaratory judgment of non-infringement. D.I. 1. On July 17, 2026, tZERO filed its Amended Answer and Counterclaims. D.I. 15. Securitize now moves to dismiss tZERO's Amended Counterclaims.

## II. SUMMARY OF THE ARGUMENT

1. The Asserted Patents are invalid under § 101 because each of their claims is directed to an abstract idea and does not contain an inventive concept sufficient to transform the claimed abstract idea into patent-eligible subject matter.

[1] This Motion uses the following abbreviations: Plaintiff/Counterclaim-Defendant Securitize I, Inc. ("Securitize"); Defendant and Counterclaim-Plaintiff tZERO IP, LLC ("tZERO"); Securities and Exchange Commission ("SEC"); U.S. Patent Nos. 11,394,560 (the "'560 Patent"); 11,216,802 (the "'802 Patent"); 12,223,496 (the "'496 Patent"); 12,051,078 (the "'078 Patent"); 12,099,996 (the "'996 Patent") (together the "Asserted Patents").

## III. STATEMENT OF FACTS

The ’560 Patent “relate[s] to trading,” D.I. 15-2 at 1:20-21, and its purported benefits include “guaranteed settlement, transparency of ownership and easy money movement, and secure settlements.” *Id.* at 2:47-49. To accomplish those business goals, the patent’s claims are directed to a “customer committed wallet [that] may be used to secure digital transactional items committed in future orders, ***akin to an escrow account***.” *Id.* at 11:54-56 (emphasis added).[2] While the claims recite using a cryptographic key to cryptographically sign the escrow transactions, the specification admits that it was “well known in the art” that digital transaction items may be transferred using such cryptographic techniques. *Id.* at 3:14-16.

The ’496 and ’802 Patents[3] also concern trading. They assert that “one potential problem for security token transactions is the transfer of a security token to and/or from an investor that does not qualify under an exemption to the SEC regulations.” D.I. 15-3 at 3:44-46. Thus, the patents explain, “[i]t is desirable to prevent security token transactions not complying with SEC regulations from being executed.” *Id.* at 3:48-50. Accordingly, the claims are directed to complying with rules when trading a security token. *Id.* at 3:54-61. The specification defines a “security token” as any cryptographic token that represents a security, which itself “may be any fungible, negotiable financial instrument that holds some type of monetary value.” *Id.* at 4:22-35. While the claims recite using smart contracts on a distributed ledger such as a blockchain to

---

[2] The “customer committed wallet” corresponds to the “second account” referred to in the claims. *See* D.I. 15-2 at 6:56-7:5 (“The addressed ***accounts may be referred to as ‘wallets.’*** …. ***The second wallet, referred to at times herein as the customer committed wallet***, stores digital transactional items that the customer has placed in buy or sell orders that have not yet been completed (e.g., ‘committed’ assets or funds).”) (emphasis added).

[3] The ’496 Patent and the ’802 Patent are related and large portions of their specification overlap. All citations to the ’496 Patent specification herein correspond to identical disclosures in the ’802 Patent.

execute a transaction, the specification admits that the use of cryptographic tokens and smart contracts on a blockchain such as Ethereum was already known. *Id.* at 1:46-53.

Like the '496 and '802 Patents, the '078 Patent notes the problem of ensuring that a security token transaction complies with applicable regulations. D.I. 15-5 at 3:6-9. It states that in a traditional financial system, broker-dealers would perform Know Your Customer (KYC), Anti-Money Laundering (AML), and accreditation investor screenings because the lifetime value of customers was sufficient to justify the cost. *Id.* at 3:53-61. But in a decentralized financial system, the funds raised by a securities offering will not cover ongoing monitoring. *Id.* at 3:62-65. The patent purports to solve this problem by ensuring an individual user bears some of the cost for their screening. *Id.* at 3:62-4:5. Specifically, the patent describes allowing an investor to pay for ongoing KYC, AML, and/or accreditation investor screening and uses the existing cryptography of a blockchain to update the investor's status. *Id.* at 4:42-51.

Finally, the '996 Patent similarly notes that some tokens require that purchasers meet securities regulation requirements, D.I. 15-4 at 3:4-22, and that it is desirable to prevent a purchaser from purchasing a token that the customer cannot withdraw under the regulations. *Id.* at 3:29-34. "To address the above problem," the patent "implement[s] validation/verification of a particular transaction address being on the whitelist before allowing a transaction of the token to occur." *Id.* at 3:35-38. Like the other Asserted Patents, the '996 Patent acknowledges that cryptographic tokens and the blockchain technology the claims use to perform that process was already well known. *See, e.g.*, *id.* at 1:24-32 (noting cryptographic tokens are used for many purposes in connection with blockchains and identifying technical standard for smart contracts on Ethereum blockchain); *see also id.* at 4:34-58 (explaining operation of existing blockchains);

5:57-67, 6:49-52, and 6:66-7:5 (acknowledging wallets and the use of private and public keys was known and described in Bitcoin Improvement Proposals).

## IV. LEGAL STANDARD

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Counterclaims must meet the same standard. *Cornell Univ. v. Illumina, Inc.*, 2012 WL 1885129, at *1 n.12 (D. Del. May 23, 2012).

Abstract ideas are not patentable under 35 U.S.C. § 101. *Alice*, 573 U.S. at 217-19. When determining whether claims recite patent-ineligible subject matter, a court first determines whether they are directed to an "abstract idea." *Id.* at 218. A "fundamental economic practice" is an abstract idea. *Bilski v. Kappos*, 561 U.S. 593, 611 (2010); *Alice*, 573 U.S. at 219. A court next determines whether the claim elements, individually or in an ordered combination, add something "inventive" to the abstract idea that is "sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 217-18, 221-22. Limiting an abstract idea to a "particular technological environment" does not supply an inventive concept. *Bilski,* 561 U.S. at 611. Nor does implementing the abstract idea through the use of existing technology. *Alice*, 573 U.S. at 223.

A patent may be determined ineligible at the Rule 12(b)(6) stage when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law. *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1359 (Fed. Cir. 2020). Courts "disregard conclusory statements" and allegations that "repackage assertions of non-abstractness," *id.* at 1365, including "a patent owner's conclusory allegations of inventiveness," *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1379 (Fed. Cir. 2022). They also do

not credit allegations that contradict a patent's written description. *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017).

