**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SECURITIZE I, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:26-cv-00722-GBW |
| | ) | |
| TZERO GROUP, INC. and TZERO IP, LLC, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**ANSWERING BRIEF IN OPPOSITION TO SECURITIZE I, INC.'S MOTION TO DISMISS TZERO IP, LLC'S AMENDED COUNTERCLAIMS**

OF COUNSEL:

Kirk R. Harris
Maschoff Brennan
95 S State Street, Suite 800
Salt Lake City, UT 84111
(435) 252-1360
kharris@mabr.com

Erynn Embree
Maschoff Brennan
100 Spectrum Center Dr., Suite 1200
Irvine, CA 92618
(949) 202-1900
eembree@mabr.com

Frederick L. Cottrell, III (#2555)
Christine D. Haynes (#4697)
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
haynes@rlf.com

Attorneys for Defendants *tZERO Group, Inc. and tZERO IP, LLC*

Dated: September 18, 2026

**TABLE OF CONTENTS**

I. NATURE AND STAGE OF PROCEEDINGS ........ 1

II. SUMMARY OF THE ARGUMENT ........ 1

III. STATEMENT OF FACTS ........ 3

IV. LEGAL STANDARD ........ 6

V. ARGUMENT ........ 7

A. The ’560 Patent is directed to a patent-eligible subject matter. ........ 7

1. The ’560 Patent claims are not directed to an abstract idea under *Alice* step one. ........ 7

2. The ’560 Patent claims recite an inventive concept under *Alice* step two. ........ 10

B. The ’802 and ’496 Patents are directed to a patent-eligible subject matter. ........ 11

1. Securitize did not meet its burden regarding representative claims. ........ 11

2. The ’802 and ’496 Patents are not directed to an abstract idea. ........ 12

3. The ’802 and ’496 Patent claims recite an inventive concept under *Alice* step two. ........ 15

C. The ’996 Patent is directed to a patent-eligible subject matter. ........ 17

1. The ’996 Patent claims are not directed to an abstract idea. ........ 17

2. The ’996 Patent claims recite an inventive concept under *Alice* step two. ........ 20

D. The ’078 Patent is directed to a patent-eligible subject matter. ........ 21

1. The ’078 Patent claims are not directed to an abstract idea. ........ 21

2. The ’078 Patent claims recite an inventive concept under *Alice* step two. ........ 23

E. The allegations in the Counterclaims raise factual disputes that preclude dismissal. 24

VI. CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018)....7, 25

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014).... *passim*

*Alto Dynamics, LLC v. Wayfair LLC*,
687 F.Supp.3d 179 (D. Mass. 2023)....16, 21

*In re AuthWallet, LLC*,
2023 WL 3330298 (Fed. Cir. May 10, 2023)....19, 21

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016).... *passim*

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018)....25

*Beteiro, LLC v. DraftKings Inc.*,
104 F.4th 1350 (Fed. Cir. 2024)....13, 22

*Boom! Payments, Inc. v. Stripe, Inc.*,
839 F.App'x 528 (Fed. Cir. 2021)....8

*Bprotocol Found. v. Universal Navigation, Inc.*,
2026 WL 369394 (S.D.N.Y. Feb. 10, 2026).... *passim*

*Buck v. Hampton Twp. Sch. Dist.*,
452 F.3d 256 (3d Cir. 2006)....7

*CardioNet, LLC v. InfoBionic, Inc.*
955 F.3d 1358 (Fed. Cir. 2020)....10

*Caselas, LLC v. VeriFone, Inc.*,
2024 WL 2720092 (Fed. Cir. May 28, 2024)....19

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019)....7, 25

*Checksum Ventures, LLC v. Dell Inc.*,
412 F.Supp.3d 906 (N.D. Ill. 2019)....19, 21

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)....9, 10, 14, 15

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)....................6

*Game Play Network, Inc. v. Potent Sys., Inc.*,
2024 WL 3226214 (D. Del. Jun 28, 2024) ....................11

*Identitii Ltd. v. JPMorgan Chase & Co.*,
2026 WL 1506530 (D. Del. May 29, 2026).................... *passim*

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
942 F.3d 1143 (Fed. Cir. 2019)....................9

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016)....................9, 14, 20

*Prism Technologies LLC v. T-Mobile USA, Inc.*,
696 F.App'x 1014 (Fed. Cir. 2017) ....................16, 21, 24

*Rady v. Boston Consulting Group, Inc.*,
2024 WL 1298742 (Fed. Cir. Mar. 27, 2024)....................14, 20

*SafeCast Ltd. v. Google, LLC*,
703 F.Supp.3d 1041 (N.D. Cal. 2023) ....................13

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed. Cir. 2017)....................19, 23

*Universal Secure Registry LLC v. Apple, Inc.*,
10 F.4th 1342 (Fed. Cir. 2021) ....................18

**Statutes**

35 U.S.C. § 101.................... *passim*

**Court Rules**

Federal Rule of Civil Procedure 12(b)(6) ....................1

**Other Authorities**

U.S. Patent No. 11,216,802.................... *passim*

U.S. Patent No. 11,394,560.................... *passim*

U.S. Patent No. 12,051,078.................... *passim*

U.S. Patent No. 12,099,996.................... *passim*

U.S. Patent No. 12,223,496.................... *passim*

Defendant and Counterclaimant tZERO IP, LLC ("tZERO") respectfully submits this Answering Brief in Opposition to Plaintiff and Counterclaim-Defendant Securitize I, Inc.'s ("Securitize") Motion to Dismiss tZERO's Amended Counterclaims ("Motion") (D.I. 24, 25).

## I. NATURE AND STAGE OF PROCEEDINGS

On June 22, 2026, Securitize filed a declaratory judgement complaint against tZERO and tZERO Group, Inc. seeking declaratory judgment of non-infringement with respect to U.S. Patent Nos. 11,394,560 (the "'560 Patent") and 11,216,802 (the "'802 Patent"). tZERO filed a First Amended Answer and Counterclaims on July 17, 2026, asserting patent infringement for the '560 and '802 Patents and adding patent infringement claims for U.S. Patent Nos. 12,223,496 (the "'496 Patent"), 12,099,996 (the "'996 Patent"), and 12,051,078 (the "'078 Patent") (collectively, the "Asserted Patents"[1]) ("Counterclaims," D.I. 15). As alleged in the Counterclaims, the Asserted Patents generally pertain to technological advancements in blockchain-based systems for transactions involving digital securities and digital assets.

