IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SECURITIZE I, INC., | ) | |
| Plaintiff/Counterclaim-Defendant, | ) | |
| v. | ) | C.A. No. 26-722 (GBW) |
| TZERO GROUP, INC. and TZERO IP, LLC, | ) | |
| Defendants/Counterclaim-Plaintiff. | ) | |

**PLAINTIFF AND COUNTERCLAIM-DEFENDANT SECURITIZE I, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS TZERO IP, LLC'S AMENDED COUNTERCLAIMS**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff/Counterclaim-Defendant Securitize I, Inc.*

OF COUNSEL:

David J. Lisson
Micah G. Block
Thomas C. Horn
Natalie J. Stoecklein
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, CA 94063
(650) 752-2000

Rachael S. Bacha
Zhikun (David) Jiang
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

September 30, 2026

## TABLE OF CONTENTS

PAGE


I. The ’560 Patent Claims Are Patent Ineligible ........ 1

A. Step 1: The Claims Are Directed to an Abstract Idea ........ 1

B. Step 2: The Claims Fail to Recite an Inventive Concept ........ 3

II. The ’496 and ’802 Patent Claims Are Patent Ineligible ........ 4

A. Step 1: The Claims Are Directed to an Abstract Idea ........ 4

B. Step 2: The Claims Fail to Recite an Inventive Concept ........ 6

III. The ’996 Patent Claims Are Patent Ineligible ........ 8

A. Step 1: The Claims Are Directed to an Abstract Idea ........ 8

B. Step 2: The Claims Fail to Recite an Inventive Concept ........ 10

IV. The ’078 Patent Claims Are Patent Ineligible ........ 11

A. Step 1: The Claims Are Directed to an Abstract Idea ........ 11

B. Step 2: The Claims Fail to Recite an Inventive Concept ........ 12

V. The Counterclaims’ Conclusory Allegations Must Be Disregarded ........ 13

VI. Conclusion ........ 13

## TABLE OF AUTHORITIES

PAGE

**Cases**

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013) .......... 2

*Am. Axle & Mfg. v. Neapco Holdings LLC*,
967 F.3d 1285 (Fed. Cir. 2020) .......... 7, 8

*Beteiro, LLC v. DraftKings Inc.*,
104 F.4th 1350 (Fed. Cir. 2024) .......... 4, 11

*Boom! Payments Inc. v. Stripe, Inc.*,
839 F. App'x 528 (Fed. Cir. 2021) .......... 3, 4

*Bprotocol Found. v. Universal Navigation, Inc.*,
2026 WL 369394 (S.D.N.Y. Feb. 10, 2026) .......... passim

*Brumfield, Tr. for Ascent Tr. v. IBG LLC*,
97 F.4th 854 (Fed. Cir. 2024) .......... 11

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) .......... 6

*CardioNet, LLC v. InfoBionic, Inc.*,
955 F.3d 1358 (Fed. Cir. 2020) .......... 3

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014) .......... 6

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) .......... 3

*Identitii Ltd. v. JPMorgan Chase & Co.*,
2026 WL 1506530 (D. Del. May 29, 2026) .......... passim

*In re Greenstein*,
774 F. App'x 661 (Fed. Cir. 2019) .......... 8

*Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*,
50 F.4th 1371 (Fed. Cir. 2022) .......... 6, 13

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
942 F.3d 1143 (Fed. Cir. 2019) .......... 3

*McRO, Inc. v. Bandai Namco Games America Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) ........................................ 2, 3

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ........................................ 8

*Prism Technologies LLC v. T-Mobile USA, Inc.*,
696 F. App'x 1014 (Fed. Cir. 2017) ........................................ 12

*Rady v. Bos. Consulting Grp., Inc.*,
2024 WL 1298742 (Fed. Cir. Mar. 27, 2024) ........................................ 7

*SafeCast Limited v. Google, LLC*,
703 F. Supp. 3d 1041 (N.D. Cal. 2023) ........................................ 5

*Sanderling Mgmt. Ltd. v. Snap Inc.*,
65 F.4th 698 (Fed. Cir. 2023) ........................................ 13

*Schoeneckers, Inc. v. Kobie Mktg., Inc.*,
2026 WL 1587261 (D. Del. June 3, 2026) ........................................ 13