## V. ARGUMENT

### A. The '560 Patent Claims Are Unpatentable

The '560 Patent claims are directed to the abstract idea of an escrow. For example, as shown in Appendix 1, '560 Patent Claim 14 recites simply (1) receiving an order to trade an item in a first account, (2) signing a first transaction to transfer that item into a second account, (3) signing a second transaction that includes the order to trade, and (4) authorizing placement of the order on an exchange if the signatures match. Escrow agents have performed those functions since time immemorial. Using an identifier and "cryptographic key" to sign the transactions, neither of which the patent purports to invent, does not render the claims non-abstract or add an inventive concept.

Claim 14 is representative of all the claims in the '560 Patent because "all of the independent claims . . . recite the same concept" and "the dependent claims offer only minor, non-technical variations." *Fast 101 PTY Ltd. v. Citigroup Inc.*, 424 F. Supp. 3d 385, 388 (D. Del.), *aff'd*, 834 F. App'x 591 (Fed. Cir. 2020). Independent claims 1 and 8 recite, respectively, a "system comprising a processor" and a "non-transitory computer-readable storage medium" for carrying out the same steps as claim 14. The dependent claims recite merely conventional steps for completing the transaction (claims 2-3, 9-10, and 15-16), limitations regarding who authorized the transactions (claims 4, 11, and 17), the use of already-known private keys, hashes, and common identifiers (claims 5 and 20), and limitations regarding the types of accounts (claims 7, 13, and 19) and types of assets (claims 6, 12, and 18).

### 1. Step 1: The Claims Are Directed to the Abstract Idea of an Escrow

The purported benefits of the ’560 Patent are non-technical: “guaranteed settlement, transparency of ownership and easy money movement, and secure settlements.” D.I. 15-2 at 2:47-49. The claimed solution it provides is a similarly non-technical idea: an escrow. *Id.* at 11:54-56 (“The customer committed wallet may be used to secure digital transactional items committed in future orders, ***akin to an escrow account***.”) (emphasis added).

Courts have consistently held that fundamental economic practices, including escrow, are abstract and patent ineligible. For example, in *Alice*, the Supreme Court held that “intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk,” is an abstract idea. *Alice*, 573 U.S. at 219-20. The claims in *Alice* were directed to facilitating “the exchange of financial obligations between two parties by using a computer system as a third-party intermediary,” where the intermediary permitted only approved transactions to proceed. *Id.* at 213-14. As the court found, this was a “fundamental economic practice long prevalent in our system of commerce” and implementing it on generic computer systems did not make it patent eligible. *Id.* at 219, 221. More recently, the Federal Circuit held that claims specifically directed to online payment escrow were abstract. *Boom! Payments Inc. v. Stripe, Inc.*, 839 F. App’x 528, 532 (Fed. Cir. 2021). Those claims recited a payment processor that receives a buyer’s payment information, later receives a request to purchase an item, generates a transaction-specific buyer acceptance identifier, receives corresponding identifiers from the seller, and charges the buyer’s account only if the identifiers match. *See id.* at 530. The Federal Circuit held that those steps were directed to “the abstract idea of payment escrow” because they “only describe steps of passing information back and forth by a computer,” and because “[t]he very purpose of the patents, as explained in the written description, is verifying consummation of a transaction before releasing payment by a third party, which is the definition of escrow.” *Id.* at 532.

The claims of the '560 Patent are indistinguishable from those invalidated in *Alice* and *Boom!*. Like in *Alice*, the '560 Patent claims purport to reduce settlement risk by transferring an item into an escrow account before the order is placed. And, as in *Boom!*, the '560 Patent claims confirm that a precondition has been satisfied before allowing the transaction to proceed. As both *Alice* and *Boom!* found, these are not technological improvements, but rather simply the idea of intermediated settlement using conventional computer operations.

tZERO's counterclaims allege that the '560 Patent's claims "relate to authorizing trades on a trading platform for accounts with a common identifier utilizing cryptographic keys." D.I. 15 ¶ 12.[4] But even that does not suggest that the claims offer a technological improvement. The patent admits that public-key cryptography including cryptographic keys was "well known," D.I. 15-2 at 3:14-16. And the Federal Circuit has repeatedly rejected the assertion that identifiers render a claim not abstract. *See Boom!*, 839 F. App'x at 532 ("[A]t most the use of an identification code does nothing more than overlay a second layer of abstraction—specifically, identity authentication—on the escrow procedure described by the claims"); *see also Rady v. Bos. Consulting Grp., Inc.*, 2024 WL 1298742, at *2-4 (Fed. Cir. Mar. 27, 2024) (claims directed to identifying a physical item's unique "signature" and recording it to the blockchain abstract); *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1348-50 (Fed. Cir. 2021) (claims directed to secure verification of a user's identity to enable a transaction abstract).

Moreover, the '560 Patent's claims recite "functional results . . . but do[] not sufficiently describe how to achieve these results." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017); *see also Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258-59 (Fed. Cir. 2016). The steps of claim 14, for example, merely "receiv[e],"

---

[4] All references to paragraphs in D.I. 15 refer to tZERO's Counterclaims.

"sign[]," "verify[]," and "authoriz[e]" things at a high level of generality. They do not explain or limit how orders are received, how transactions are signed using a cryptographic signature, or how the signatures are verified. Moreover, as a final "telltale sign of abstraction," the claim steps have been long performed by humans in their "mind or using pencil and paper." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021) (cleaned up). Receiving an order to trade an item, signing transactions to place the item in a second account and to place the order, and authorizing the placement of the order by comparing signatures are all conventional human activities. Replacing handwritten signatures with cryptographic ones simply inserts well-known computer technology used in its conventional manner. The claims thus "only explicate the necessary steps of an escrow arrangement." *Boom!*, 839 F. App'x at 532-33.

### 2. Step 2: The Claims Lack an Inventive Concept

"[C]laims to 'an abstract idea implemented on generic computer components, without providing a specific technical solution beyond simply using generic computer concepts in a conventional way'" do not provide an "inventive concept" sufficient to transform them into a patent-eligible application. *Zillow*, 50 F.4th at 1379-80 (citation omitted). Because each of the components recited by the '560 Patent's claims is a generic computer component used in a conventional manner, the claims also fail *Alice* step two. *Alice*, 573 U.S. at 217-18.