On August 21, 2026, pursuant to Federal Rule of Civil Procedure 12(b)(6) and prior to claim construction, discovery, or any factual record concerning the state of the art, the understanding of a person of ordinary skill, or the conventionality of the claimed technological arrangements, Securitize moved to dismiss the Counterclaims under 35 U.S.C. § 101.

## II. SUMMARY OF THE ARGUMENT

1. Securitize's Motion not only rests on a flawed characterization of the Asserted Patents, but it is also inconsistent and contradictory to its own statements regarding the technology claimed in the Asserted Patents. Securitize's publicly traded parent company,

[1] Copies of the patents can be found at D.I. 15, Exhibits 1 ('802 Patent), 2 ('560 Patent), 3 ('496 Patent), 4 ('996 Patent), and 5 ('078 Patent).

Securitize Corp., has characterized the technology tZERO now accuses Securitize of infringing as "represent[ing] a fundamental shift that we believe will result in a profound change to the existing financial system by materially improving efficiency, reducing costs, expanding accessibility, and accelerating innovation." Securitize Corp., Registration Statement (Form S-1), at 67 (July 31, 2026). Now, contrary to its public statements (even to the SEC and its shareholders), Securitize tries to "dumb down" the technology in order to escape what it knows it cannot: infringement of the patented technology that its business relies so heavily upon. Rather than analyze the patented claims as a whole, Securitize strips away the specific technological elements and attempts to reduce them to generalized business concepts such as "escrow," "complying with rules when trading a security," "updating an investor's compliance status," or "restricting transfers to whitelisted recipients" to argue they are abstract. That is precisely the type of oversimplification rejected by the Supreme Court and the Federal Circuit when analyzing whether an invention is directed to an abstract idea under 35 U.S.C. § 101 ("Section 101").

2. Contrary to Securitize's Motion (but consistent with Securitize's public characterizations of the technology at issue), the Asserted Patents are directed to specific technological solutions for problems arising in blockchain-based systems. The Asserted Patents are not simply utilizing an already-existing blockchain technology in order to perform pre-existing abstract ideas. The patents claim particular technological improvements that solve known problems and improve the function of the underlying blockchain system.

3. Furthermore, even if the Court were to conclude that the Asserted Patents pertain to an abstract concept, dismissal would still be improper. tZERO's Counterclaims expressly allege that the claimed inventions represent technological improvements and that the claimed

elements and ordered combinations were not well-understood, routine, or conventional. Those factual allegations must be accepted as true at the pleading stage. The Motion should be denied.

## III. STATEMENT OF FACTS

Securitize claims that tZERO's Asserted Patents are invalid because they are directed to abstract ideas, (D.I. 25.) Not so. The Asserted Patents generally relate to improvements to blockchain-based systems that are used for trading, verifying, and managing digital assets and digital securities. tZERO's Counterclaims allege that the Asserted Patents' inventions represent technological advances in blockchain-based systems and elements combinations that were not well-understood, routine, or conventional as of the relevant priority dates. (D.I. 15 ¶¶ 20–21.)

The '560 Patent discloses a "Crypto Integration Platform" that solves compatibility issues between traditional trading systems (e.g., centralized government-regulated institutions, like the New York Stock Exchange) and crypto trading systems (e.g., decentralized blockchain networks that operate around the clock), enabling trades matched on conventional trading systems to settle on a blockchain network, which was not possible in prior systems. '560 Patent at 1:32–34. It "provides . . . an interface between legacy trading systems and crypto exchanges that trade digital transactional items" and "transforms the message so that the trade can be consummated using cryptographic techniques." '560 Patent at 2:52–59. The '560 Patent improves the underlying blockchain system by guaranteeing settlement of trades by securing assets and funds before matching orders and verifying availability of settlement and creates a necessary link between off-chain (transactions that occur outside the blockchain network) execution and on-chain (transactions that occur directly on the blockchain) settlement. '560 Patent at 2:22–46. It also improves security against spoofed orders by "prevent[ing] attackers from monitoring the public

ledger and trying to create fraudulent orders which appear to be backed by a committed order," and does so via its claimed cryptographic techniques. '560 Patent at 7:60–8:3.

The '802 and '496 Patents are related and share a common specification. The patents relate to improvements to blockchain-based security token technology that enables assets to be self-enforcing when there are "fewer or no intermediaries" as there is in traditional financial market transactions. '802 Patent at 3:38–41; '496 Patent at 3:64-67. Prior blockchain technologies "do not cause security tokens 102 to automatically self-enforce compliance with SEC regulations" and there is no trusted intermediary to otherwise enforce such rules on a blockchain as there is in traditional finance, which makes achieving compliant trades impossible. '802 Patent at 10:5–8; '496 Patent at 11:49–52. To address this problem, tZERO invented a new technological advancement that enables a blockchain-based asset to be interoperable with decentralized technologies and to unilaterally enforce all applicable compliance rules by utilizing transfer functions that "may further call method(s) in one or more smart contracts 130–134 in the global registry 108 and/or compliance rule(s) 106" to "check/verify" information associated with investors and other system participants before the transfer occurs. '802 Patent at 8:45–50; '496 Patent at 10:16–21. The '802 Patent requires a compliance-rule smart contract that is "separate from an originating smart contract that implements the security token," so that compliance rules "may be updated without modifying the security token 102 itself" resulting in more efficient changes to the system because regulations can be changed and applied without altering the security token itself, paving the way for compliant security tokens to trade on decentralized networks without intermediation. '802 Patent at 10:15–30, claim 1. It uses global registries that contain investor-specific personally identifiable information ("PII") hashes that are committed to the distributed ledger and updated when investor information changes, making it cheaper to

update affected portions of code when there are bugs or PII updates. '802 Patent at 11:18–27, claims 1, 8; '496 Patent at 12:63–13:5, claim 13.