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) ........................................ 13

*Simio, LLC v. FlexSim Software Prods., Inc.*,
983 F.3d 1353 (Fed. Cir. 2020) ........................................ 13

*Synopsys, Inc. v. Mentor Graphics Corp.*,
839 F.3d 1138 (Fed. Cir. 2016) ........................................ 1

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed. Cir. 2017) ........................................ 11

*Universal Secure Reg. LLC v. Apple Inc.*,
10 F.4th 1342 (Fed. Cir. 2021) ........................................ 4, 9

tZERO's Opposition confirms that the asserted claims are directed to fundamental economic activities—escrow, complying with securities rules, updating an investor's compliance status, and restricting transfer of an asset to a verified recipient on a whitelist—and contain no inventive concept. Instead of identifying any specific technological improvement in its claims, tZERO submits jargon and references to unclaimed aspects of the specification. But the § 101 inquiry focuses on the claims themselves, not what is unclaimed. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016). And desired business outcomes—*e.g.*, "guaranteeing settlement of funds," D.I. 27 at 3, "self-enforcing SEC regulations," *id.* at 15, and "preventing invalid transactions," *id.* at 17—are not technological improvements.

tZERO does not help itself by invoking Securitize's Registration Statement that ***"[t]he Internet financial system*** . . . represents a fundamental shift that we believe will result in a profound change to the existing ***financial system***." *Id*. at 2 (emphasis added). Contrary to tZERO's description, this statement makes no reference to tZERO's technology. *Id*. And using the Internet to perform economic practices long prevalent in our financial system, which tZERO's patents purport to claim, is not patentable. The Amended Counterclaims must be dismissed with prejudice.

## I. THE '560 PATENT CLAIMS ARE PATENT INELIGIBLE

### A. Step 1: The Claims Are Directed to an Abstract Idea

The '560 Patent states that it "relate[s] to trading," D.I. 15-2 at 1:20-21, a fundamental economic activity. Its claims recite a process that the patent itself analogizes to an escrow. D.I. 15-2 at 11:54-56 ("The customer committed wallet may be used to secure digital transactional items committed in future orders, ***akin to an escrow account***.") (emphasis added). To wit, the claimed process transfers an item into a committed account and releases the item upon confirmation of a signature match, which is intended to solve the non-technological problem of

"guaranteed settlement, transparency of ownership and easy money movement, and secure settlements." D.I. 15-2 at 2:47-49. That is an escrow.

While tZERO accuses Securitize of oversimplifying the patent, the steps Securitize identifies are as depicted in Figure 6 of the patent itself. D.I. 15-2, Fig. 6. tZERO invokes unclaimed aspects of the specification to contend that its patent offers a supposed "technological solution" for transforming communications protocols between different platforms. D.I. 27 at 7-8. But that is not what is claimed, and tZERO cannot import unclaimed aspects of the specification into the claims. *See Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) ("[T]he level of detail in the specification" cannot save a claim from being abstract because "the important inquiry for a § 101 analysis is to look to the claim.").

tZERO's reference to a purported "cryptographic verification framework," D.I. 27 at 8, similarly cannot change the nature of the claims. The Opposition describes the framework as requiring "a commitment transaction and an order transaction to be signed using the same cryptographic key that is verified before order placement." D.I. 27 at 8. But, as Figure 6 shows and the claim language confirms, that simply means confirming that the same party signed the first transaction and the second transaction—the same function of signature matching that a human escrow agent performs. The patent admits that public/private-key cryptography, signing, and blockchains were all "well-known," *see* D.I. 15-2 at 3:13-25, 5:52-63, and the claims do not recite any specific way in which these functions are to be performed, confirming that the claims do not recite technological improvements but simply the use of generic tools to perform the business practice of an escrow.