The '560 Patent states that its claimed techniques can be performed by a "general-purpose or special purpose processor," or with "any known processor." D.I. 15-2 at 20:53-58, 21:1. Moreover, the specification confirms that the cryptographic key and signature recited in the claims are also generic and conventional. It explains that "[t]he digital transactional items . . . may be transferred to other owners using cryptographic techniques such as public-key cryptography and bidirectional encryption, ***as well known in the art***." *Id.* at 3:13-16 (emphasis added). Moreover, the patent makes clear that it was known that public-key cryptography uses a

"public key" and "private key," and that transaction messages could be digitally signed by the sender's private key to authenticate the sender's identity. *Id.* at 3:16-25. Thus, the use of a cryptographic key to sign the transactions in the claims is "merely a combination of known authentication techniques that yields only expected results," and "the claims fail to recite an inventive concept." *Universal Secure Registry*, 10 F.4th at 1353.

The remaining components of the claims, such as an order to execute a trade, an identifier, accounts, and transactions, are all elements of a financial transaction. D.I. 15-2 at cl. 14. They are themselves abstract ideas that cannot provide an inventive concept. "[T]he combination of receipt and display of information, even of a particular type, and use of the information to engage in the fundamental economic practice of placing an order, are abstract ideas," and "[t]he abstract idea itself cannot supply the inventive concept." *Brumfield, Tr. for Ascent Tr. v. IBG LLC*, 97 F.4th 854, 868 (Fed. Cir. 2024); *see also In re Elbaum*, 2021 WL 3923280, at *2 (Fed. Cir. Sept. 2, 2021); *Island Intell. Prop. LLC v. TD Ameritrade, Inc.*, 2022 WL 17546958, at *3 (E.D. Tex. Sept. 28, 2022) ("Maintaining accounts, maintaining databases, transferring funds . . . all lie entirely in the abstract realm."), *report and recommendation adopted*, 2022 WL 17080738 (Nov. 17, 2022), *aff'd*, 2024 WL 2207311 (Fed. Cir. May 16, 2024). And the subject of the transaction is simply a "transactional item," which can include shares of stock, bonds, or currency. D.I. 15-2 at 5:43-45. Trading such an item is not an inventive concept and doing so digitally does not provide one either. *E.g.*, *Alice*, 573 U.S. at 224-25; *In re Chorna*, 656 F. App'x 1016, 1021 (Fed. Cir. 2016) (use of "'electronic communications networks' . . . to facilitate trading" of financial instrument did not provide an inventive concept).

When considered together, the ordered combination of the elements in the '560 Patent's claims is also conventional. *See Two-Way Media*, 874 F.3d at 1339. Claim 14 recites "receiving

an order," "signing" a first transaction to transfer items to a second account, "signing" a second transaction that includes the order, "verifying" the signatures, and "authorizing placement of the order" if the signatures match. These are routine steps for an escrow and are substantially similar to those in *Boom!*, where the claim required a computer programmed to "receive . . . a request . . . to be able to purchase at least one item," "generate a[n] . . . identifier," "receive . . . an identifier," "compare the identifier[s]," and "charge an account associated with the buyer" if they match. 839 F. App'x at 530. These "are merely the necessary steps of executing payment escrow and so do not constitute an inventive concept." *Id.* at 533.

### B. The '496 and '802 Patent Claims Are Unpatentable

The '496 and '802 Patent claims are directed to the abstract idea of complying with rules when trading a security. For example, as demonstrated in Appendix 2, claim 13 of the '496 Patent recites (1) the use of a computer connected to a blockchain to (2) receive a request to transfer a security token, (3), execute compliance rules by referencing a registry that includes information about investors, and (4) transfer the token based on the execution of the compliance rules. Stockbrokers have been performing those functions since the first securities laws, and using smart contracts on a blockchain to perform those functions is not inventive. *Identitii*, 2026 WL 1506530, at *7; *Bprotocol Found. v. Universal Navigation, Inc.*, 2026 WL 369394, at *6-7 (S.D.N.Y. Feb. 10, 2026) .

Claim 13 of the '496 Patent is representative of all claims of both patents. The only other independent claim of that patent, claim 1, recites conventional computer hardware that implements a nearly identical method as claim 13. D.I. 15-3 at cl. 1. Independent claims 1, 9, and 16 of the '802 Patent respectively recite a "network node," "computerized method," and "system," for performing the same steps while requiring additional information about the investor and security token be stored in the global registry. D.I. 15-1 at cls. 1, 9, and 16. The

dependent claims of both patents offer only minor, non-technical variations, such as details on the type of security token ('496 Patent cls. 2, 8, 9, 14, 20, 21; '802 Patent cls. 2, 6, 10, 19), additional information regarding the registry ('496 Patent cls. 3-7, 15-19; '802 Patent cls. 3-5, 11-13, 17-18), and the recording of information about the transaction in the blockchain ('496 Patent cls. 8, 10-11, 20, 22-23; '802 Patent cls. 6-8, 14-15, 19). While claims 12 and 24 of the '496 Patent also recite steps to implement a split for a security token, that too is a conventional financial practice that merely changes the quantity and value of individual shares of a stock, as the patent acknowledges. D.I. 15-3 at 4:44-59.

#### 1. Step 1: The Claims Are Directed to the Abstract Idea of Complying with Rules When Trading a Security

The '496 and '802 Patents identify a fundamentally non-technical problem: ensuring that a security token is not transferred to or from an investor who is not qualified under SEC regulations. D.I. 15-3 at 3:44-50. They then claim a fundamentally non-technical solution of executing compliance rules when processing a securities transaction. But complying with rules when trading a security is an abstract idea,[5] and implementing that idea using smart contracts on a blockchain does not make the idea any less abstract.

Courts have repeatedly found claims directed to complying with rules to be abstract. In *Beteiro, LLC v. DraftKings Inc.*, for example, the Federal Circuit considered claims for receiving information about a bet, determining whether the bet was placed from a location where betting was legal, and processing the bet only if it was allowed. 104 F.4th 1350, 1354 (Fed. Cir. 2024). The court found those claims abstract because "checking legal compliance [is] rooted in the

---

[5] tZERO essentially concedes this is the idea to which the claims are directed when it alleges that the two patents "relate to the execution of transactions involving tokenized security assets on a blockchain system based on compliance rules or regulations associated with the tokenized security asset." D.I. 15 ¶¶ 10, 14.

abstract—they are legal problems, not technical problems." *Id.* at 1357. *SafeCast Limited v. Google LLC* reached the same conclusion for claims directed to "automating compliance with . . . broadcast regulations." 703 F. Supp. 3d 1041, 1045 (N.D. Cal. 2023). There, the claims described a system that referenced a "rules database" to determine when advertisements could be broadcast under applicable regulations. *See id.* at 1043. The claims of the '496 and '802 Patents are no different: they simply automate compliance with securities rules by referencing a registry.