The '996 Patent creates an improved transaction verification process on a blockchain that requires whitelist verification and actual control over a target address to prevent invalid transfers or attacks on a wallet on a blockchain. This process avoids scenarios where purchasers purchase an asset but are "unable to withdraw the token" because the transaction is "restricted to certain public keys" or whitelisted addresses. "It is desirable to prevent the above scenario so that a customer does not inadvertently purchase tokens when the customer cannot withdraw them,"; so, the patent "implement[s] validation/verification of a particular transaction address . . . before allowing a transaction of the token to occur" to address this issue. '996 Patent at 3:23–38; 8:56–65. The invention conducts validation checks at withdrawals and requires a user to prove control over a wallet via cryptographic signatures before a transaction takes place, thereby ensuring transactions are approved only if the receiving address is controlled by the same party requesting the withdrawal. *Id.* at 3:45–58. This reduces invalid transactions across the network, reducing congestion and protecting against unwanted or malicious transfers. *Id*. at 3:45–58; 7:33–36.

The '078 Patent is a solution for ongoing account monitoring for assets that ties the cost of renewal screening to the account holder to verify the status and control of the account and to allocate costs efficiently. Under traditional financial transactions, required KYC ("Know Your Customer")/AML ("Anti-Money Laundering") screenings are tied to accounts, rather than individual assets. In comparison, "[i]n decentralized ecosystems, it is necessary for the issuer of a security to perform the same KYC screenings and the funds raised by the offering will likely cover the KYC, but not necessarily the required ongoing monitoring." '078 Patent at 3:62–65. The invention is "a technical improvement over conventional subscription/license renewal for

digital assets" that "utilize[s] cryptography . . .to verify that the original purchaser of the subscription/license is still in control of their private key 326 associated with the tagged or whitelisted transaction address" such that the tagged or whitelisted address is maintained to allow access and the issuer can be verified as being the "same customer who paid for that access (because that customer possesses the private key used to do both)." *Id.* at 27:25–44. "With the ability to sign and prove ownership of an address, an issuer or exchange could know that sufficient verification and/or renewed scanning has been performed in the last six months by an entity that has policies in place," thereby improving the mechanism of an accreditation renewal system that provides information about status and ownership. *Id.* at 4:1–5.

## IV. LEGAL STANDARD

Under Section 101, patents may be obtained for "any new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. Although laws of nature, natural phenomena, and abstract ideas are not patentable, courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). The Supreme Court in *Alice* articulated a two-step framework to determine if a patent is patent-eligible. *Id.* In step one, courts first determine whether the claims are directed to, a patent-ineligible concept. *Id*. If so, the analysis proceeds to step two to determine whether the claims contain an "inventive concept" sufficient to transform the claimed invention into patent-eligible subject matter. *Id*. at 217–18. The Federal Circuit has repeatedly emphasized that courts may not oversimplify claims or ignore specific claim limitations when conducting the *Alice* inquiry; instead, courts must consider the claims as a whole and determine whether they are directed to a specific technological improvement rather than merely an abstract result. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–37 (Fed. Cir. 2016).

At the pleading stage, the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the non-moving party. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). Dismissal under Section 101 is improper "in the face of factual allegations . . . that[] if accepted as true, establish that the claimed combination contains inventive components and improves the workings of the computer." *Id*. Whether an element or ordered combination was conventional is an issue of fact, and dismissal is inappropriate where the pleadings raise a plausible factual dispute on that issue. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317–19 (Fed. Cir. 2019). "In evaluating a motion to dismiss [Courts] may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (citation modified).

## V. ARGUMENT

### A. The '560 Patent is directed to a patent-eligible subject matter.

#### 1. The '560 Patent claims are not directed to an abstract idea under *Alice* step one.

Securitize argues the '560 Patent is abstract by improperly characterizing the claims as being directed to "an escrow." (D.I. 25 at 6.) This characterization blatantly ignores the problem identified by the patent and the technological solution that is claimed. The problem identified by the '560 Patent is that "existing trading systems [i.e., SEC-regulated trading systems not using digital blockchain technology] use protocols for pre-trade communications and execution that are not compatible with trading systems that trade digital transactional items." '560 Patent at 1:32–38. The technological solution the '560 Patent claims is "an interface between legacy trading systems and crypto exchanges that trade digital transactional items" that "takes a protocol for trading and communication between broker-dealers, Alternative Trading Systems ('ATS'), and

exchanges, and transforms the message so that the trade can be consummated using cryptographic techniques." *Id*. at 2:52–59.

The '560 Patent implements this solution through a specific cryptographic verification framework that requires a commitment transaction and an order transaction to be signed using the same cryptographic key that is verified before order placement. *Id*. at 7:64–67 ("signing the . . . order transaction and the crypto order transaction with the same private key allows [the system to] mathematically verify that the order originated from the same entity"). This verification process "provide[s] certainty that the FIX order transaction is associated with the crypto committed transaction and therefore that the digital funds are available for the transaction." *Id*. at 13:45–48. Thus, the '560 Patent is a technological advancement that enabled a digital asset to trade on a conventional trading system and settle on the blockchain.

These claimed features bear little resemblance to the escrow arrangements discussed in *Alice* and *Boom! Payments, Inc. v. Stripe, Inc.*, 839 F. App'x 528 (Fed. Cir. 2021), which are relied upon by Securitize. In *Alice*, the Supreme Court held that the claims were directed to the abstract concept of intermediated settlement because they merely used a computerized intermediary to reduce settlement risk between counterparties. 573 U.S. at 218–20. In *Boom!*, the Federal Circuit held that the claims were directed to the abstract "payment escrow," where a payment processor verified consummation of a transaction before releasing payment. 839 F. App'x at 532. In both cases, the claimed technological advancement implemented a financial transaction using generic computer parts. In contrast, the '560 Patent does not merely claim an abstract concept of "escrow" implemented on a blockchain; it recites a specific, new type of cryptographic architecture that improves an underlying function on a blockchain by permitting on-chain settlement for off-chain execution. This was previously impossible. It does so by

securely linking traditional trading orders and blockchain-based asset commitments and enabling otherwise incompatible trading systems to operate together. '560 Patent at 1:29–35; 4:47–5:6.