The caution in *McRO, Inc. v. Bandai Namco Games America Inc.* not to oversimplify and "fail[] to account for the specific requirements of the claims" does not help tZERO here. 837

F.3d 1299, 1313 (Fed. Cir. 2016).[1] The claims in that case contemplated the use of specific rules "to set the morph weights and transitions between phonemes." *Id.* Here, the claims recite the fundamental steps of an escrow using admittedly "well-known" tools, not any change to any technology. Similarly, the claims held to be patent-eligible in *Koninklijke* are far afield because they provided a specific implementation for generating check data differently than in the prior art. 942 F.3d 1143, 1151 (Fed. Cir. 2019). And rather than "broadly and generically claim 'use of the Internet' to perform an abstract business practice," the claims in *DDR Holdings* specified how clicking a hyperlink on the Internet would change from the expected result of directing to one website and would instead generate a new webpage and redirect a visitor to that page. 773 F.3d 1245, 1258-59 (Fed. Cir. 2014). The claims of the '560 Patent do nothing of the sort—they instead use ***existing*** cryptographic and private/public key technology to implement an escrow using the same steps by which escrow has always been performed. They are thus directed to an abstract idea. *See Boom! Payments Inc. v. Stripe, Inc.*, 839 F. App'x 528, 532 (Fed. Cir. 2021).

**B. Step 2: The Claims Fail to Recite an Inventive Concept**

tZERO does not deny that each element of the '560 patent's claims was "familiar." D.I. 27 at 10. Further, the ordered combination of those elements is "merely the necessary steps of executing payment escrow and so do[es] not constitute an inventive concept." *Boom!*, 839 F. App'x at 533. Indeed, even tZERO's description of the combination as "guaranteeing settlement of funds . . . since assets are secured before an order is matched, and authorization is provided only after verification occurs," thus providing "improved security against spoofed orders,", D.I. 27 at 10, offers only and exactly what is expected of an escrow. *See Boom!*, 839 F. App'x at 532

[1] *CardioNet* is similarly inapplicable given that the '560 Patent itself refers to the use of the items it discloses being "akin to an escrow account." 955 F.3d 1358, 1358 (Fed. Cir. 2020); D.I. 15-2 at 11:54-56.

("[V]erifying consummation of a transaction before releasing payment by a third party . . . is the definition of escrow."). The claims do not recite a specific cryptographic framework and, as discussed in Section I.A, do not purport to solve any interoperability problem. The only cryptographic elements they require are "signing," a "cryptographic key"/"private key," and "verifying." These are generic cryptography functions, which the patent states may be done "as well known in the art." D.I. 15-2 at 3:13-28. The claim elements are thus "merely a combination of known authentication techniques that yields only expected results" and provide no inventive concept. *Universal Secure Reg. LLC v. Apple Inc.*, 10 F.4th 1342, 1353 (Fed. Cir. 2021).

## II. THE '496 AND '802 PATENT CLAIMS ARE PATENT INELIGIBLE

### A. Step 1: The Claims Are Directed to an Abstract Idea

tZERO's own framing of the '496 and '802 Patents confirms that their claims are directed to an abstract idea. tZERO admits that the problem the patents attempted to solve was the need to enforce compliance with SEC regulations and that the claimed solution is simply complying with regulations before completing a transaction. D.I. 27 at 12. That is a fundamental business practice and an abstract idea. Restating the need to comply with SEC regulations as a shortcoming of blockchain technology does not convert it into a technological problem. *See Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1357 (Fed. Cir. 2024) ("[C]hecking legal compliance [is] rooted in the abstract—they are legal problems, not technical problems").

While tZERO asserts that the claims recite their solution "in detail," the purported detail simply describes the basic steps of ensuring compliance with rules before performing a transaction, as identified in Securitize's brief and depicted in Figure 3 of the patents. D.I. 25 at 10-11; D.I. 15-3, Fig. 3. The only purported technological detail that tZERO identifies is the use of a "global registry" in all claims and that the compliance rules reside in a smart contract separate from the security token in the '802 Patent's claims. D.I. 27 at 12-13. But the patents

teach that the registry "could be a traditional database," D.I. 15-3 at 13:9-19, 12:50-54, and the "PII hash" claimed therein is simply personally identifiable information encrypted with a generic hash function, D.I. 15-3 at 15:16-24. Storing information about an investor in a registry is a basic compliance function, and using a conventional tool such as a database to do so is not an improvement in technology. Similarly, housing compliance rules in a separate smart contract does not change the nature of the claims—they are directed at complying with rules when trading a security, regardless of where those rules are located. Smart contracts are conventional, and housing compliance rules in a smart contract separate from the one implementing the securities token is analogous to what securities brokers have always done: the document recording a security would not contain the full text of every applicable regulation but instead may reference those regulations, which are set out in separate documents. And the "solution" is recited at such a high level of abstraction that it cannot constitute a technical improvement. There are no details describing ***how*** to implement the security token, global registry, or the compliance rules.