The claims' use of smart contracts on a blockchain do not save them under step 1. Again, implementing a "fundamental economic practice" on "generic computer systems" does not make it patent eligible. *Alice*, 573 U.S. at 219; *see also Bilski*, 561 U.S. at 610-11 ("[T]he prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the [idea] to a particular technological environment.'"). Accordingly, in *Identitii*, this Court held that "processing a financial transaction on the blockchain" is an abstract idea. 2026 WL 1506530, at *7. The Court noted that the claims in that case (as here) failed to recite an improvement in blockchain technology and that the benefits of the claims "merely stem from running an ***existing*** process (a financial transaction) on a new technology (the blockchain)." *Id.* at *6 (emphasis added). Likewise, in *Bprotocol Foundation v. Universal Navigation, Inc.*, the court held that claims directed to "calculating currency exchange rates to perform transactions" using smart contracts and a blockchain were directed to an abstract idea. 2026 WL 369394, at *6. It noted that "[c]urrency exchange is 'a fundamental economic practice long prevalent in our system of commerce'" and "implement[ing] the idea of currency exchange on the blockchain . . . does not make [the claims] non-abstract." *Id.* at *6-7. Further, cryptocurrencies, smart contracts, and the blockchain all previously existed and "the claims 'do not purport to solve any technological

problem but instead use existing . . . blockchain technology in predictable ways to address [an] economic problem.'" *Id*. at *7 (quoting *Rady*, 2024 WL 1298742, at *4).

The same applies here. The '496 and '802 Patents' claims merely use existing blockchain technology in a predictable way to trade a security. They do not purport to have invented or improved the computers, security tokens, smart contracts, or the blockchain referenced in the claims, and tZERO cannot dispute that the pertinent components all predate the patent. D.I. 15-3 at 1:46-53. The purported benefit therefore flows not from any technological improvement, but from performing an existing process (executing compliance rules while trading a security) using pre-existing technology. *See Identitii*, 2026 WL 1506530, at *7.

Finally, the '496 and '802 Patents' claims possess the hallmarks of abstractness. First, they recite desired outcomes—receiving a request to transfer a token, executing compliance rules, referencing a registry, and transferring the token based on those rules—but do not recite any particular algorithm, smart-contract logic, data structure, hashing technique, or distributed-ledger improvement for achieving them. *Two-Way Media*, 874 F.3d at 1337. Second, they are all mental processes that can be performed by the human mind. *PersonalWeb*, 8 F.4th at 1316. Shorn of the generic computer elements, the claims describe steps that sellers of securities have been performing for decades, according to regulations under the Securities Act of 1933. *E.g.*, Regulation D, 47 Fed. Reg. 11251, 11262-63 (Mar. 16, 1982) (requiring the issuer to comply with Regulation D "for all purchasers" and defining the requirements of an "accredited investor"). Accordingly, the claims are directed to an abstract idea under step one.

### 2. Step 2: The Claims Lack an Inventive Concept

The claims of the '496 and '802 Patents recite simply that the abstract idea is implemented on generic computer components without providing a specific technical solution

beyond using known concepts in a conventional way. They thus do not provide an inventive concept sufficient to make them patent eligible. *Zillow*, 50 F.4th at 1379.

*First*, the "network node" and "remotely located computing device" recited in the claims are generic computers that cannot provide an inventive concept. The specification describes a "network node" as "a computing device implemented using one or more processors that execute instructions stored in memory." *E.g.*, D.I. 15-3 at 8:20-23. The patents confirm that a network node's "processor" can be "any known processor," *id.* at 40:41-42, and that "memory" is "any device . . . or populated data structure used for storing information," *id.* at 40:15-17. The same is true for the claimed "remotely located computing device," which the patents state can be any of "a mobile device, such as a cell phone or tablet, personal computer, or a server" connected to a network. *Id*. at 8:5-9. The Federal Circuit has repeatedly held that such computer components are generic and insufficient to supply the required inventive concept. *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016) ("interface," "network," and "database" are "generic computer components"); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1366 (Fed. Cir. 2020) ("[T]he invocation of 'already-available computers that are not themselves plausibly asserted to be an advance . . . amounts to a recitation of what is well-understood, routine, and conventional'" and "is insufficient to supply the required inventive concept.") (internal quotation marks omitted).

*Second*, the claimed "security token," "smart contract" and "distributed ledger" are all admittedly pre-existing technologies used in a conventional manner. A security token is just a cryptographic token representing a security that "may be implemented as a smart contract on (e.g., stored on) a distributed ledger [] (e.g., a blockchain)." D.I. 15-3 at 4:22-23, 4:35-37. And the '496 and '802 Patents acknowledge that those concepts were all well known. Indeed, both

patents begin by noting that "[c]urrently, cryptographic tokens are used in connection with various aspects of blockchains," and go on to provide the example of smart contracts implemented on an Ethereum blockchain and to identify a technical standard already used for such smart contracts. D.I. 15-3 at 1:47-53. Thus, just as in *Identitii*, tZERO cannot "contend that it invented blockchain technology." 2026 WL 1506530, at *7. Nor can tZERO "assert that applying tokenization improves the underlying blockchain technology"; instead, as in *Identitii*, the patents "use[] conventional tokens on a conventional blockchain in a conventional manner." *Id.* at *8; *see also Rady*, 2024 WL 1298742, at *5 (no inventive concept because the claims use "existing blockchain technology to implement the abstract idea").

*Third*, that the '496 and '802 Patents recite using a smart contract to process a particular kind of information ("compliance rules") also does not provide an inventive concept. *See Rady*, 2024 WL 1298742, at *5 ("recording a particular type of information . . . to a blockchain does not mean that it improves the underlying blockchain technology"). As has already been found in the context of an online cryptocurrency exchange, "a smart contract that determines at least one rule for performing a transaction" is "existing smart contract and blockchain technology" that does not provide an inventive concept. *Bprotocol*, 2026 WL 369394, at *8.