The '560 claims instead resemble those upheld in the *McRO* and *Koninklijke* cases. In *McRO*, the Federal Circuit held that the claimed methods of automatic lip synchronization using computer-implemented rules were patent-eligible because they recited specific rules governing how the desired result would be achieved. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313–15 (Fed. Cir. 2016). It was the rules themselves, and not the use of the computer, that resulted in the claimed improvement. Similarly, *Koninklijke* found that software patent claims directed towards data transmission error checking were patent-eligible; the Court emphasized that the claimed invention was directed to a non-abstract improvement because it was directed to a new methodology (of generating check data) that addressed situations not solved by prior art systems. *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1151–53 (Fed. Cir. 2019).

Here, the '560 Patent claims are similarly patent-eligible and not abstract. The claims specifically recite a series of particular cryptographic ordered steps in which the system creates a commitment transaction and an order transaction, signs both using the same cryptographic key, "mathematically verif[ies] that the order originated from the same entity," and places the order only after the signatures match. '560 Patent at 7:64–67, 13:51–53, claim 14. The claims set forth a new methodology that improves the function of the underlying technology. Securitize attempts to argue that the '560 Patent's claims "recite 'functional results … but do[] not sufficiently describe how to achieve those results.'" But, for the above reasons, this is incorrect.

The asserted claims also resemble those upheld in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). There, the Federal Circuit held that claims directed to a solution

"necessarily rooted in computer technology" to address a problem arising in computer networks were not abstract. *Id.* at 1257. The claims did not merely implement an already-known method on a computer; instead, the claims addressed a problem unique to the internet, making them patent-eligible. Here, the '560 Patent identifies a problem that existing trade system protocols were "not compatible with trading systems that trade digital transactional items," as described above. '560 Patent at 1:32–35; 2:52–59. And as in *CardioNet*, the Court should focus on the technological improvement actually recited by the claims rather than Securitize's oversimplified characterization of them as merely "escrow." *CardioNet, LLC v. InfoBionic, Inc.* 955 F.3d 1358, 1368–71 (Fed. Cir. 2020). The claims are not directed to an abstract idea under *Alice* step one.

**2. The '560 Patent claims recite an inventive concept under *Alice* step two.**

Even if the Court finds the claims are directed to an abstract idea, dismissal is improper because the claims recite an inventive cryptographic framework that was not well-understood, routine, or conventional under *Alice* step two. Securitize isolates familiar components such as processors, cryptographic keys, and distributed ledgers in a misleading attempt to argue that the '560 Patent was not inventive. (D.I. 25 at 8–10). Yet "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

The ordered combination of the '560 Patent discussed above is inventive. The patent requires cryptographic signatures for both a commitment transaction and an order transaction using the same cryptographic key, verifying that both transactions were signed using that key, and authorizing placement of the order only if verification succeeds. '560 Patent at claim 14. It improves blockchain technology by guaranteeing settlement of funds for every transaction that is approved since assets are secured before an order is matched, and authorization is provided only after verification occurs. *Id.* at 2:22–46. There is improved security against spoofed orders by

preventing fraudulent orders which appear to be backed by a committed order. *Id.* at 7:66–8:3. The claims recite a specific cryptographic framework that improves the underlying technology to allow for secure and validated cryptographic transactions.

All of the cases relied upon by Securitize, (Motion, pp. 8–10), are distinguishable from the present invention because they involved generic computer implementation of conventional trading, verification, or escrow activities. None of them claimed to solve a problem of interoperability between traditional and blockchain-based systems. The claims of the ’560 Patent recite significantly more than the abstract concepts Securitize identifies.

**B. The ’802 and ’496 Patents are directed to a patent-eligible subject matter.**

**1. Securitize did not meet its burden regarding representative claims.**

Securitize incorrectly relies on claim 13 of the ’496 Patent as being representative of *all* claims in both the ’802 and ’496 Patents, alleging that that all claims are “directed to the abstract idea of complying with rules when trading a security.” (Motion, at 10.) However, in doing so, Securitize ignores key differences between the ’496 and ’802 Patent claims. “Courts have declined to rule on a § 101 motion to dismiss when the accused infringer failed to meet its burden to show that its choice of representative claim is proper.” *Game Play Network, Inc. v. Potent Sys., Inc.,* No. 23-323-GBW, 2024 WL 3226214, at *6 (D. Del. Jun 28, 2024).

Although the ’802 and ’496 Patents are related, their claims have meaningful differences that impact their independent inventiveness such that claim 13 of the ’496 Patent is not representative of all claims. The ’802 Patent includes specific limitations in every claim that require “using at least one smart contract **separate** from an originating smart contract.” *See, e.g.,* ’802 Patent, claim 1 (emphasis added). This substantively impacts the functional benefits arising from the claimed invention. The ’802 Patent claims additionally require that a global registry stores indications relating to qualifications of SEC regulations and AML/KYC checks. *See, e.g.,*

’802 Patent, claim 1. None of these limitations are found in Securitize’s “representative” claim 13. Claim 13 also isn’t representative of other ’496 Patent claims, including claim 24, which has limitations pertaining to “determining a split ratio for a new split of security tokens . . .without updating token balances on the distributed ledger.” This, too, impacts the inventiveness of the claimed invention. Because claim 13 is not representative of the ’802 Patent or the ’496 Patent, this Court should decline to rule on Securitize’s Motion as to these patents.

**2. The ’802 and ’496 Patents are not directed to an abstract idea.**

Notwithstanding, Securitize’s arguments still fail. Securitize claims the ’802 Patent and ’496 Patents are abstract by improperly classifying them as being directed to “complying with rules when trading a security.” (D.I. 25 at 11.) But tZERO has solved a problem existing within blockchain technology itself, not in abstract financial transactions. The patents state “ERC20 [i.e., rules for building digital tokens] and Title 8 [i.e., Title 8 of the Delaware Code], individually and combined, do not cause security tokens 102 to automatically self-enforce compliance with SEC regulations” which is problematic in blockchain systems because there is no trusted intermediary to otherwise enforce such rules.’802 Patent at 10:5–8; ’496 Patent at 11:49–52. tZERO addressed that problem through self-enforcing security tokens that execute smart-contract-based compliance rules before completing transactions.