tZERO asserts that *Beteiro* and *SafeCast* are inapplicable because the claims in those cases "merely receive information and make a compliance determination." D.I. 27 at 13. But that is exactly what the claims do here. *See* D.I. 15-3, Fig. 3. *SafeCast* is directly on point—there, the claims referenced using a "rules database" to determine when advertisements could be broadcast under applicable regulations, and the court found them abstract. 703 F. Supp. 3d 1041, 1051-52 (N.D. Cal. 2023). In contrast, *McRO* and *DDR Holdings* do not apply for the reasons discussed above. *See supra* Section I.A.1. The claims in *McRO* recited the specific rules that were the technological advance; here, the claims recite no rules, only that "compliance rules" are executed. Because tZERO's claims use known blockchain technology for the fundamental business process of ensuring compliance with regulations before executing a trade, they are directed to an abstract

idea. *Identitii Ltd. v. JPMorgan Chase & Co.*, 2026 WL 1506530, at *6-7 (D. Del. May 29, 2026); *Bprotocol Found. v. Universal Navigation, Inc.*, 2026 WL 369394, at *6 (S.D.N.Y. Feb. 10, 2026).

Finally, in its Opening Brief, Securitize explained why all the challenged claims relate to the same abstract idea and the non-representative claims fail to add any inventive concepts that would result in patent eligibility. D.I. 25 at 10-11; *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348-49 (Fed. Cir. 2014). To argue otherwise, tZERO primarily relies on the fact that the '802 Patent claims require separate smart contracts for the token and compliance rules. D.I. 27 at 11-12. However, because that feature does not render those claims non-abstract, tZERO's argument fails.[2] tZERO's remaining arguments relate to including information on SEC qualifications and AML/KYC checks in the registry or reciting security splits, but those elements do not change the nature of those claims. Those are all admittedly well-known financial concepts. D.I. 15-3 at 3:8-24, 7:1-20, 4:44-59.

**B. Step 2: The Claims Fail to Recite an Inventive Concept**

The '802 and '496 Patents also lack an inventive concept as they claim nothing beyond implementing the abstract idea using conventional blockchain technology. *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1379 (Fed. Cir. 2022). tZERO's arguments regarding the "self-enforcing" nature of the security token in the claims merely restate the abstract idea, *supra* Section II.A, and so cannot provide an inventive concept. *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018).

Notably, the '802 and '496 Patents do not purport to claim a particular "architecture," D.I. 27 at 16, a word that appears in neither patent. That the PII hashes "are committed to the

[2] tZERO's heavy (though mistaken) reliance on this element for the '802 Patent reinforces the ineligibility of the '496 Patent's claims, which have no such feature.

distributed ledger" is not an inventive concept. A "distributed" ledger is just a distributed database, D.I. 15-3 at 13:9-15, 18:34-43, and "recording information . . . on a blockchain, rather than another type of ledger," provides no inventive concept. *Rady v. Bos. Consulting Grp., Inc.*, 2024 WL 1298742, at *5 (Fed. Cir. Mar. 27, 2024). The claims' requirement that "each . . . PII hash is updated when PII of a respective investor . . . changes," D.I. 15-1 at cls. 1, 9, 16; D.I. 15-3 at cls. 1, 13, only specifies the type of information stored on the blockchain (updated PII hashes), but even where it "may be useful," "recording a particular type of information . . . to a blockchain" provides no inventive concept. *Rady*, 2024 WL 1298742, at *4-5.

tZERO again highlights that the compliance-rule smart contract is separate from the smart contract that implements the security token in the '802 Patent. D.I. 27 at 16. That is irrelevant to the '496 Patent claims. In any event, the patents themselves show that using an originating smart contract for a token and a separate smart contract interacting with the token was well-understood, routine and conventional. Both patents incorporate the ERC20 standard "by reference in its entirety." D.I. 15-1 at 1:43-46, D.I. 15-3 at 1:52-53. ERC20 discusses both "tokens within smart contracts" and "other contracts" that interact with the token, Ex. 1 (ERC20) at 1, 2, including the need for "[t]he contract" implementing the token to have "backwards compatibility with contracts deployed before." *Id.* at 3. *Bprotocol* also considered a separate "rule smart contract" in the claims at issue ("a smart contract that determines at least one rule for performing a transaction related to a first cryptocurrency token") and found that the claimed smart contracts provided no inventive concept. 2026 WL 369394, at *2, *7.