*Fourth,* the smart contract's referencing of a "global registry" is also not an inventive concept, especially given the patents' teaching that the registry "could be a traditional database." D.I. 15-3 at 13:9-19, 12:50-54; *see BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1291 (Fed. Cir. 2018) ("routine and conventional database structures and activities . . . do[] not supply an inventive concept"). The "PII hash" in the claimed registry simply refers to personally identifiable information about an investor that has been encrypted using a generic hash function. D.I. 15-3 at 15:16-24. Hash identifiers have been used for decades and do not provide an

inventive concept. *E.g.*, *Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1374 n.9 (Fed. Cir. 2017) ("A hash identifier is a generic and routine concept that does not transform the claims to a patent-eligible application of the abstract idea."); *PersonalWeb*, 8 F.4th at 1319 (affirming that "[u]sing a generic hash function . . . does not render these claims non-abstract" at *Alice* step 2).[6]

Just as the specific elements recited in the claims are all conventional, so too is the order of their combination. The claims recite the steps of receiving a request to transfer a security token, executing compliance rules by referencing a registry, and transferring the security token based on the compliance rules, which is the conventional and expected order for those steps. Indeed, the steps are very similar to those found to be conventional in *Prism Technologies LLC v. T-Mobile USA, Inc.* 696 F. App'x 1014, 1016-18 (Fed. Cir. 2017) (finding the steps of "receiving identity data . . . with a request," "authenticating the identity data," "authorizing" and "permitting access" to be "perfectly conventional" when viewed as an ordered combination); *see also Alto Dynamics, LLC v. Wayfair LLC*, 687 F. Supp. 3d 179, 188-89 (D. Mass. 2023) (holding asserted claim "contain[ed] a litany of well-known, routine computer functions (e.g., receiving, verifying, comparing and sending information) arranged in a conventional order").

### C. The '078 Patent Claims Are Unpatentable

The '078 Patent claims are directed to the abstract idea of updating an investor's compliance status. As demonstrated in Appendix 3, Claim 1 of the '078 Patent recites the basic steps of (1) performing an initial KYC, AML, or accredited investor review for an account

[6] Including additional information related to various securities regulations in the registry similarly cannot provide an inventive concept since that is a financial, not a technical, concept. *E.g.*, *Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971, 979 (Fed. Cir. 2020) (holding claims that recited "record[s] of an electronic financial transaction" to be patent ineligible because "the use of well-known computer components to collect, analyze, and present data, in this case to verify financial transactions, does not render these claims any less abstract.").

owner, (2) receiving funds from the account, (3) validating the payment and account owner using the cryptography of a blockchain, (4) running a second KYC, AML, or accredited investor review for the account owner, and (5) determining the compliance status has changed and recording that change. But financial institutions have been updating the status of investors for decades. Doing this with blockchain technology does not render the claims patent eligible, as the ’078 Patent fails to claim any improvement to the blockchain technology itself.

Claim 1 is representative of all claims of the ’078 Patent. Independent claim 7 recites a “qualifier computing system” for performing the same steps and independent claim 13 only adds a subscription or license option. The dependent claims simply recite receiving identity data about the account owner and payment for identity services (claims 2, 8, 14), determining that the review was completed successfully (claims 3, 9, 15), notifying the account owner about the result (claims 4, 10, 16), details about the transaction account (claims 5, 11, 17), and who can tag the accounts (claims 6, 12, 18).

**1. Step 1: The Claims Are Directed to the Abstract Idea of Updating an Investor’s Compliance Status**

The ’078 Patent attempts to solve a business problem related to updating an investor’s compliance status by having the individual bear some of the cost. D.I. 15-5 at 3:62-4:5. But just as complying with securities regulations is an abstract idea, *supra* Section V.B.2, so is updating an investor’s compliance status, regardless of who pays. *See Beteiro*, 104 F.4th at 1357 (“[C]hecking legal compliance [is] rooted in the abstract—they are legal problems, not technical problems.”).

As with the patents above, implementing the abstract idea using blockchain technology does not save the claims from abstractness. *Bilski*, 561 U.S. at 610-11; *Identitii*, 2026 WL 1506530, at *6-7; *Bprotocol*, 2026 WL 369394, at *6-7. The patent acknowledges that the

cryptocurrencies, keys, hashing, smart contracts, and distributed ledgers of the claims are all known technologies. D.I. 15-5 at 7:67-8:5 (identifying pre-existing distributed ledgers and blockchains), 9:8-16 (identifying pre-existing cryptocurrency and wallet technology), 7:10-15 (identifying pre-existing key technology). The patent asserts that "[u]sing the cryptography of a blockchain is a technical improvement over conventional methods of renewal KYC, AML and/or accreditation investor." *Id.* at 4:49-51. But while using blockchain technology to address an economic problem may be a technical improvement over conventional methods of solving that economic problem, it is not an improvement to the technology. As in *Bprotocol*, "the claims 'do not purport to solve any technological problem, but instead use existing . . . blockchain technology in predictable ways to address [an] economic problem.'" 2026 WL 369394, at *7 (quoting *Rady*, 2024 WL 1298742, at *4); *see also Identitii*, 2026 WL 1506530, at *8.

The claims also recite desired outcomes—for example, "causing" reviews to be performed, "deriving" a public key, hashing that key, and "determining" a change—but do not recite any particular algorithm, smart-contract logic, data structure, hashing technique, or distributed-ledger improvement for achieving those functions. *Two-Way Media*, 874 F.3d at 1337. Moreover, they reflect the automation of processes that could be performed in the human mind. *PersonalWeb*, 8 F.4th at 1316. Indeed, the patent confirms that the purpose of using the cryptography of the blockchain is to enable the platform to ensure that it is renewing the status for the same person who was previously screened, D.I. 15-5 at 4:56-60, a function that humans have traditionally performed by, for example, comparing signatures. The claims are thus directed to an abstract idea under *Alice* step one.

### 2. Step 2: The Claims Lack an Inventive Concept

The '078 Patent's specification teaches that the claimed method can be implemented on any generic computer running any software, firmware or other instructions for carrying out the

claimed functions. *See* D.I. 15-5 at 5:62-6:3, 13:65-14:4, 28:26-34. And the use of "already-available computers that are not themselves plausibly asserted to be an advance . . . amounts to a recitation of what is well-understood, routine, and conventional" and "is insufficient to supply the required inventive concept." *Customedia*, 951 F.3d at 1366 (cleaned up).

Further, the specification confirms that the claims use known blockchain components in a conventional way. For example, the claimed "cryptocurrency" can be a conventional cryptocurrency such as "Bitcoin or Ethereum" or "Ravencoin (RVN)." D.I. 15-5 at 8:31-35, 4:66-5:1. The same is true for the public and private "keys," which can "operate according to" pre-existing encryptions. *Id*. at 7:11-15. The patent also confirms that "tagging" in order to update the compliance status of transaction accounts was already in use. *Id.* at 4:10-12 ("For example, the solution for having a decentralized KYC is built into the tagging system of Ravencoin."). The hashing recited by the claims has been used for many years and has been held not to provide an inventive concept. *E.g.*, *Smart Sys. Innovations*, 873 F.3d at 1374 n.9.