The claims recite this solution in detail. Claim 1 of the ’802 Patent requires a security token, compliance rules implemented using a separate smart contract, and a global registry referenced by those rules. “By storing the compliance rules 106 outside of the security token 102,” the compliance rules “may be updated without modifying the security token 102 itself” and “[m]ultiple types of security tokens 102 (e.g., issued by different companies) can access the same smart-contract-based compliance rule(s) 106.” *Id.* at 10:21–24, 10:44–46. This “may be cheaper, in terms of transaction costs, to replace a portion of the code . . . instead of replacing the code

encompassed by all the smart contracts." *Id.* at 11:21–26. This results in a more efficient system. The '496 Patent requires execution of smart-contract-based compliance rules that reference a global registry before transfer but does not require it to be separate. '496 Patent, claim 13.

The claims also require a particular global registry architecture. Both patents include investor-specific PII hashes that are "committed to the distributed ledger" and "updated when PII" changes. '802 Patent, claim 1; '496 Patent, claim 13. The PII "may be encrypted into a PII hash that is stored as an investor attribute" and when an investor's PII changes, "the PII hash in the investor element for the investor 120 . . . may be updated," permitting more efficient updates that utilize less resources due to this structure. '802 Patent at 13:44–46, 13:62–64; '496 Patent at 15:22–24, 15:41–42. The claims do not merely direct a computer to consult compliance information; they define how investor information is represented, committed to the distributed ledger, maintained, and used by smart-contract-based rules during a token transfer. Prior to this technological advance, regulated securities could not easily be traded in blockchain.

Securitize argues that because the '802 and '496 Patents are merely "complying with rules," the claims are abstract. (D.I. 25, p. 11.) But this is misplaced. *Beteiro* involved claims determining whether a wager was placed from a location where gambling was legal, and *SafeCast* involved claims consulting a rules database to determine whether an advertisement could be broadcast. *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1354, 1357 (Fed. Cir. 2024); *SafeCast Ltd. v. Google, LLC*, 703 F. Supp. 3d 1041, 1043–45 (N.D. Cal. 2023). These are distinguishable from the '802 and '496 Patents which do not merely receive information and make a compliance determination. They claim an architecture for a self-enforcing smart-contract that improves the underlying blockchain capabilities that in turn allows for self-enforcing transfers of tokens on the blockchain, which otherwise could not happen.

Securitize's reliance on *Identitii and Bprotocol* are also distinguishable. (D.I. 25, p. 12.) *Identitii* concerned "processing a financial transaction on the blockchain," where the asserted benefits "merely stem[med] from running an existing process (a financial transaction) on a new technology (the blockchain)." *Identitii Ltd. v. JPMorgan Chase & Co.*, No. 23-1095-GBW, 2026 WL 1506530, at *6–7 (D. Del. May 29, 2026). *Bprotocol* addressed "calculating currency exchange rates to perform transactions" using smart contracts and blockchain technology, without solving a technological problem in the blockchain itself. *Bprotocol Found. v. Universal Navigation, Inc.*, No. 25-cv-4214 (JGK), 2026 WL 369394 at *6–8 (S.D.N.Y. Feb. 10, 2026). The '802 and '496 Patent claims do not merely move an existing financial transaction or calculation onto a blockchain but represent a fungible, functional improvement to blockchain technology to enable self-enforcing transfers of tokens, that was previously not easily achievable. They address the problem where existing token standards did not cause security tokens to "automatically self-enforce compliance," and they claim an architecture governing whether a token transfer may occur at all. '802 Patent at 10:3–8; '496 Patent at 11:47–52.

Thus, unlike *Identitii* and *Bprotocol*, the asserted claims do not use blockchain merely as a new venue for performing or recording an existing process. They recite a particular token, rule-contract, and registry architecture that improves the token-transfer process itself. This differentiates the inventions from those in *Rady v. Boston Consulting Group, Inc.*, No. 2022-2218, 2024 WL 1298742, at *3 (Fed. Cir. Mar. 27, 2024) (Court finding the blockchain-related claims "recite generic steps and results—as opposed to a specific solution to a technological problem") (citation omitted). The asserted claims resemble those upheld in *McRO* and *DDR Holdings*. Like *McRO*, the asserted claims recite specific steps governing a new technological process, rather than merely claiming the result. 837 F.3d at 1313–15. The attempted transfer

triggers smart-contract-based compliance rules, those rules reference dynamically maintained registry information, and the token is transferred only upon execution of the rules. As in *DDR Holdings*, the patents address a problem arising in a particular technological environment and provide a solution rooted in that technology. 773 F.3d at 1257. Conventional token standards could transfer tokens but did not cause security tokens to "automatically self-enforce compliance." '802 Patent at 10:7–8; '496 Patent at 11:50–52. The claimed token, rule-contract, and global-registry architecture supplies that inventive functionality. As a whole, the claims are directed to specific architectures for self-enforcing security tokens, not the abstract idea of securities compliance. The claims are not directed to an abstract idea under *Alice* step one.

**3. The '802 and '496 Patent claims recite an inventive concept under *Alice* step two.**

Securitize attacks the individual components of the system, including network nodes, smart contracts, distributed ledgers, registries, and hash functions in order to argue lack of inventive concept. (D.I. 25 at 13–16). But the asserted claims must be evaluated as a whole, not as a collection of isolated components. *See BASCOM*, 827 F.3d at 1350. As discussed above, tZERO's inventions claimed in the '802 and '496 Patents enable a blockchain-based asset to be interoperable with decentralized technologies via self-enforcing security tokens. The claims for both patents address deficiencies in prior art wherein security tokens were incapable of self-enforcing SEC regulations ('802 Patent at 10:5–8; '496 Patent at 11:49–52); this is achieved through the self-enforcing architecture of the claims wherein smart contracts and registry information govern whether a transfer may proceed.