Nor is there any inventive concept in a "separate on-chain global registry" or other "various smart contracts [that are] separate," D.I. 27 at 16, because neither feature is claimed. *Am. Axle & Mfg. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020). The only

features that the claims require to be "separate" are the "compliance rules . . . smart contract" and the "originating smart contract" in the '802 Patent, as discussed above. tZERO's cited excerpts suggest benefits of "implementing the global registry 108 using multiple smart contracts 128-134," D.I. 15-1 at 11:18-27, but tZERO omits that a global registry may equally "be a database that stores attributes . . . on the distributed ledger ***without utilizing*** smart contracts 128-134." *Id.* at 11:36-40 (emphasis added). Because the claims do not require a separate global registry or to keep other smart contracts separate, these ideas cannot provide an inventive concept.

Finally, the '496 Patent claims 12 and 24 that require token splitting do not provide an inventive concept either. "[S]plit" in the patent "is used to refer to a forward [or reverse] stock split," D.I. 15-3 at 4:60-67, which the patent acknowledges is an existing financial practice, *id*. at 4:44-59. Adding such a split to the other claim elements is "[a]dding one abstract idea . . . to another," which is "not something 'more,' let alone anything 'significantly more,' than the abstract idea itself." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1318 (Fed. Cir. 2021). The specification's statement that "the present systems and methods may simulate splits" also does not provide an inventive concept, at least because simulating a split is not in any claim. *Am. Axle*, 967 F.3d at 1293. Even if tZERO argues that "simulat[ing] splits" refers to the claimed "determin[ing] a split ratio . . . without updating token balances," D.I. 15-3 cls. 12, 24, the patent's description of "determining a split ratio" confirms that it requires no more than dividing two numbers that are provided. *Id.* at 29:7-12. "[U]sing a computer to perform arithmetic does not provide an inventive concept." *In re Greenstein*, 774 F. App'x 661, 665 (Fed. Cir. 2019).

## III. THE '996 PATENT CLAIMS ARE PATENT INELIGIBLE

### A. Step 1: The Claims Are Directed to an Abstract Idea

tZERO admits that the '996 Patent purports to solve the non-technical problem that an individual may inadvertently purchase tokens they are not permitted to withdraw. D.I. 27 at 17.

The solution the patent purportedly offers is simple and likewise non-technical: perform identity and authorization checks to make sure that the customer can withdraw the token before allowing the transaction. *See* D.I. 25 at 22. tZERO's assertion that performing these conventional identity and authorization checks on a blockchain is an improvement to the blockchain itself is wrong. Claims fail to recite an improvement in technology where they merely "run[] an existing process (a financial transaction) on a new technology (the blockchain)." *Identitii*, 2026 WL 1506530, at *6. And the alleged benefits of the claims—avoiding invalid transfers, congestion, and malicious transfers—are ***desired business outcomes***, not improvements to cryptography, the blockchain, or computers. D.I. 27 at 17-18; D.I. 25 at 20-23.

tZERO's emphasis on "actual control" and two-step verification does not make the claims directed to a technical improvement. D.I. 27 at 18-19. The tools the claims use to perform those functions—public/private-key cryptography, address derivation, digital signatures, smart contracts, and blockchains—are all admittedly conventional computer components. D.I. 15-4 at 1:24-32, 4:34-58, 5:59-67. tZERO does not dispute that the claims fail to recite any new cryptographic algorithm or key architecture. *See* D.I. 27 at 19. The patent simply uses the private key to sign data, asks whether the target address or public key is derivable from that key, and then checks authorization. That is conventional cryptographic authentication used here to determine whether or not to permit a transaction.