The only aspect that the '078 Patent purports to offer as a technological advance is the use of the cryptography of a blockchain to accomplish the updating of an investor's compliance status. *See* D.I. 15-5 at 4:49-51. But again, the use of a blockchain to perform traditional financial functions is not an inventive concept sufficient to save the claims. *See Identitii*, 2026 WL 1506530, at *7 (holding claim "does not contain an inventive concept" because it "uses conventional technology to track attributes of a financial transaction using an identifier and unspecified blockchain"). And, as with the other patents, the ordered combination of elements in the '078 Patent is conventional. Reviewing an investor's status, receiving payment and confirming the investor's identity, renewing the review and then recording a change are conventional steps employed in a customary manner. *Prism Techs.,* 696 F. App'x at 1016-18.

During examination, the Examiner rejected the ’078 Patent claims on § 101 grounds three times. *See, e.g.*, Ex. 1 at 3 (describing response to prior rejection and restating rejection); Ex. 2 at 9. The Examiner characterized the abstract idea of the claims as “authenticating an account initially and upon payment,” Ex. 1 at 13-14, noting that “the additional elements merely serve as a tool to perform the abstract idea.” *Id.* at 18. After an interview and significant argument from the applicant, the Examiner eventually decided the claims were allowable because “the claim [sic] as a whole are more than a drafting effort designed to monopolize the [judicial] exception,” i.e., the abstract idea. Ex. 2 at 9. However, courts do not defer to PTO determinations on § 101, which is a question of law. *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 705 (Fed. Cir. 2023). Furthermore, in this case, the Examiner failed to consider the correct legal standard, which requires that the claims have “additional elements [that] ‘transform the nature of the claim’ into a patent-eligible application,” *Alice*, 573 U.S. at 217, and which “cannot simply be ‘well-understood, routine, conventional activit[ies]’ previously known to the industry.” *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 773 (Fed. Cir. 2019) (citation omitted). As explained, the ’078 Patent admits that it simply uses the cryptography of the blockchain to perform the abstract idea, D.I. 15-5 at 4:49-51, and thus the claims recite unpatentable subject matter.

**D. The ’996 Patent Claims Are Unpatentable**

The ’996 Patent claims are directed to the abstract idea of restricting the transfer of an asset to a verified recipient on a whitelist. As shown in Appendix 4, Claim 1 essentially recites (1) a network of computers using public-private key cryptography to (2) receive a request to transfer a token, (3) in response, send cryptographic data to the requester and (4) restrict withdrawal of the token to whitelisted target addresses or associated public keys by (5) receiving the cryptographically signed data and target from the requestor, (6) verifying that the target

corresponds to the requestor, (7) verifying that the target is whitelisted, and (8) submitting the transfer to the blockchain if both verifications are successful and rejecting the transfer if they are not. While the claim uses repetitive and convoluted language to describe these steps, Figure 3 lays them out clearly:




Claim 1 is the only independent claim of the '996 Patent, and the dependent claims recite minor variations concerning conventional steps for cryptographically signing data (claim 2), the type of security token (claims 3, 4), the type of blockchain (claim 5), the length of private and public keys (claim 6), and the derivation of the public key and transaction address (claim 7). These are all minor, non-technical variations of the same idea, and none of the claims recites any explanation—technical or otherwise—of how these variations are accomplished.

### 1. Step 1: The Claims Are Directed to the Abstract Idea of Restricting the Transfer of an Asset to a Verified Recipient on a Whitelist

The '996 Patent purports to address a simple, non-technical problem: a person may inadvertently purchase a token that they cannot withdraw because they are not on the token's whitelist. D.I. 15-4 at 3:23-34. The alleged solution is also simple and non-technical—verify the identity of the purchaser and make sure that the purchaser is on the token's whitelist before allowing the purchase. *Id.* at 3:35-38. But financial institutions have long verified identities and limited transfers of assets to authorized recipients. Implementing such a long-standing practice using a blockchain does not save it from being an abstract idea. *See Alice*, 573 U.S. at 219; *Bilski*, 561 U.S. at 610-11; *Identitii*, 2026 WL 1506530, at *7.

The Federal Circuit found similar claims unpatentable in *Universal Secure Registry*. 10 F.4th at 1348-52. There, the representative claim recited numerous steps, including those for receiving a transaction, verifying a customer and merchant using a "time-varying multicharacter code," determining compliance with access restrictions, and enabling or denying the transaction. *Id.* at 1348-49. In ruling the claims abstract, the court held that "the claims simply recite conventional actions in a generic way (e.g., receiving a transaction request, verifying the identity of a customer and merchant, allowing a transaction)." *Id.* at 1349 (cleaned up); *see also Caselas, LLC v. VeriFone, Inc.*, 2024 WL 2720092, at *1-2 (Fed. Cir. May 28, 2024) (checking information before completing a transaction is abstract underwriting). Here, the '996 Patent claims use a great deal of words to describe very similar functions using public/private-key cryptography instead of a time-varying multicharacter code, as demonstrated by Figure 3.

The claims also "'do not purport to improve any underlying technology.'" *Universal Secure Registry*, 10 F.4th at 1349. They contain verbose descriptions of the conventional technologies, but nothing departs from conventional practices or provides an improvement to

such practices. Indeed, both the specification and claims reference the conventional Ethereum blockchain and the standard for smart contracts on that blockchain. D.I. 15-4 at cls. 4, 5. There is no mention of any improvement to cryptography, public/private-key architecture, smart contracts, or computer functionality. Instead, the claims describe using those technologies to achieve the desired outcome. *See Two-Way Media*, 874 F.3d at 1337. For example, there is no restriction on how to "cryptographically sign" data or the steps or algorithms for "cryptographically transforming the data using a private key." D.I. 15-4 at 19:15-24. Likewise, the claims describe cryptographic verification using a "verification function" but only describe the ***outcomes*** of using the function, not the function itself. *Id.* at 19:61-20:24. Indeed, the alleged innovative aspect of the patent has nothing to do with cryptography but is directed to the concept of limiting transactions to only whitelisted accounts. *Id.* at 3:35-38. The claimed use of public/private-key cryptography to do so does not change the abstract nature of the claims. *See Checksum Ventures, LLC v. Dell Inc.*, 412 F. Supp. 3d 906, 915-16 (N.D. Ill. 2019) (finding claims abstract where they used conventional encryption methods, including private and public keys); *In re AuthWallet, LLC*, 2023 WL 3330298, at *3-4 (Fed. Cir. May 10, 2023) (holding the "focus" of the claims is the longstanding commercial practice and that the conventional "security" feature does not render the claims non-abstract).