Securitize's reliance on *Identitii* and *Bprotocol* does not establish that the claimed arrangement was conventional. As discussed above, the patents in those cases used blockchain technology to implement or facilitate existing financial processes, rather than improve the underlying technology. *Identitii*, 2026 WL 1506530, at *6–8; *Bprotocol*, 2026 WL 369394, at

*6–8. Here, by contrast, the patents solve a deficiency in the function of blockchain through self-enforcing security tokens, compliance-rule smart contracts, and registry information prior to transfer. Claim 1 of the '802 Patent requires a compliance-rule smart contract that is "separate from an originating smart contract that implements the security token." '802 Patent, claim 1. The decision to keep the various smart contracts separate "may be cheaper, in terms of transaction costs, to replace a portion of the code . . . instead of replacing the code encompassed by all the smart contracts." *Id.* at 11:21-26. The separate on-chain global registry makes it cheaper to update affected portions of code when there are bugs or PII updates. '802 Patent at 11:18–27, claims 1, 8; '496 Patent at 12:63–13:5, claim 13. Securitize did not identify any authority holding that this particular combination was well-understood, routine, or conventional, because it wasn't.

Securitize further argues that the global registry and PII hashes are not inventive because they are conventional database and identifier features and refers to authorities with generic databases or hash functions. (D.I. 25 at 15–16.) But the '802 and '496 Patents require investor-specific PII hashes that are "committed to the distributed ledger" and "updated when PII" changes, which differs from conventional hashes. '802 Patent, claims 1, 8; '496 Patent, claim 13. The claims recite dynamically maintained ledger commitments that are used during execution of the compliance rules not previously known. Securitize's conventional-order argument overlooks the claimed architecture which improves the functionality of the blockchain. (D.I. 25 at 16.) Describing the claims as merely receiving information, verifying it, and authorizing an action ignores the invention's contributions as a whole and the functional purpose underlying every limitation. The claimed order and function differs from the conventional sequence discussed in *Prism Technologies LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1016–18 (Fed. Cir. 2017), and *Alto Dynamics, LLC v. Wayfair LLC*, 687 F. Supp. 3d 179, 188–89 (D. Mass. 2023).

The ’496 Patent independently recites a specific solution to distributed-ledger constraints through, for example, its token-split claims. Claim 24 includes limitations “determining a split ratio for a new split of security tokens” and “without updating token balances on the distributed ledger.” ’496 Patent, claim 24. Updating token balances following a split may require separate transactions for individual token holders; however, these transactions consume “gas” and “upper gas limits” (blockchain-related fees) which can make updating all balances costly and time-consuming since updating balances can occur frequently on a blockchain. ’496 Patent at 16:43–53. Rather than immediately updating every holder’s balance, “the present systems and methods may simulate splits until an actual transfer of security token(s) 102 is made, thereby saving gas on unnecessary transactions” and improving the efficiency and resources of the system. *Id.* at 16:54–56. The Court should deny Securitize’s motion even if it reaches *Alice* step two.

**C. The ’996 Patent is directed to a patent-eligible subject matter.**

**1. The ’996 Patent claims are not directed to an abstract idea.**

Securitize characterizes the ’996 Patent as abstract because it is directed to “restricting the transfer of an asset to a verified recipient on a whitelist.” (D.I. 25 at 20, 22.) But this oversimplifies the function of the claimed invention by omitting the problem identified by the patent and its offered solution. The ’996 Patent improves verifications on a blockchain via a process that requires whitelist verification and actual control over a target address before permitting transactions. This prevents a customer from “inadvertently purchas[ing] tokens when the customer cannot withdraw them,” ’996 Patent at 3:23–34, and results in improvements such as preventing invalid transactions and congestion and safety from malicious transfers since users are required to prove control over a wallet via cryptographic signatures *Id.* at 3:45–58.

The ’996 Patent solves a specific problem faced by transactions on a blockchain and discloses steps for an improved verification function. Claim 1 recites a specific pre-transfer

cryptographic protocol for verifying that a target address is cryptographically derivable from the private key that signed the request in order to confirm the recipient address belongs to the party requesting a withdrawal. This is a solution to a problem existing on blockchain, not the generalized concept of verifying a recipient, as argued by Securitize. In addition to verifying the whitelist status of an account, the system requires a user to prove control over a wallet via cryptographic signatures before a transaction takes place; it obtains data signed with a private key and verifies "that the transaction address corresponds to the private key that corresponds to the transaction address the user indicated was the intended destination for the regulated token and that the transaction address is on the appropriate whitelist." '996 Patent at 3:40–50, claim 1. Consistent with that disclosure, claim 1 requires a processor-implemented cryptographic verification function that determines whether "the target transaction address is cryptographically derivable from the private key used to cryptographically sign the cryptographically signed data" and "the target public key associated with the target transaction address is cryptographically derivable from the private key." '996 Patent, claim 1. The claim verifies that the target appears in a "smart contract-implemented whitelist" and permits the transfer only after both conditions are satisfied. *Id.* This is a two-step verification design intended to prevent invalid transfers or attacks on a wallet on a blockchain that improves existing function.

Securitize argues that the '996 Patent claims are abstract because they are similar to those in *Universal Secure Registry LLC v. Apple, Inc.*, 10 F.4th 1342 (Fed. Cir. 2021). (D.I. 25, p. 22.) However, the claims in that case received a transaction request, mapped a code to a user identity, checked restrictions, and ultimately enabled or denied a transaction. *Universal*, 10 F.4th at 1348–50. This is distinguishable from claim 1 of the '996 Patent because claim 1 does not simply authenticate a user before permitting a transaction. Instead, the patent discloses a specific

cryptographic protocol that verifies that an address is cryptographically derivable from a private key in order to confirm "the transaction address the user indicated was the intended destination for the regulated token" and that "the transaction address is on the appropriate whitelist." *See, e.g.,*'996 Patent at 3:45–49. The claim is not merely a generalized identity-authentication process discussed in *Universal*. For similar reasons, *Caselas, LLC v. VeriFone, Inc.*, No. 2023-1326, 2024 WL 2720092 (Fed. Cir. May 28, 2024), does not establish that the claims are directed to abstract underwriting. Securitize reduces the '996 Patent to checking information before completing a transaction. (D.I. 25 at 22.) But the claims do not merely assess a recipient's qualifications; Securitize ignores the functional requirements and ordered process of the claims. *See* '996 Patent, claim 1.