As in *Universal*, the '996 Patent claims receive a transaction request, verify that the purported recipient satisfies an authentication/authorization condition, and enable or deny the transaction. 10 F.4th at 1348-52. Substituting a known cryptographic key/address-derivation check for the time-varying code in *Universal* does not alter the claim's abstract nature. And while tZERO claims the '996 Patent discloses a "specific cryptographic protocol," it fails to explain how that

protocol is anything but an overcomplicated recitation of conventional steps, as outlined in Securitize's opening brief and shown in Figure 3. D.I. 25 at 20-22; D.I. 15-4, Fig. 3.

Ultimately, tZERO fails to explain how the claims, comprised entirely of conventional technologies used in conventional ways, constitute an improvement to blockchain functionality. *See Identitii*, 2026 WL 1506530, at *6. They do not. Rather, as the patent itself acknowledges, those claims are directed to solving a business problem and performing a fundamental economic activity. D.I. 15-4 at 3:23-38; D.I. 25 at 22.

**B. Step 2: The Claims Fail to Recite an Inventive Concept**

Contrary to tZERO's assertion, the alleged "transfer-verification protocol" does not supply an inventive concept. D.I. 27 at 20-21. Despite this technical-sounding jargon (which does not appear in the patent), the "transfer-verification protocol," as described by tZERO itself, is simply verifying that the person who controls the destination account is on a whitelist before permitting the transfer. That is not a technological advance.

As confirmed in Figure 3 of the patent, the claimed steps are conventional: receiving a transaction request, verifying the identity of a purchaser, and deciding whether to approve or deny is the expected sequence for any authorized transaction. D.I. 15-4, Fig. 3; D.I. 25 at 24. That the claims require both "cryptographic derivation verification" and "whitelist verification" merely states the expected (and conventional) gating conditions. D.I. 27 at 20. Nor does tZERO provide any explanation for its conclusory (and incorrect) statement (D.I. 27 at 21) that there is non-conventional or inventive ordering of these steps in its claims.

The alleged benefits of the '996 Patent—protecting purchasers from tokens they cannot withdraw, reducing congestion, and preventing malicious transfers—are the desired business outcomes of implementing the abstract idea of restricting transfers to authorized recipients, D.I.

27 at 17-18, 20-21, and cannot supply an inventive concept, *Brumfield, Tr. for Ascent Tr. v. IBG LLC*, 97 F.4th 854, 868 (Fed. Cir. 2024).

## IV. THE '078 PATENT CLAIMS ARE PATENT INELIGIBLE

### A. Step 1: The Claims Are Directed to an Abstract Idea

tZERO admits that the claims are directed to account monitoring that ties the cost of renewal screening to the account holder to verify the status and control of the account. D.I. 27 at 5, 21. Under *Beteiro*, checking legal compliance is an abstract idea, and charging the investor as opposed to a broker-dealer to do so does not render the idea any less abstract. *Beteiro*, 104 F.4th at 1357. The only purported "technical improvement" that tZERO's Opposition identifies in the patent is simply "[u]sing the cryptography of a blockchain" to ensure that the same person is renewing their compliance status. D.I. 15-5 at 4:49-60; D.I. 27 at 21-24. But using "existing . . . blockchain technology in predictable ways to address [an] economic problem" does not render a claim non-abstract. *Bprotocol*, 2026 WL 369394, at *7; *Identitii*, 2026 WL 1506530, at *8.

Although tZERO asserts that the limitations "establish a specific cryptographic process" for performing the monitoring, even tZERO's description of it is simply a description of admittedly standard blockchain technology. *Compare* D.I. 27 at 22 with D.I. 15-5 at 7:67-8:5, 9:8-16, 7:10-15, 24:28-33. Moreover, the claims fail to prescribe how the transfer is validated. For example, they recite validating the signature by, "deriving," "validating," "hashing," and "comparing" without reciting ***how*** any of that is done. Similarly, they recite "determining that the payment of the amount of cryptocurrency is received. . . and the signature is successfully validated" and "determining that the at least one of KYC, AML, and accredited investor review being performed again causes a status of the owner of the transaction account to change," D.I. 15-5 at cl. 1—those are ***results***, not recitations of how to achieve those results. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017). tZERO's

assertions that the claims recite a specific cryptographic process cannot overcome the patent's own acknowledgment that the specific cryptographic process they recite is "the cryptography of a blockchain" and that such cryptography is being used for a fundamental business practice. D.I. 15-5 at 3:32-57, 4:49-51. The claims are thus directed to that business practice, not any improvement to cryptography, and are abstract. *Bprotocol*, 2026 WL 369394, at *7.