**2. Step 2: The Claims Lack an Inventive Concept**

The specification confirms that, notwithstanding their verbosity, the '996 Patent claims do not include an inventive concept. To the contrary, the hardware is generic. *See, e.g.*, D.I. 15-4 at 12:55-63, 13:35-43, Fig. 4, Fig. 5 (showing generic computer systems); 15:63-16:10 (network is "***any*** network capable of transmitting information from one entity to another") (emphasis added); 11:67-12:28 and 13:5-11 (memory and processor can be any known memory or processor); 14:11-50 (describing existing network interfaces). And each blockchain

functionality, including verification using public and private keys, was admittedly previously known and conventional. *See, e.g.*, *id.* at 3:4-22 (describing existing tokens that only allow those on a whitelist to purchase), 4:54-58 (listing 17 existing blockchains), 5:59-67 and 6:47-7:7 (referencing standards related to wallets, private keys, and public keys).

Similarly, assembling the elements of the claims as an ordered combination does not supply an inventive concept. Receiving a transaction request, verifying the identity of a purchaser, and deciding whether to approve or deny a transaction are conventional steps. *See Universal Secure Registry*, 10 F.4th at 1349. While the claims recite sub-steps describing the verification, including sending cryptographic data to the purchaser, receiving cryptographic data back, and verifying that the transaction address corresponds to the purchaser, those are performed in a conventional order for verifying any identity. For example, banks require customers to submit PINs before allowing withdrawals: the PIN is compared to a stored value corresponding to the customer, and the funds are withdrawn only if the entered PIN corresponds to the stored value and the customer is authorized to receive funds. Describing the use of blockchain technology to perform an age-old practice does not supply an inventive concept.

As with the ’078 Patent, the Examiner repeatedly rejected the ’996 Patent claims on §101 grounds during prosecution. *See, e.g.*, Ex. 3 at 3; Ex. 4 at 13. The Examiner found the claims to be directed to a similar abstract idea as articulated herein, Ex. 3 at 3, and that the then-claimed additional elements are merely tools to perform the idea. Ex. 4 at 3. The Examiner ultimately allowed the claims after an examiner’s amendment that added conventional limitations regarding public-private key cryptography used by the “computer system” and “remotely located computing device,” finding that the amendment integrated the exception into a practical

application. *See* Ex. 5 at 7-8, 16. But that is not the applicable test here, and adding those elements cannot provide an inventive concept given the specification's admissions.

### E. The Allegations in the Counterclaims Do Not Defeat Dismissal

tZERO's allegations in its Counterclaims cannot defeat dismissal. *See* D.I. 15 at ¶¶ 20-21. tZERO first asserts that all of the Asserted Patents reflect (unidentified) advancements in blockchain-based systems for digital securities and assets. *Id.* ¶¶ 20. That must be disregarded as simply stating a legal conclusion. *Simio*, 983 F.3d at 1365 ("A statement that a feature 'improves the functioning and operations of the computer' is, by itself, conclusory."). It then asserts that the claims are directed to solutions that improve how digital asset transfers are validated, authorized, and executed within distributed ledger environments. D.I. 15 ¶ 20. As this Court has already found, allegations claiming "the use of blockchain technology is helpful in facilitating financial [securities] transactions" cannot show an inventive concept. *Identitii Ltd.*, 2026 WL 1506530, at *8; *see also SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1170 (Fed. Cir. 2018) (patent claims that carry out "improved mathematical calculations" for finance on "already-available computers" failed to provide inventive concept). The Counterclaims then repeat the legal standard that the claimed elements were not well understood, routine, or conventional, which improperly contradicts the teachings of the patents themselves. *Supra* Sections V.A.2, V.B.2, V.C.2, and V.D.2; *Secured Mail*, 873 F.3d at 913.

In the only allegations specific to each patent, tZERO simply restates the claims. D.I. 15 ¶ 21. Of course, the abstract idea itself cannot supply the inventive concept, *Brumfield*, 97 F.4th at 868, and a paraphrasing of the claims is not "plausible and specific factual allegations that aspects of the claims are inventive," *Zillow*, 50 F.4th at 1379.

## VI. CONCLUSION

For these reasons, tZERO's Counterclaims should be dismissed with prejudice.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Anthony D. Raucci*

Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff/Counterclaim-Defendant Securitize I, Inc.*

OF COUNSEL:

David J. Lisson
Micah G. Block
Thomas C. Horn
Natalie J. Stoecklein
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, CA 94063
(650) 752-2000

Rachael S. Bacha
Zhikun (David) Jiang
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

August 21, 2026

## Appendix 1

| **’560 Patent Claim 14** | |
|---|---|
| A method, comprising: | |
| receiving an order to execute a trade of at least one transactional item associated with a first account, wherein the order, the first account, and a second account are associated with a common identifier; | 1 |
| cryptographically signing, using a cryptographic key, a first transaction to transfer the at least one transactional item from the first account to the second account; | 2 |
| cryptographically signing, using the cryptographic key, a second transaction that includes the order; | 3 |
| verifying that the first transaction and the second transaction were both cryptographically signed using the cryptographic key; and<br><br>authorizing placement of the order on an exchange if the first transaction and the second transaction were both cryptographically signed using the cryptographic key. | 4 |

## Appendix 2

| ’496 Patent Claim 13 | |
|---|---|
| A computerized method for transferring a self-enforcing security token, wherein the computerized method is performed by a network node configured to be included within a plurality of network nodes in a peer-to-peer network of network nodes implementing a distributed ledger, wherein the network node is configured to be communicatively coupled to other network nodes in the peer-to-peer network, the computerized method comprising: | 1 |
| receiving, from a remotely located computing device, a request to transfer a security token; | 2 |
| executing a plurality of compliance rules associated with the security token, wherein at least one of the plurality of compliance rules is implemented using at least one smart contract, wherein the at least one smart contract references a global registry; and | 3 |
| transferring the security token based on the execution of the plurality of compliance rules, | 4 |
| wherein the global registry comprises at least one personally identifiable information (PII) hash for each of at least one investor associated with the transfer of the security token, wherein the at least one PII hash for each of the at least one investor is committed to the distributed ledger, wherein each of the at least one PII hash is updated when PII of a respective investor of the at least one investor changes. | 3 |