Nor are the claims result-oriented under *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017); Securitize argues that because the patent does not prescribe a particular "improvement to cryptography, public/private-key architecture, smart contracts or computer functionality" the claims "recite desired outcomes." (D.I. 25 at 22–23.) But Section 101 does not require the claim to invent a new cryptographic algorithm or that each individual limitation be an improvement of each underlying function. The function and improvements of the claims as a whole, rather than their individual parts, are an improvement to the function of blockchain, and do not merely claim the result.

Securitize's reliance on *Checksum Ventures, LLC v. Dell Inc.*, 412 F. Supp. 3d 906, 915–16 (N.D. Ill. 2019), and *In re AuthWallet, LLC*, No. 2022-1842, 2023 WL 3330298, at *3–4 (Fed. Cir. May 10, 2023), likewise fails because those cases addressed the use of known cryptographic and authentication techniques, standing alone. Here, by contrast, the claims create a new function within blockchain utilizing cryptographic verification as part of the transfer-control mechanism

discussed above, requiring both cryptographic derivation verification and whitelist verification before a blockchain transfer may proceed, and contributing to an improvement to the underlying blockchain technology. ’996 Patent, claim 1. Like the claims in *McRO*, the ’996 Patent does not merely claim a desired result but recites specific rules governing how that result is achieved and improves blockchain functionality. *McRO*, 837 F.3d at 1313–15. Viewed as a whole, the claim is directed to a specific blockchain transfer-verification protocol, not an abstract idea.

**2. The ’996 Patent claims recite an inventive concept under *Alice* step two.**

Securitize argues there is no inventive concept while pointing to some of the individual components of the system, including network interfaces, processors, memories, public-private-key cryptography, whitelists, and blockchain technology. (D.I. 25 at 23–25.) But the asserted claims must be evaluated as a whole, not as a collection of isolated components. *See BASCOM*, 827 F.3d at 1350. The inventive concept resides in the transfer-verification protocol discussed above, which provides a solution to known problems within the blockchain space. The ’996 Patent claims prove both control of the destination address for transactions utilizing cryptographic private and public keys and a separate verification against a whitelist in order to permit transactions. ’996 Patent, claim 1. This “protect[s] the potential subsequent purchasers” by “implement[ing] a verification process prior to allowing a transfer of a regulated token” and further “protect[s] a potential subsequent purchaser from transacting for a token they cannot withdraw.” ’996 Patent at 8:66–9:2; 11:40–45. This improves the overall efficiency and reliability and prevents malicious orders by only permitting verifiable and approved transactions.

Securitize’s arguments regarding generic computer hardware and known blockchain technologies miss the point. (D.I. 25 at 23–24.) tZERO does not contend that processors, networks, cryptographic keys, or blockchains were invented by the patent. The relevant question is whether the claimed transfer-verification protocol was conventional. Nor do *Identitii*, *Rady*,

*Universal*, *Checksum Ventures*, or *AuthWallet* establish that the claimed arrangement was conventional. As discussed above, those cases involved using blockchain, authentication, or cryptographic techniques to implement existing financial or identity-verification processes. Those cases also did not involve the claimed combination of cryptographic derivation verification, independent whitelist verification, and communication of the transfer to the blockchain only after both conditions are satisfied. *See* '996 Patent, claim 1.

Securitize's conventional-order argument likewise overlooks the claimed protocol. (D.I. 25 at 24–25.) Unlike the conventional authentication-and-access sequences discussed in *Prism* and *Alto Dynamics*, the claimed steps govern whether a blockchain transfer may occur at all. '996 Patent, claim 1. The claim therefore recites more than a conventional ordering of generic computer functions. The Court should deny Securitize's motion even if it reaches *Alice* step two.

**D. The '078 Patent is directed to a patent-eligible subject matter.**

**1. The '078 Patent claims are not directed to an abstract idea.**

Securitize argues the '078 Patent is directed to an abstract idea by incorrectly characterizing the '078 Patent as "updating an investor's compliance status." (D.I. 25 at 17.) But the '078 Patent identifies and solves a problem that exists in decentralized token ecosystems; it teaches ongoing account monitoring for specific assets that ties the cost of renewal screening to the account holder in order to verify the status and control of the account. As an example, the patent identifies "a technical improvement over conventional methods of renewal KYC, AML, and/or accreditation investor" screening because the "initial payment and renewal cryptocurrency transaction would both be signed by the same private key," which allows the system to ensure "that the same individual (who was originally screened) still controls the address that is tagged or whitelisted." *Id.* at 4:49–60. The identity of an account holder is derived from cryptographic material, rather than being claimed and then checked, which improves the mechanism to confirm

status and ownership of the account. There is an economic proof arising from payment that originated from a specific transaction account and a cryptographic proof that the requester controls the account (via private keys). Requiring both forms of proof is a design decision inherent to the patented claims and the improved function for transfers on a blockchain.

Claim 1 implements that improvement through a specific challenge-response protocol. The claim requires "send[ing], by a first account, a challenge string to be signed by [a] private key," "receiv[ing] . . . the challenge string signed by the private key," "deriv[ing] a public key corresponding to the private key from the signature," "hash[ing] the public key," and "compar[ing] the hash of the public key to the transaction account." '078 Patent, claim 1. This ensures the signature is not stale. The verifier may validate the signature by "deriving the customer's public key 330 from the signature," "hashing the encoded public key 330," and "compar[ing] the resulting hash against the customer's tagged (or whitelisted) address on the distributed ledger." '078 Patent at 24:28–33. The claim further requires determining that "the payment of the amount of cryptocurrency was received at another account from the transaction account" before renewed screening occurs. '078 Patent, claim 1. These limitations establish a specific cryptographic process for verifying continued control of a previously screened blockchain address before renewing on-ledger permissions and compliance status.