**B. Step 2: The Claims Fail to Recite an Inventive Concept**

tZERO's Opposition does not deny that the claimed elements, including cryptocurrency payments, public and private keys, hashing, distributed ledgers, and smart-contract whitelists, were all conventional, as the patent's specification confirms. *See* D.I. 25 at 19. Instead, the Opposition asserts that the "technical improvement over conventional methods" is the "specific verification protocol" which "ties renewal screening and ledger-based permissions to continued control of a previously screened blockchain address" and "requires both proof that payment originated from the transaction account and proof that the account owner currently controls the corresponding private key." D.I. 27 at 24. But that "specific verification protocol" merely uses the blockchain to perform a traditional financial function—verifying the status and control of an account. It thus does not contain an inventive concept sufficient to save the claims. *See Identitii*, 2026 WL 1506530, at *7. tZERO attempts to assert that the ordered combination of elements constitutes an inventive concept. But reviewing an investor's status, receiving payment and confirming the investor's identity, repeating the review and then recording a change are conventional steps employed in a customary manner. *Prism Technologies LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1016-18 (Fed. Cir. 2017). The order in which these steps are laid out in the claims is exactly how one would go about checking compliance status for any individual.

## V. THE COUNTERCLAIMS' CONCLUSORY ALLEGATIONS MUST BE DISREGARDED

None of the allegations in tZERO's Counterclaims raise factual disputes precluding dismissal. tZERO never actually identifies any purported factual disputes nor any specific allegations in the Counterclaims that purportedly give rise to them. Nor could it. The allegations in the Counterclaims merely restate the legal standard—they allege that the claimed elements were "not well understood, routine, or conventional," D.I. 15 ¶ 20, which is precisely the type of conclusory assertion courts disregard. *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020); *Zillow*, 50 F.4th at 1379. They are also contrary to the patents' own specifications, which admit that elements recited in the claims were all conventional and are used in expected ways. *See, e.g.*, D.I. 15-2 at 3:13-16; D.I. 15-3 at 1:46-53; D.I. 15-4 at 4:34-58; D.I. 15-5 at 7:67-8:5; *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017). Finally, the fact that four of five Asserted Patents overcame § 101 rejections during prosecution is irrelevant: eligibility under § 101 is a question of law that courts decide without deference to PTO determinations. *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 705 (Fed. Cir. 2023).

## VI. CONCLUSION

For these reasons, tZERO's Amended Counterclaims should be dismissed with prejudice. Leave to amend should be denied, as tZERO's Opposition does no more than passingly request it, and further as another amendment would be futile. *Schoeneckers, Inc. v. Kobie Mktg., Inc.*, 2026 WL 1587261, at *7 n.11 (D. Del. June 3, 2026) ("[A] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought . . . does not constitute a motion . . .") (internal quotation marks and citation omitted).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Anthony D. Raucci*

Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff/Counterclaim-Defendant Securitize I, Inc.*

OF COUNSEL:

David J. Lisson
Micah G. Block
Thomas C. Horn
Natalie J. Stoecklein
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, CA 94063
(650) 752-2000

Rachael S. Bacha
Zhikun (David) Jiang
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

September 30, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on September 30, 2026, upon the following in the manner indicated:

Frederick L. Cottrell, III
Christine D. Haynes
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, DE 19801
*Attorneys for Defendants tZERO Group, Inc. and tZERO IP, LLC*

*VIA ELECTRONIC MAIL*

Kirk R. Harris
MASCHOFF BRENNAN
95 S. State Street, Suite 800
Salt Lake City, UT 84111
Attorneys for Defendants tZERO Group, Inc. and tZERO IP, LLC

*VIA ELECTRONIC MAIL*

Erynn Embree
MASCHOFF BRENNAN
100 Spectrum Center Dr., Suite 1200
Irvine, CA 92618
*Attorneys for Defendants tZERO Group, Inc. and tZERO IP, LLC*

*VIA ELECTRONIC MAIL*

*/s/ Anthony D. Raucci*

Anthony D. Raucci (#5948)