**Appendix 3**

<table>
<tr><th>’078 Patent Claim 1</th><th></th></tr>
<tr><td>A computerized method, comprising:</td><td></td></tr>
<tr><td>causing at least one of know-your-customer (KYC), anti-money laundering (AML), and accredited investor review to be initially performed for an owner of a transaction account;</td><td>1</td></tr>
<tr><td>receiving payment of an amount of cryptocurrency from the transaction account to another account;</td><td>2</td></tr>
<tr><td>sending a challenge string to a customer device to be signed by a private key of a wallet of the owner;<br><br>receiving the challenge string with a signature from the private key of the wallet of the owner;<br><br>validating the signature against the transaction account on a distributed ledger that is tagged or whitelisted by:<br><br>deriving a public key corresponding to the private key of the wallet of the owner from the signature; hashing the public key to form a hash; and comparing the hash against the transaction account on the distributed ledger that is tagged or whitelisted;<br><br>determining that the payment of the amount of cryptocurrency is received at the another account from the transaction account and the signature is successfully validated;</td><td>3</td></tr>
<tr><td>causing the at least one of KYC, AML, and accredited investor review to be performed again for the owner of the transaction account;</td><td>4</td></tr>
<tr><td>determining that the at least one of KYC, AML, and accredited investor review being performed again causes a status of the owner of the transaction account to change;<br><br>adding at least one indication of the status of the owner in the distributed ledger by:<br><br>recording at least one tag into the transaction account; and adding the transaction account or the public key of the owner to at least one whitelist implemented on at least one smart contract; or<br><br>removing at least one indication of the status of the owner to the distributed ledger by:<br><br>removing at least one tag from the transaction account; and removing the transaction account or the public key of the owner from at least one whitelist implemented on at least one smart contract.</td><td>5</td></tr>
</table>

**Appendix 4**

| '996 Patent Claim 1 | |
|---|---|
| A system comprising:<br><br>a computer system;<br><br>and a remotely located computing device connected to at least one network and configured to cryptographically sign data by cryptographically transforming the data using a private key to create cryptographically signed data,<br><br>the data communicated by the computer system,<br><br>the private key having:<br><br>(1) a corresponding public key derived from the private key and (2) a corresponding transaction address associated with the corresponding public key and derived from at least one of the private key and the corresponding public key;<br><br>the computer system comprising:<br><br>at least one processor;<br><br>at least one memory communicatively coupled to the at least one processor;<br><br>at least one network interface communicatively coupled to the at least one processor; and<br><br>wherein the at least one processor is configured to: | 1 |
| receive a request to cryptographically transfer a cryptographic token into a target transaction address from the remotely located computing device via the at least one network using the at least one network interface; | 2 |
| communicate the data to the remotely located computing device via the at least one network using the at least one network interface in response to the request to cryptographically transfer the cryptographic token into the target transaction address being received from the remotely located computing device via the at least one network using the at least one network interface; | 3 |
| comply with a first smart contract to restrict withdrawal of the cryptographic token to only: (1) whitelisted transaction addresses identified in a smart contract-implemented whitelist or (2) whitelisted public keys that are associated with the whitelisted transaction addresses identified in the smart contract-implemented whitelist; | 4 |

| | |
|---|---|
| receive the cryptographically signed data from the remotely located computing device via the at least one network using the at least one network interface;<br><br>receive at least one of the target transaction address or a target public key associated with the target transaction address from the remotely located computing device via the at least one network using the at least one network interface; | 5 |
| cryptographically verify that the at least one of the target transaction address or the target public key associated with the target transaction address corresponds to the private key used to cryptographically sign the cryptographically signed data by:<br><br>receiving both (1) the cryptographically signed data cryptographically signed by the private key and (2) the at least one of the target transaction address or the target public key associated with the target transaction address into a processor-implemented cryptographic verification function; and<br><br>outputting a determination from the processor-implemented cryptographic verification function that at least one of:<br><br>(1) the target transaction address is cryptographically derivable from the private key used to cryptographically sign the cryptographically signed data such that the target transaction address is the corresponding transaction address associated with the corresponding public key and derived from at least one of the private key and the corresponding public key; or<br><br>(2) the target public key associated with the target transaction address is cryptographically derivable from the private key used to cryptographically sign the cryptographically signed data such that the target public key is the corresponding public key derived from the private key; | 6 |
| only verify that the at least one of the target transaction address or the target public key associated with the target transaction address is whitelisted to receive cryptographic transfer of the cryptographic token after the target transaction address or the target public key associated with the target transaction address is identified in the smart contract-implemented whitelist; | 7 |

<table>
<tr><td>only communicate the cryptographic transfer, via the at least one network and using the at least one network interface, to a blockchain to cryptographically transfer and record the cryptographic transfer of the cryptographic token into the target transaction address on the blockchain after:<br><br>(1) cryptographically verifying that the at least one of the target transaction address or the target public key associated with the target transaction address corresponds to the private key used to cryptographically sign the cryptographically signed data; and<br><br>(2) verifying that the at least one of the target transaction address or the target public key associated with the target transaction address is whitelisted to receive the cryptographic transfer of the cryptographic token after the target transaction address or the target public key associated with the target transaction address is identified in the smart contract-implemented whitelist; and<br><br>reject (1) the cryptographic transfer of the cryptographic token into the target transaction address and (2) communication of the cryptographic transfer, via the at least one network and using the at least one network interface, to the blockchain when it is not both:<br><br>(1) cryptographically verified that the at least one of the target transaction address or the target public key associated with the target transaction address is cryptographically derivable from the private key used to cryptographically sign the cryptographically signed data; and<br><br>(2) verified that the at least one of the target transaction address or the target public key associated with the target transaction address is whitelisted to receive the cryptographic transfer of the cryptographic token based on the smart contract-implemented whitelist.</td><td>8</td></tr>
</table>

# CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on August 21, 2026, upon the following in the manner indicated:

Frederick L. Cottrell, III
Christine D. Haynes
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, DE 19801
*Attorneys for Defendants tZERO Group, Inc. and tZERO IP, LLC*

*VIA ELECTRONIC MAIL*

Kirk R. Harris
MASCHOFF BRENNAN
1389 Center Drive, Suite 300
Park City, UT 80098
*Attorneys for Defendants tZERO Group, Inc. and tZERO IP, LLC*

*VIA ELECTRONIC MAIL*

Erynn Embree
MASCHOFF BRENNAN
100 Spectrum Center Dr., Suite 1200
Irvine, CA 92618
*Attorneys for Defendants tZERO Group, Inc. and tZERO IP, LLC*

*VIA ELECTRONIC MAIL*

*/s/ Anthony D. Raucci*

Anthony D. Raucci (#5948)