These limitations are distinguishable from the authorities on which Securitize relies to argue that the '078 Patent is directed to an abstract idea. *Beteiro* concerned determining whether wagers complied with applicable law, while *Identitii* and *Bprotocol* involved performing financial transactions or calculations that merely implemented known concepts on blockchain technology, rather than improving the underlying technology. Here, by contrast, the '078 Patent offers an inventive solution to improve the functionality of transfers on a blockchain system by

utilizing challenge-response verification protocol that includes private-key cryptography to confirm continued control of a tagged or whitelisted blockchain address. The claims are not merely applying compliance rules to financial activity on a blockchain but provide a uniquely designed process for verifying transactions.

Nor are the claims result-oriented under *Two-Way Media*. Securitize argues that the claims merely recite functions such as "deriving," "hashing," and "determining." (D.I. 25 at 18.) But the '078 Patent specifies how those functions are performed through a particular sequence of cryptographic operations, including generation and signing of a challenge string, derivation of a public key from the resulting signature, comparison of a hash of that key to a blockchain transaction account, and verification that payment originated from that account before renewed screening occurs. '078 Patent, claim 1. Unlike the claims in *Two-Way Media,* the specific limitations in the claim as a whole prescribe how the transfer is validated rather than merely claiming the result of secure transfer. Securitize's suggestion that a human could perform the claimed process is similarly misplaced. (D.I. 25 at 18). The claims require recovering a public key from a digital signature and comparing a hash of that key against a distributed-ledger account before updating smart-contract whitelist status. Those computer-based cryptographic operations have no practical offline analog and are not capable of being implemented by a human mind. Viewed as a whole, the claims are directed to a specific cryptographic protocol for verifying continued control of a blockchain address that improves the function and security of transactions on a blockchain, not the abstract idea of updating an investor's compliance status.

**2. The '078 Patent claims recite an inventive concept under *Alice* step two.**

Even if the Court concludes that the claims are directed to an abstract idea, the claims nevertheless recite an inventive concept. Securitize attacks individual claim elements such as cryptocurrency payments, public and private keys, hashing, distributed ledgers, and smart-

contract whitelists as not being inventive. (D.I. 25 at 18–19). But this applies an incorrect standard because the inventive-concept analysis considers the ordered combination of claim elements rather than each element in isolation. *BASCOM*, 827 F.3d at 1350.

Claim 1 does not merely recite cryptocurrency payments, public and private keys, hashing functions, distributed ledgers, and smart contracts in isolation. Instead, it requires a specific verification protocol that ties renewal screening and ledger-based permissions to continued control of a previously screened blockchain address in order to properly authorize accounts and renewals. Claim 1 requires both proof that payment originated from the transaction account and proof that the account owner currently controls the corresponding private key before renewed screening occurs. '078 Patent, claim 1. This is "a technical improvement over conventional methods of renewal KYC, AML, and/or accreditation investor screening" because it ensures "that the same individual (who was originally screened) still controls the address that is tagged or whitelisted," which matters for transactions in a decentralized ecosystem. '078 Patent at 4:49–60.

Securitize's authorities do not establish that this ordered combination was conventional or well-known. Neither *Prism* nor *Identitii* involved the claimed combination of challenge-response verification, derivation of a public key from a digital signature, comparison of a hash of that key to a tagged blockchain account, and automated modification of blockchain permissions based on the result. The claims therefore recite significantly more than the abstract idea Securitize identifies. Thus, the Court should deny Securitize's motion even if it reaches *Alice* step two.

**E. The allegations in the Counterclaims raise factual disputes that preclude dismissal.**

The Counterclaims allege that the Asserted Patents reflect "significant technological advancements in blockchain-based systems" and that their claimed elements, "both individually and as ordered combinations, were not well understood, routine, or conventional." (D.I. 15 ¶ 20.) They further allege that the claimed features represent "nonconventional approaches that

improve the security, reliability, integrity, and regulatory compliance of digital-securities systems." (*Id.* ¶ 21.) Securitize's assertion that these allegations must be disregarded as legal conclusions is contrary to Federal Circuit precedent, which recognizes that allegations regarding technological improvements and whether claimed arrangements were well understood, routine, or conventional are factual allegations that must be accepted as true on a motion to dismiss. *See Aatrix*, 882 F.3d at 1126–28; *Cellspin*, 927 F.3d at 1317–18; *Berkheimer*, 881 F.3d at 1368.

That certain individual components were known does not defeat these allegations because "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM*, 827 F.3d at 1350. Whether the claimed arrangements were well understood, routine, and conventional presents a factual question. *Berkheimer*, 881 F.3d at 1368–70. The prosecution histories are consistent with that conclusion. Four of the five Asserted Patents overcame Section 101 rejections during prosecution. Although the '496 Patent was not separately rejected under Section 101, it is a continuation of the '802 Patent and shares the same specification that was subjected to such scrutiny. At minimum, those histories underscore that patent eligibility and conventionality were not so clear-cut that they can be resolved against tZERO as a matter of law on the pleadings. Accordingly, even if the Court reaches Alice step two, tZERO's allegations preclude dismissal under Section 101.

## VI. CONCLUSION

The Asserted Patents are directed to specific technological improvements to blockchain-based systems, not abstract ideas. The claims recite inventive concepts and present factual disputes regarding whether the claimed arrangements were well-understood, routine, and conventional. Dismissal under Section 101 is improper. Alternatively, if the Court identifies any deficiency in tZERO's allegations, tZERO respectfully requests leave to amend.

OF COUNSEL:

Kirk R. Harris
Maschoff Brennan
95 S State Street, Suite 800
Salt Lake City, UT 84111
(435) 252-1360
kharris@mabr.com

Erynn Embree
Maschoff Brennan
100 Spectrum Center Dr., Suite 1200
Irvine, CA 92618
(949) 202-1900
eembree@mabr.com

September 18, 2026

By: /s/ *Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Christine D. Haynes (#4697)
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
haynes@rlf.com

Attorneys for Defendants *tZERO Group, Inc. and tZERO IP, LLC*